**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

ADVANCE TRUST & LIFE ESCROW SERVICES, LTA,
as securities intermediary for
LIFE PARTNERS POSITION HOLDER TRUST,
on behalf of itself and all others similarly situated,

      Plaintiff,

v.

SECURITY LIFE OF DENVER INSURANCE COMPANY,

      Defendant.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

Plaintiff Advance Trust & Life Escrow Services, LTA, as securities intermediary of Life Partners Position Holder Trust ("Plaintiff"), on behalf of itself and all others similarly situated, for its Complaint against defendant Security Life of Denver Insurance Company ("Security Life"), states as follows:

### <u>NATURE OF THE ACTION</u>

1.    This is a class action brought on behalf of Plaintiff and similarly situated owners of universal life insurance policies issued by Security Life. Plaintiff seeks to represent a class of Security Life policyholders who have paid and are being forced to pay unlawful and excessive cost of insurance ("COI") charges by Security Life. These policies are all standardized form policies issued on Security Life policy forms 1165-8/03 and 1166-3/04 and marketed under the product names Strategic Accumulator Universal Life (or Strategic Accumulator UL) and Life Design Guarantee Universal Life (or Life Design Guarantee UL) (the "Subject Policies").

2.      Security Life is one of several life insurer subsidiaries of Voya Financial, Inc. ("Voya").  Beginning in September 2015, Voya subsidiaries began announcing COI increases on certain legacy blocks of universal life insurance policies.  Universal life ("UL") policies combine death benefits with a savings or investment component, often known as the "account value."

3.      A key feature of such policies was the "unbundling" or "transparency" of the COI charges, other contractually-specified costs, and crediting rates. This means that the monthly deductions are broken down into an array of discrete charges.  The Dictionary of Insurance Terms describes unbundled universal life insurance as "coverage in which the investment features, mortality element and cost factors of a life insurance policy are separated, permitting each part to be independently analyzed."  The COI charge is the policy's unbundled insurance component and is used to cover the insurer's mortality risk.  It is also referred to in the industry as the "mortality charge" or the "pure cost of protection."  The savings component, as discussed in more detail herein, allows policyholders to use their policies as tax-advantaged savings vehicles and earn interest on the account value.

4.      For every policy at issue, the COI is listed as a charge that is separate from charges for other expenses and a premium charge from which Security Life earns a profit. Collectively, these charges constitute the total premium that a policyholder pays.  The COI charge is typically the largest part of that premium.  The COI charge is deducted from the policy owner's account value on a monthly basis, so the policyholder forfeits the COI charge entirely to Security Life.

5.      The COI charge is supposed to compensate Security Life for mortality risk, *i.e.*, the expected probability that the insured for that particular policy will die in a particular year. Security Life's parent company, Voya, maintains a "Life Insurance Glossary" on its website,

which defines "Cost of Insurance" as the deduction for "the pure death benefit protection" and is synonymous with "Mortality Charge":

### Cost of Insurance (COI)

Cost of Insurance (COI) is the automatic deduction made from the Accumulation Value on universal and variable universal life policies, for the pure death benefit protection. This cost is based on the net amount at risk under the policy, the insured's risk classification at the time of policy purchase and the insured's current age. The deduction occurs on a monthly basis. This is also known as Cost of Risk or Mortality Charge. Refer to your policy for the specific terms and conditions.

6.     The Subject Policies do not provide any alternative definition to "mortality charge" or "pure death benefit protection" for what the cost of insurance is supposed to pay.  The Subject Policies state that this cost of insurance rate "will be determined by us from time to time" and will be multiplied against the net amount at risk in order to determine monthly charges:

The cost of insurance for the policy is the sum of the cost of insurance for all segments. A segment's cost of insurance is the cost of insurance rate for the premium class for the segment multiplied by the net amount at risk allocated to the segment.  It is determined on a monthly basis.
***
The cost of insurance rate for each segment will be determined by us from time to time.[1]

7.     After issuance, an insurer is typically required to periodically review—as the contract requires here, "determined by us from time to time"—the COI rates to confirm that they correctly capture the insurer's projected mortality costs.   If the insurer's review reveals that

---

[1] The policies define "segment" to mean "a block of death benefit coverage."  The "premium class" of the insured is provided for on a schedule for every policy and it is the insured's underwriting classification and smoker status (e.g., Preferred Non-Smoker; Standard Non-Smoker), which are groups used to assess mortality risks.

projected mortality costs are lower than the corresponding COI rates, the insurer is required to reduce COI rates.

8.      Policyholders' comfort with this arrangement is based on trust that the insurer will dutifully adjust COI rates to reflect only the pure costs of mortality coverage. Security Life, however, has not only failed to live up to its end of the bargain in terms of decreasing rates as its mortality expectations improved—it has attempted to dramatically increase COI rates at the same time as it was projecting that mortality rates would continue to decline.

9.      In September 2015, Security Life sent letters to policyholders notifying them of significant COI increases for the Subject Policies.  The increase imposed on Strategic Accumulator UL policies was a massive 42%, which is costing Plaintiff hundreds of thousands of dollars each year.  For Life Design Guarantee UL, the increase was 9.25%, which also materially impacts the value of such policies.  Security Life's letters to policyholders were deliberately cryptic as to the reasons for the increases, making no mention of mortality experience and stating only that "[t]he increase in the cost of insurance rates was made in response to the increase in the anticipated cost of providing future coverage."

10.     There was no sudden change for the worse in Security Life's mortality expectations for the policies, as would be required to raise COI rates.  Nationwide mortality rates have declined significantly over the past several decades and this trend is widely projected to continue. That trend of improving mortality expectations should have resulted in the lowering of COI rates, not a massive raise.  Indeed, Security Life has itself stated that mortality experience has been more favorable than it originally expected and that it expects historic mortality improvement trends to continue.  For example, in its 2015 Annual Statement Exhibit 5, which was filed with each state and signed by Voya's Chief Actuary, Security Life stated that

"[r]egarding future experience, we expect historical mortality improvement trends…to continue." As a result, insureds are living longer than Security Life originally anticipated when the policies at issue were first priced and Security Life expects to pay out fewer death benefits on an annual basis. And if Security Life pays out fewer death benefits over time, then Security Life's "anticipated cost of providing future coverage" goes down, and the COI rate should correspondingly decrease.

11. Despite this improved mortality experience, however, Security Life has not only failed to lower the COI rates it charges its customers—it has increased them. Security Life's apparent motivation is profit and increasing the dividends paid to its parent company, Voya. When life insurers issue policies, they record deferred acquisition costs ("DAC"), which are designed to defer accounting charges for the up-front costs of commissions, marketing expenses, and product development. DAC is an intangible asset on the books of the insurer and amortized over the time the policy is in-force. The amortization of those costs, rather than the costs themselves, is recorded as an expense. The amount of amortization in a year is based upon the expectations of future cash flows compared with past and current cash flows, including COI charges. When COI rates are adjusted upwards in a way that increases expected future cash flows, it triggers an accounting process called "dynamical unlocking" whereby past amortizations are retroactively changed and released into the current year's earnings. The accounting benefit is immediate (as opposed to waiting until COI charges are actually collected), and the profit recognized in the year of increase greatly exceeds the amount of excess COI charges that are actually collected in that year.

12. In recent years, insurers have improperly used COI increases to trigger large, one-time dividends to their parent companies. In Security Life's case, the 2015 COI increase allowed

Security Life to pay an "extraordinary dividend" of $111 million to Voya in 2015, on top of a $111 million "ordinary dividend." This $241 million total dividend in 2015 constituted a 750% increase over the $32 million dividend that Security Life paid to Voya in 2014.  This confirms that the 2015 increase was not based on any increase in the *cost* of providing pure death benefit protection to Security Life's policyholders, but rather Security Life's and Voya's *profit* objectives and their desire to provide increased returns to Voya's shareholders. This is, of course, improper: Security Life is not allowed to bake profit margins into its COI rates, let alone increase COI rates to boost profits and trigger extraordinary dividends to its parent company.

13.     Security Life's manipulation of COI rates to load and increase profits is particularly egregious given that the policies at issue have various other unbundled and transparent mechanisms through which profits are already realized and other expenses are funded:

- A premium charge of 4% of each premium, which means that Security Life collects as profit 4% of all premiums paid by policyholders;
- A sales charge of 11% of each premium in the first 10 years;
- Monthly administrative charges;
- Per policy administrative charges;
- Loan charges; and
- Interest earned on account values in excess of the credited rate (known as the "interest spread").

14.     A reasonable policyholder would expect Security Life's profits to come from these other express provisions, not from COI charges.  Indeed, there is no plausible interpretation of "cost of insurance" that would include profits—the two terms (cost & profit) are antonyms.

15.     In sum, Security Life has violated the terms of the Subject Policies by failing to base cost of insurance rates on the projected cost of insurance.  In the face of the substantially

improved mortality experience that has benefited Security Life enormously, Security Life has not only failed to reduce COI rates—it has increased them.  Security Life apparently believes that it has the right to load COI rates with profit margins and other impermissible considerations unrelated to the actual costs of insurance, despite imposing separate charges for profits and expenses.  This position has no merit and is contrary to the well-established definition of "cost of insurance" and the reasonable expectations of insureds.  As a result of this misconduct, plaintiff seeks, among other things, monetary relief for the COI overcharges that Security Life has wrongly imposed and continues to impose on its customers.

## THE PARTIES

16.    Plaintiff Advance Trust & Life Escrow Services, LTA is organized under the laws of Texas and is located at 1401 New Road, Suite 200, Waco, Texas 76711.  Plaintiff is suing in its capacity as security intermediary of Life Partners Position Holder Trust and is the owner of the following Security Life policies that are subject to the 2015 COI Increase:

- Policy #1603978 (Policy Date: 5/17/2005; Initial Stated Death Benefit: $1,500,000)
- Policy #1605330 (Policy Date: 9/7/2005; Initial Stated Death Benefit: $3,215,799)
- Policy #1602412 (Policy Date: 12/28/2004; Initial Stated Death Benefit: $10,000,000)
- Policy #1617003 (Policy Date: 10/26/2007; Initial Stated Death Benefit: $1,000,000)
- Policy #1629065 (Policy Date: 3/17/2008; Initial Stated Death Benefit: $7,000,000)

17.    Defendant Security Life is a corporation organized and existing under the laws of Colorado and has its corporate headquarters at 8055 East Tufts Avenue, Suite 710, Denver, Colorado 80237.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over Plaintiff's claims because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000.  Security Life is incorporated and has its principal place of business in Colorado.  Plaintiff is a citizen of Texas and unnamed class members are citizens of states across the United States.  This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

19.     This Court has personal jurisdiction over Security Life because it is incorporated in Colorado and its principal place of business is in Colorado.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because Security Life is headquartered in this District and the events giving rise to Plaintiff's causes of action occurred in this District.

## FACTUAL BACKGROUND

### A.     The Policies at Issue

21.     The policies at issue are all flexible-premium, UL policies issued by Security Life in the mid-2000s.  They were all issued on the same standardized policy forms and insureds are not permitted to negotiate different terms.  Exhibit A to this Complaint is a representative policy (Policy #1603978), redacted for personal information.

22.     UL policies combine death benefits with a savings or investment component, often known as the "account value."  One benefit of UL policies is that they permit policyholders flexibility in the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other

specified expenses. The COI charge is deducted from the Policy Account (i.e., the savings component) of the policy on a monthly basis, so the policyholder forfeits the COI charge entirely to Security Life. Any premiums paid in excess of COI charges and other charges are applied to a policy's "Policy Account," sometimes known as "policy account value" or "cash value." These excess premiums earn interest at the credited rate. This structure is beneficial because it allows policyholders the choice to either (i) minimize their capital investment and generate greater rates of return through other investments or (ii) to use the UL policy as a savings vehicle and earn interest on the account value.

23.     The size of the COI charge is highly significant to universal life policyholders. First, it dictates the minimum amount of money that must be paid to keep a policy in force. Second, high COI rates can quickly diminish a policy's account value and reduces the amount of money on which interest can be earned.  Absent a secondary guarantee, if the policy account value diminishes such that COI charges can no longer be deducted, then the policy will go into grace and, if no additional premiums are paid after adequate time provided by an accurate grace notice, the policy may lapse.  Third, higher current and illustrated future COI rates reduce the value of a policy in the secondary and tertiary markets.

24.     Although many UL policies contain a table of guaranteed maximum COI rates, policies are marketed, illustrated, and sold based almost exclusively on the basis of current rates. The guaranteed rates are set far in excess of current rates—often as much as three times higher— and generally bear no connection to either current or projected rates.  If policies were marketed and sold based on guaranteed COI rates, virtually no one would ever buy a UL policy because the economics would not make any sense.  For example, Exhibit B to this Complaint is an August 19, 2015 illustration for Policy #1603978.  While Security Life was required, by statute,

to illustrate values under both guaranteed maximum rates and current rates, the "Guaranteed" columns are all populated with "0" even with a premium outlay of $227,463 per year. *See* Exhibit B at p. 4. These zeros are explained in a footnote that states: "In the event that the guaranteed costs were deducted and the guaranteed interest rate was paid from 8/19/2015 forward, the policy would lapse and cannot be illustrated beyond the year shown. Additional premiums [above the $227,463 per year] would be required to continue the coverage." In other words, the policy would lapse even if the $227,463 projected premium outlay were paid, and Security Life refused to even illustrate the premiums that would be required under the guaranteed rates. In contrast, under the then-current rates, the policy would remain in force through age 100 and have an account value of $765,561 by the nineteenth policy year. On page 7 of Exhibit B, Security Life provided another illustration that further breaks down the separate policy charges, including COI charges. This illustration is based solely on current rates—no similar illustration is provided under guaranteed rates, and there is no projection of what annual COI charges would be under guaranteed maximum rates. This is consistent with the way UL policies are always illustrated and marketed: the focus is on current rates, and no consumer expects to pay the guaranteed maximum rates (which the insurer will not even properly illustrate).

25.     The COI charge is part of the insurance component of a UL policy. It is supposed to be the insurer's cost of providing mortality coverage. Security Life's parent defines "Cost of Insurance" on its website as the charge for the "pure death benefit protection," and states that "Cost of Insurance" is synonymous with "Mortality Charge." The Society of Actuaries conducts actuarial exams for "Individual Life & Annuities United States – Design & Pricing," in which it instructs that "mortality charge" is an "equivalent or similar term" to "cost of insurance." And popular online dictionary sources, like BusinessDictionary, define "cost of insurance charge" as

follows: "Synonym for the mortality charge. The charge associated with the pure insurance protection element of a life insurance policy."[2]

26.     The Subject Policies do not provide any alternative definition of this well-known term, stating instead that the cost of insurance rate "will be determined by us from time to time" and will be multiplied against the net amount at risk in order to determine monthly charges.  The entirety of the COI language in the Subject Policies is set forth below:

> The cost of insurance for the policy is the sum of the cost of insurance for all segments.[3] A segment's cost of insurance is the cost of insurance rate for the premium class for the segment multiplied by the net amount at risk allocated to the segment. It is determined on a monthly basis.

> The net amount at risk is (a) minus (b) where:

>> a)  is the sum of (i) the base death benefit for each segment as of the monthly processing date after the monthly deductions (other than cost of insurance charges for the base death benefit and any riders), divided by (ii) the result of 1 plus the monthly equivalent of the guaranteed minimum interest rate as shown in the Schedule; and
>> b)  is your account value as of the monthly processing date after the monthly deductions (other than the cost of insurance charges for the base death benefit and any riders).

> The net amount at risk will be allocated to a segment in the same proportion as that segment's stated death benefit bears to the sum of the Stated death benefits for all segments.

> The cost of insurance rate for each segment will be determined by us from time to time. Different rates will apply to each segment. The Company will refer to the gender and age of the insured as of the effective date of segment coverage, the duration since the coverage began, the amount of target death benefit and the segment premium class in applying its current rates for each insured. Any change in rates will apply to all individuals of the same premium class and whose policies have been in effect for the same length of time. The rates will never exceed those

---

[2] http://www.businessdictionary.com/definition/cost-of-insurance-charge.html (visited July 3, 2018)
[3] A "segment" is defined in the Subject Policies as "a block of death benefit coverage."  For example, if a policy has an initial death benefit of $1,000,000, and later increases the amount to $1,500,000, this would be deemed as two "segments," one in the amount of $1,000,000 and a second in the amount of $500,000. The total cost of insurance for the policy would then be the sum of the cost of insurance for both segments.

rates shown in the Table of Guaranteed Rates for the segment. These tables are in the Schedule.

27.     Cost of insurance, by definition, does not include a profit component.

28.     When first introduced as a product, universal life was designed to separately identify the charges levied on a policyholder, including a separate cost of insurance charge that was intended to be a pure mortality charge, covering only the cost of providing death benefits. For example, the Dictionary of Insurance Terms defines universal life insurance as: "ADJUSTABLE LIFE INSURANCE under which (1) premiums are flexible, not fixed; (2) protection is adjustable, not fixed; and (3) insurance company expenses and other charges are specifically disclosed to a purchaser. This policy is referred to as UNBUNDLED *life insurance* because its three basic elements (investment earnings, *pure cost of protection,* and company expenses) are separately identified both in the policy and in an annual report to the policyholder."[4] The pure cost of protection is the cost of providing the death benefit, without expenses or profit margins, and therefore covers only expected mortality risks.  The other expense and profit charges are then separately charged and, together with the COI charge, constitute the total premiums paid each month.  *See* The Dictionary of Insurance Terms at 430 (explaining in the definition of "Rate Making" that insurance companies use experience studies to determine the "*pure cost of protection*, or *pure premium,* to which the insurance company adds on loads for agent commissions, premium taxes, administrative expenses, contingency reserves, other acquisition costs, and profit margin," and that "[t]he result is the GROSS PREMIUM to be charged to the insured.").

29.     Pure cost of protection rates are designed to be charged against the actual amount payable in the event of a claim, known as the "net amount at risk," which is defined in The

---

[4] Rubin, <u>Dictionary of Insurance Terms</u> (6th ed. 2013) (emphasis in original).

Dictionary of Insurance Terms as "difference between the face amount of a life insurance policy and its cash value (also known as "pure amount of protection")." The difference between the cash value discussed above and the account value is a "surrender charge," which decreases over time and provides a further source of profit to the issuing company.

30.     The structure and terms of the Subject Policies are consistent with this design. First, they state that "[a] segment's cost of insurance is the cost of insurance rate multiplied by the net amount at risk," with the net amount at risk calculated as death benefit minus account value.   This is consistent with the "pure cost of protection" described in The Dictionary of Insurance Terms and the "pure death benefit protection" described in Voya's glossary: using net amount at risk to calculate COI charges ensures that the COI charge is directly tied to what the insurer must pay out upon a mortality event.   Second, the Subject Policies have other distinct charges (or loads) to pay for agent commissions, premium taxes, administrative expenses, marketing and sales costs, and profits.   For example:

- Security Life collects a premium charge of 4% of each premium payment, which reflects profit margin on the policies.   Retaining three to four percent of all premiums as profits is a standard profit margin in the industry.

- Security Life imposes a sales charge of 11% of each premium in the first 10 years, which amount compensates Security Life for commissions and marketing costs (hence its title as a "sales charge").

- Security Life imposes a monthly administrative charge of $0.049 per $1000 of target death benefit in years 1-5, and $0.010 thereafter. This covers Security Life's administrative costs.

- Security Life imposes a per policy administrative charge of $13 per policy month in years 1-3, and $3 per policy month in years 4 and thereafter.  This also covers administrative costs.

- Security Life charges $25 for each illustration after the first year, to cover illustration costs.

- The surrender charge.

- Security Life earns additional profit based on the difference between the investment income that Security Life earns by investing policyholders' account values and the amounts that it credits to the account values.  With the current credited rate at the guaranteed minimum of 3%, and most insurers projecting earned rates of around 5%, this means that Security Life is annually earning a spread of 2% on all policyholder accounts, equating to tens of millions of dollars.

31.     Including anything other than mortality charges in the COI rate would be inconsistent with these provisions and the unbundled policy structure. For example, if Security Life were to claim that it could recover administrative expenses through the COI charges, then it would be violating the cap on administrative charges.  The same would be true if Security Life sought to recover taxes or commissions through the COI rates.   Indeed, Security Life's illustrations expressly state that "[t]he monthly expense charge is made up of the policy charge, monthly policy fees, tax charges, sales charges, service fees for partial withdrawals, and administration charges." The cost of insurance is described separately and should not contain those charges.  The Subject Policies are therefore structured as traditional universal life policies, in which charges for mortality and charges to cover administrative and marketing costs are separated.

32.     Further additional evidence that the various different monthly deduction charges each have their own specific purposes comes from the "Periodic Reports" section of the Subject Policies, which promises to send the policy owner at least once a year a report that "will include any other information that may be currently required by the insurance company supervisory official of the jurisdiction in this policy is delivered." Pursuant to the Code of Colorado Regulations, the annual report must include "[t]he total amounts that have been credited or debited to the policy value during the current report period, identifying each *by type* (e.g., interest, mortality, expense and riders)." 3 C.C.R. 702-4 Series 4-1-7, Section 10 (emphasis added). The only entry in the Periodic Reports that Security Life sent to policyholders that plausibly purports to identify mortality charges is the "Cost of Insurance Charges" section. "Administrative Charges," "Policy Charges," "Rider Charges," "Interest Credited," and "Other Charges/Adjustments"[5] are all separately listed in the Periodic Reports.

**B.     Security Life Fails to Reduce COI Rates Despite Continued Mortality Improvement**

33.     A mortality table is a chart showing the rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status, and duration since underwriting. Mortality tables are used by actuaries to calculate insurance rates and are designed to reflect mortality rate expectations.

---

[5] As explained in a footnote to the Periodic Reports, "Other Charges/Adjustments" include surrender charges, value adjustments, partial surrenders and withdrawals, and partial surrender and withdrawal fees.

34.     Beginning at least as early as 1941, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry-standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.   A mortality table is a chart showing the expected rate of death at a certain age.

35.     In 2001, at the request of the NAIC, the Society of Actuaries ("SOA") and the American Academy of Actuaries ("Academy") produced the 2001 CSO Mortality Table, which showed strong mortality improvements, particularly at older ages, over the 1980 CSO table.  An investigative report on the update of the CSO tables by the SOA was published in March 2015 and showed significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

36.     The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. These surveys have consistently showed mortality improvements over the last three decades, particularly for ages 70-90.

37.     Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include: (a) 1990-95 Basic Select and Ultimate Mortality Tables; (b) 2001 Valuation Basic Mortality Table, (c) 2008 Valuation Basic Table, and (d) 2015 Valuation Basic Table.

38.     The 1990-95 Basic Table was drawn from the death rates observed by 21 large life insurance companies with policy anniversaries between 1990 and 1995. This experience study is for data at, around, or immediately prior to the publication of the policy forms which are the subject of this complaint.   The 2001, 2008 and 2015 Valuation Basic Tables each show

16

significant mortality improvements from the 1990-1995 Basic Tables and the 1975-80 Basic Tables, demonstrating that mortality experience has continued to improve substantially and consistently.  That trend continues.  In 2014, the SOA finalized new mortality tables and a new mortality improvement scale, reflecting improved life expectancies and an expectation that the trend of improving mortality will continue.

39.     Security Life has acknowledged that mortality has continually improved not only industry-wide, but specifically with respect to the policies it has issued.  Each year, insurers are required to file a statement entitled "Annual Statement Exhibit 5, Interrogatory 3, Determination of Non-Guaranteed Elements" (the "Annual Statement").  The Annual Statement must be signed by an appointed actuary and contains various representations regarding non-guaranteed elements. Security Life's 2015 Annual Statement represented that, "[r]egarding future experience, we expect historical mortality improvement trends and maintenance expense inflation to continue," and that "changes in these trends will be reflected in the re-determination of non-guaranteed elements."  COI rates are one of the "non-guaranteed elements" referenced in this statement. Security Life made the same or similar statements in its Annual Statements for the years 2012-2014.  And in each of 2008 (the first year such statements are available online), 2009, 2010, and 2011, Security Life acknowledged that mortality experience had been better than originally estimated at original pricing, stating: "For older business, our mortality…experience has generally been better than the anticipated experience factors underlying the non-guaranteed elements."

40.     Despite this continued improvement in mortality experience and Security Life's commitment to redetermine cost of insurance rates "from time to time"[6]—and despite Security Life's sworn promise to regulators that its improving mortality trends "will be reflected in the redetermination of" its COI rates—Security Life has never decreased COI rates on the Subject Policies at any time over the past 15 years.

### C.     Security Life's Unlawful COI Increase in the Face of Continued Mortality Improvement

41.     In September 2015, Security Life started mailing letters to policyholders notifying them of a COI increase that would be taking effect on their October 2015 processing dates.  The letter did not explain what costs were projected to increase, stating only that "[t]he increase in the cost of insurance rates was made in response to the increase in the anticipated cost of providing future coverage."

42.     The amount of the increase was significant: owners of Life Design Guarantee policies were subjected to 9.25% increases, while owners of Strategic Accumulator policies were hit with 42.3% increases.  To illustrate the magnitude of the increases in dollar terms, Plaintiff received an illustration for Policy # 1603978 on August 20, 2015—less than a month before the increase was announced—showing that COI charges in policy year 13 (2017) would be $134,890. A post-increase illustration dated May 31, 2016 showed that the new cost of insurance charge for policy year 13 would be $214,103—a $79,103 increase for a single year.[7]  If the insured reaches age 99, the amount of overcharge due to the COI increase alone (exclusive of the

---

[6] Industry standards, and some state regulations, require review of COI rates at least every five years. *See, e.g.,* 11 New York Code of Rules and Regulations 48.
[7] This equates to a greater than 42.3% increase because the illustrations use different assumptions as to account values.

pre-increase base rate and all other charges) will total over $1.5 million for a single $3 million policy.

43.     There is no possible justification for the 2015 increase.  Mortality had steadily improved from the time the Subject Policies had issued and less than six months after the 2015 increase, Security Life's Chief Actuary again certified that it expected mortality rates to continue to improve.  As a result, Security Life was projecting at the time of the 2015 increase that insureds would live longer than Security Life originally anticipated and that Security Life would have to pay out fewer death benefits on an annual basis.  This, in turn, decreased—rather than increased—Security Life's projected costs of insurance.

44.     Further, Security Life had continued to illustrate COI charges under the pre-increase COI rates as late as August 19, 2015.  This also contradicts Security Life's purported justification for the COI increase.  The Code of Colorado Regulations requires that illustrations provided to policyholders be not more favorable than a scale of rates that is reasonably based on actual recent experience, and requires insurers to annually certify compliance. 3 CCR 702-4 Series 4-1-8 at §§ 4(D) & 6(B)(5).  The purpose of such illustration regulations, which exist in virtually every state, is to ensure that policyholders are informed of experience trends and that the insurer is not illustrating COI rates that it knows may change.  This prevents insurers from engaging in bait-and-switch tactics whereby they illustrate low rates in order to convince policyholders to continue paying premiums and then suddenly increase rates at a later date after policyholders have invested tens of thousands of dollars into their policies.  That Security Life was illustrating pre-increase COI rates as late as August 19, 2015 further confirms that—contrary to its letters to policyholders—Security Life had no actuarial basis for concluding that the "anticipated cost of providing future coverage" was increasing.

45.     In light of declining mortality rates both industry-wide and within Security Life, the only possible explanation for Security Life's conduct is that it is impermissibly using COI rates to manage and increase its own profitability.  At the same time that Security Life was increasing COI rates on the Subject Policies, it declared a $111 million ordinary dividend and a $130 million extraordinary dividend to its parent company, Voya.  This aggregate dividend of $241 million marked a *750%* increase over the single $32 million dividend that Security Life paid to Voya in 2014. The only way that such a massive dividend could have been triggered is if Security Life was using COI adjustments to increase profitability.

46.     In addition to merely increasing profitability, the increase also furthered Security Life's goal of inducing policy lapses and relieving itself of potential death claims.  COI increases—particularly those as high as 42.3%—result in a phenomenon called "shock lapse." Shock lapse occurs when, in response to a COI increase, significant numbers of policies either lapse or are surrendered because (a) account values are being rapidly drained by the new COI charges and/or (b) the cost of the future premiums is not worth the benefits of coverage.  Shock lapses are a boon for insurers because policyholders are forced to forfeit all the premium charges they previously paid—often over the course of a decade—and the insurer is relieved from ever paying out death benefits under the lapsed or surrendered policies. This allows the insurer to lock in profits and to release reserves, further enabling the type of dividend that Security Life declared in 2015.

47.     Though the number of shock lapses depends on the size of the increase, it is commonly projected that ten percent of all policies will lapse or be surrendered within the first year of the increase. For an increase of 42.3%—which Security Life imposed on Strategic

Accumulator policyholders—Security Life was likely projecting an even higher rate of lapses and surrenders.

48.     Using COI rates to increase profitability and induce lapses violates the terms of the Subject Policies and the covenant of good faith and fair dealing.  As discussed, cost of insurance charges are, by definition, supposed to reflect the actual costs of providing insurance— not to provide an additional profit mechanism. Including profits—or anything other than "pure death benefit protection"—in the cost of insurance is contrary to the reasonable expectations of insureds and directly conflicts with the plain and ordinary meaning set forth in Security Life's own parent company's "Life Insurance Glossary."

49.     And while, subject to the language in the contract and other applicable law, an insurer may claim to have discretion in setting rates, the covenant of good faith and fair dealing imposes additional limitations on that discretion.  For example, courts have held that insurers may not use COI rates to manage profitability; may not use COI rates to induce lapses by forcing policyholders to unexpectedly pay exorbitant premiums; must use actuarially reasonable assumptions when setting COI rates; and must set COI rates in good faith.  Security Life violated each of these restrictions: it dramatically increased COI rates in order to bolster profitability and induce lapses, and it did not have any actuarially reasonable basis to increase COI rates given its own projections that mortality would continue to decline.  In doing so, Security Life breached its contracts with its policyholders.

## CLASS ACTION ALLEGATIONS

50.     This action is brought by Plaintiff individually and on behalf of a class pursuant to Rule 23(b)(3) and Rule 23(b)(2) of the Federal Rules of Civil Procedure. The class—referred to herein as the "COI Overcharge Class"—consists of:

> All owners of Strategic Accumulator and Life Design Guarantee universal life policies issued by Security Life of Denver Insurance Company that were subjected to a cost of insurance rate increase announced in or after September 2015.

The COI Overcharge Class does not include defendant Security Life, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

51.     The COI Overcharge Class consists of hundreds, if not thousands, of policyholders and is thus so numerous that joinder of all members is impracticable.   The identities and addresses of class members can be readily ascertained from business records maintained by Security Life.

52.     The claims asserted by Plaintiff are typical of the claims of the COI Overcharge Class.

53.     Plaintiff will fairly and adequately protect the interests of the COI Overcharge Class and does not have any interests antagonistic to those of the other members of the class.

54.     Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters, as well as class and complex litigation.

55.     Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

56.     This action is appropriate as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because Security Life has acted on grounds that apply generally to the COI Overcharge Class, such that final injunctive and/or declaratory relief is appropriate. Appropriate declaratory and/or injunctive relief includes, but is not limited to:

(a)     prohibiting the continuing imposition of the 2015 COI increase; and

(b)     allowing reinstatement of policies that have lapsed or been surrendered following Security Life's breach of contract.

57.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

(a)     the construction and interpretation of the form insurance policies at issue in this litigation;

(b)     whether Security Life has breached its contracts with the class members by not decreasing COI rates;

(c)     whether Security Life has breached its contracts with class members by increasing COI rates;

(c)     whether Security Life has violated the implied covenant of good faith and fair dealing;

(d)     whether Plaintiff and class members are entitled to receive damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages; and

(h)     whether Plaintiff and class members are entitled to declaratory relief, injunctive relief, and/or specific performance.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress

individually for the wrongs that defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)     when Security Life's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)     without a class action, many class members would continue to suffer injury, and Security Life's breaches will continue without redress while Security Life continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e)     this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract (on Behalf of the COI Overcharge Class)

59.     Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth therein.

60.     The Subject Policies are binding and enforceable contracts.

61.     Security Life materially breached the policies because it did not base COI rates on its actual projected costs of insurance and increased COI rates based on factors other than the cost of insurance.

62. In the event that any breach alleged herein is not explicitly covered by the terms of the contract, Security Life has breached the covenant of good faith and fair dealing by the conduct alleged above.

63. Plaintiff has performed all of its obligations under the policies, except to the extent that its obligations have been excused by Security Life's conduct as set forth herein.

64. As a direct and proximate cause of Security Life's material breaches of the policies, Plaintiff and the COI Overcharge Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiff and the COI Overcharge Class compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity;

3. Awarding Plaintiff and the COI Overcharge Class pre-judgment and post-judgment interest, as well as costs;

4. Awarding Plaintiff and the COI Overcharge Class injunctive and equitable relief that may include:

(a) prohibiting Security Life from continuing to collect the unlawfully and unfairly increased COI amounts in violation of the COI Increase Policies; and

(b) ordering the reinstatement of any policy that was surrendered, lapsed, or otherwise terminated following Security Life's breach.

6. Awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: July 26, 2018

*/s/ Paul H. Schwartz*
Paul H. Schwartz
Jonathan A. Helfgott
SHOEMAKER GHISELLI + SCHWARTZ LLC
1811 Pearl Street
Boulder, CO 80302
Tel: 303-530-3452
pschwartz@sgslitigation.com

Steven G. Sklaver
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: 310-789-3100
Fax: 310-789-3150
ssklaver@susmangodfrey.com

Ryan Kirkpatrick
(D. Colo. bar application to be filed)
Seth Ard
(D. Colo. bar application to be filed)
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019-6023
Tel.: 212-336-8330
Fax: 212-336-8340
rkirkpatrick@susmangodfrey.com
sard@susmangodfrey.com

Stephen E. Morrissey
(D. Colo. bar application to be filed)
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA  98101
Tel: 206-516-3880
Fax: 206-516-3883
smorrissey@susmangodfrey.com
*Attorneys for Plaintiff*