AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Colorado

**RECEIVED BY**

*received by*

**MAR 1 3 2019**

*by*

| | |
|---|---|
| Advance Trust & Life Escrow Services, LTA | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  18-cv-01897-WJM-NYM **CORP LAW DEPT** *HR* |
| Security Life of Denver Insurance Company | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:        Transamerica Life Insurance Company, c/o Sheila Luken, 4333 Edgewood Rd NE MS 2520, Cedar
Rapids, IA 52499

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A.

| Place: First Legal Records, c/o Hawkeye State Process | Date and Time: |
|---|---|
| Server LLC, 1927 Keokuk St., Lower Level, Iowa City, IA 52240 | 03/29/2019 5:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        03/12/2019

*CLERK OF COURT*

OR

_____        /s/ Scott J. Fulford
*Signature of Clerk or Deputy Clerk*        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Advance Trust &
Life Escrow Services, LTA        , who issues or requests this subpoena, are:

Scott Fulford; 1000 Louisiana St., Suite 5100, Houston, TX 77005; SFulford@SusmanGodfrey.com; 713.653.7860

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT A**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.    18-cv-01897-WJM-NYM

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*                    .

☐ I served the subpoena by delivering a copy to the named person as follows:

_____                on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____         _____
                                            *Server's signature*

                                            _____
                                            *Printed name and title*

                                            _____
                                            *Server's address*

Additional information regarding attempted service, etc.:

**EXHIBIT A**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT A**

# EXHIBIT A

## INSTRUCTIONS

This is an exhibit to a subpoena pursuant to the authority of the United States District Court for the District of Colorado requiring you to produce certain documents, electronic files, and/or tangible things for inspection, copying, etc. This exhibit provides instructions, definitions, and specific document requests. Documents, electronic files, or tangible things that are responsive to those requests must be produced no later than 5:00 p.m. on March 29, 2019, at the offices of First Legal Records, c/o Hawkeye State Process Server LLC, 1927 Keokuk St., Lower Level, Iowa City, IA 52240.

Do not destroy or alter any document, electronic file, or other evidence that is related in any way to any of the document requests below.

The document requests below include all documents within your possession, custody, or control, whether or not you are their author or owner.

Responsive documents shall be produced as they have been kept in the usual course of business and shall not be shuffled or otherwise rearranged. Alternatively, you may produce responsive documents organized and labeled to correspond to the enumerated requests of this demand. Documents you find stapled, clipped, or otherwise fastened together shall be produced in such form.

If no document within your possession, custody, or control is responsive to any particular document request below, so state in writing.

Electronic documents such as spreadsheets should be produced in their native format, which is the format in which the documents are maintained electronically.

If information stored in, or accessible through, a computer or other data retrieval system is produced, it must be accompanied with instructions and all other materials necessary to use or interpret such data.

Documents that cannot be copied legibly must be produced in their original form.

**EXHIBIT A**

If any portion of a document is responsive to an individual document request below, then the entire document shall be produced.

Where specific documents are listed as part of a general category of documents, then you must produce all documents falling within that general category.

If a responsive document contains legally privileged material, produce the entire document with the privileged material redacted, noting the redactions on the face of the document.

Do not redact any document such that any of its content is altered or destroyed permanently.

If any responsive document is withheld under a claim of privilege, you shall produce a list specifying each such document and setting forth the following information:

(i)     the date the document was created;

(ii)    the number of pages of the document;

(iii)   the name and last known address of each person who prepared or participated in the preparation of the document;

(iv)    the name and last known address of each addressee or other person to whom the document, or any part thereof, was sent or to whom the document or its contents, or any part thereof, was disclosed;

(v)     a summary of the general subject matter of the document (and such other information as is necessary to identify the document, such as whether the document is a letter or memorandum);

(vi)    a statement of the legal basis upon which the asserted privilege is claimed; and

(vii)   the individual document request herein to which the document is responsive.

Any responsive document or part of a document withheld under a claim of privilege must be preserved and must not be altered or destroyed.

If you do not withhold any documents under a claim of privilege, so state in writing.

**EXHIBIT A**

If any document responsive to this request once existed but has been destroyed or discarded, or is otherwise not capable of being produced, you shall furnish a list specifying each such document and setting forth the following information:

(i)     the date document was created;

(ii)    a description of the subject matter of the document;

(iii)   the name and last known address of each person who prepared or participated in the preparation of the document;

(iv)    the name and last known address of each addressee or other person to whom the document, or any part thereof, was sent or to whom the document or its contents, or any part thereof, was disclosed;

(v)     the name and last known address of any person not covered by items (iii) and (iv) who had possession, custody or control of the document or a copy thereof;

(vi)    the date on which the document was destroyed or discarded and a statement of the reasons why the document was destroyed or discarded or why such document is not capable of being produced; and

(vii)   the individual document request herein to which the document is responsive.

Each individual document request set forth below shall be construed independently and not with reference to any other request for purposes of limitation unless a particular request so specifies.

Unless otherwise specified, the documents requested herein are documents prepared, written, sent, dated, received, or in effect at any time commencing from the date on which You first reinsured the Subject Policies (defined below) through and including the date of this document request.

A Protective Order has been entered in this case and is attached as Exhibit 2.

This request for documents shall be deemed continuing in nature and requires prompt supplemental responses in accordance with Rule 26(e) of the Federal Rules of Civil Procedure in

**EXHIBIT A**

the event you become aware of, or acquire within your possession, custody or control, additional
responsive documents at any time hereafter.

## DEFINITIONS

1.      The term "Communication" means the transmittal of information (in the form of
facts, ideas, inquiries or otherwise).

2.      The term "Document" is defined to be synonymous in meaning and equal in
scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ.
P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this
term.

3.      The term and abbreviation "ESI" shall mean and refer to all electronically stored
information, including all writings, drawings, graphs, charts, photographs, sound recordings,
images, email, source code, software, databases, phone messages and records, operating
systems and software applications, backup tapes, metadata, voicemail messages, text messages,
instant messages, and other data or data compilations stored in any medium from which
information can be obtained. Any request herein for any Document or all Documents includes
and requires production of all ESI.

4.      The term "Person" is defined as any natural person or any legal entity, including,
without limitation, any business or governmental entity or association.

5.      The term "Concerning" means relating to, referring to, describing, evidencing or
constituting.

6.      The terms "all," "any," and "each" shall each be construed as encompassing any
and all.

**EXHIBIT A**

7.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

8.      The term "SLD" means and refers to Security Life of Denver Insurance Company, its parents, agents and/or employees, persons acting on their behalf; and, the predecessors and successors in interest of each of the foregoing described entities and persons.

9.      The term "Complaint" means the Class Action Complaint and Jury Demand filed in *Advance Trust & Life Escrow Services, LTA v. Security Life of Denver Insurance Company*, Case No. 18-cv-01897-WJM (D. Colo.), attached hereto as Exhibit 1.

10.     The term "COI Increase" refers to the cost of insurance rate increase on certain SLD policies described in paragraph 41 of the Complaint.

11.     The term "Subject Policies" refers to all standardized form policies issued on Security Life policy forms 1165-8/03 and 1166-3/04 and marketed under the product names Strategic Accumulator Universal Life (or Strategic Accumulator UL) and Life Design Guarantee Universal Life (or Life Design Guarantee UL).

12.     The use of the singular form of any word includes the plural and vice versa.

13.     The terms "You" and "Your" mean and refer to the entity named in the subpoena, its parents and subsidiaries including their agents and/or employees and persons acting on their behalf; and, the predecessors and successors in interest of each of the foregoing described entities and persons.

14.     "Custodial file" means all documents, including ESI, in each person's file(s), including all documents created, sent, received or otherwise in his or her possession, custody, or

control. A custodial file includes but is not limited to all documents in a person's possession, custody, or control contained in email inboxes, hard drives, shared drives, and hard copy files.

15.     Electronically Stored Information ("ESI") – as referenced in paragraph 3 above and which is included within the definition of Document – must be provided in a form that includes all data in native format (the format in which it was originally created) and metadata (and all fields of metadata) and states the computer hardware and software programs needed to translate the information into readable and searchable form. All ESI should have a unique file name and should be named with the Bates number assigned to it. In addition, all ESI produced in response to this request must also be provided as single-page TIFFs, in Group IV format, and each TIFF should be named with a Bates number assigned to it, and provided standard Concordance load files "Dat and OPT". Document level OCR shall be provided as a separate text file named per the Corresponding Bates number. The load files must include the following metadata fields in the load file: MD5hash value; conversation index; subject; to; from; cc; bcc; date sent; date received; time received; time sent; attachment or file name; beginning attachment; end attachment. The production time zone for all ESI must be in the time zone in which the Subpoena was served.

16.     Non-Convertible Files: Certain types of files such as system, program, video and sound files may not be amenable to conversion into anything meaningful in TIFF format. Responsive, non-convertible files will be produced in the form of a placeholder TIFF image. Some examples of file types that may not convert include file types with the following extensions: *.exp *.ilk *.res *.trg *.tlh *.idb *.pdb *.pch *.opt *.lib *.cab *.mov *.mp3 *.swf *.psp *.chi *.chm *.com *.dll *.exe *.hlp *.ivi *.ivt *.ix *.msi *.nls *.obj *.ocx *.rmi *.sys *.tmp *.ttf *.vbx *.wav *.wpg *.iso *.pdb *.eps *.mpeg *.mpg *.ram *.rm *.psd *.ai *.aif *.bin

**EXHIBIT A**

*.hqx *.snd *.mpe *.wmv *.wma *.xfd * Other files may not be able to be converted to TIFF due to password protection or corruption (for example). If reasonable efforts to obtain useful TIFF images of these files are unsuccessful, these non-convertible files will also be accounted for with a TIFF placeholder. Non-convertible files will be produced in the form of a placeholder TIFF image. Each TIFF placeholder will contain the endorsed bates number, endorsed confidentiality designation and the name of the non-convertible file, including the file extension.

17.    Productions should contain sequential bates numbers with no gaps. There should be no gaps in bates numbers between productions. A unique production volume number will be used for each production. If any unavoidable gaps occur, the parties agree to provide advance notice of those gaps within productions and/or between productions.

## DOCUMENTS REQUESTED

**Request for Production No. 1**: All reinsurance agreements, excess retention reinsurance agreements, financial reinsurance agreements, or other similar agreements, including any amendments to those agreements, between You and SLD Concerning the Subject Policies.

**Request for Production No. 2**: All Documents Concerning mortality data You considered in connection with any actual or proposed reinsurance rate increases affecting the Subject Policies, including, without limitation,

   (a) Internal communications regarding such mortality data;

   (b) Communications with SLD regarding such mortality data; and

   (c) Memoranda, analyses, white papers, charts, presentations, calculations, actuarial work, Communications, or other Documents Concerning whether and how mortality experience or expectations of future mortality experience would affect the reinsurance rate applicable to the Subject Policies.

**Request for Production No. 3**: All Documents Concerning any actual or proposed reinsurance rate increases affecting the Subject Policies, including, without limitation:

   (a) Communications with SLD regarding such increases;

   (b) Internal Communications Concerning such increases;

**EXHIBIT A**

(c) Documents Concerning You're the bases for your decision to increase reinsurance rates affecting the Subject Policies

**Request for Production No. 4**: All Communications with SLD Concerning reinsurance that you issued or considered issuing for the Subject Policies.

**Request for Production No. 5**: All Documents Concerning the COI Increase, including, without limitation, (a) Communications between You and SLD concerning the COI Increase and (b) Internal Communications Concerning the COI Increase.

Dated: March 12, 2019                    */s/ Scott Fulford*
                                         Seth Ard
                                         Ryan C. Kirkpatrick
                                         SUSMAN GODFREY L.L.P.
                                         1301 Avenue of the Americas, 32nd Floor
                                         New York, NY 10019-6023
                                         Tel.: 212-336-8330
                                         sard@susmangodfrey.com
                                         rkirkpatrick@susmangodfrey.com

                                         Paul H. Schwartz
                                         Jonathan A. Helfgott
                                         SHOEMAKER GHISELLI + SCHWARTZ LLC
                                         1811 Pearl Street
                                         Boulder, CO 80302
                                         Tel: 303-530-3452
                                         pschwartz@sgslitigation.com

                                         Steven G. Sklaver
                                         SUSMAN GODFREY L.L.P.
                                         1900 Avenue of the Stars, Suite 1400
                                         Los Angeles, CA 90067-6029
                                         Tel: 310-789-3100
                                         ssklaver@susmangodfrey.com

                                         Edgar Sargent
                                         SUSMAN GODFREY L.L.P.
                                         1201 Third Avenue, Suite 3800
                                         Seattle, WA 98101
                                         Tel: 206-516-3880
                                         esargent@susmangodfrey.com

**EXHIBIT A**

Scott J. Fulford
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Tel: 713.653.7860
sfulford@susmangodfrey.com

*Attorneys for Plaintiff*

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

ADVANCE TRUST & LIFE ESCROW SERVICES, LTA,
as securities intermediary for
LIFE PARTNERS POSITION HOLDER TRUST,
on behalf of itself and all others similarly situated,

     Plaintiff,

v.

SECURITY LIFE OF DENVER INSURANCE COMPANY,

     Defendant.

---

### CLASS ACTION COMPLAINT AND JURY DEMAND

---

Plaintiff Advance Trust & Life Escrow Services, LTA, as securities intermediary of Life Partners Position Holder Trust ("Plaintiff"), on behalf of itself and all others similarly situated, for its Complaint against defendant Security Life of Denver Insurance Company ("Security Life"), states as follows:

### NATURE OF THE ACTION

1.    This is a class action brought on behalf of Plaintiff and similarly situated owners of universal life insurance policies issued by Security Life. Plaintiff seeks to represent a class of Security Life policyholders who have paid and are being forced to pay unlawful and excessive cost of insurance ("COI") charges by Security Life. These policies are all standardized form policies issued on Security Life policy forms 1165-8/03 and 1166-3/04 and marketed under the product names Strategic Accumulator Universal Life (or Strategic Accumulator UL) and Life Design Guarantee Universal Life (or Life Design Guarantee UL) (the "Subject Policies").

**EXHIBIT A**

2.     Security Life is one of several life insurer subsidiaries of Voya Financial, Inc. ("Voya"). Beginning in September 2015, Voya subsidiaries began announcing COI increases on certain legacy blocks of universal life insurance policies. Universal life ("UL") policies combine death benefits with a savings or investment component, often known as the "account value."

3.     A key feature of such policies was the "unbundling" or "transparency" of the COI charges, other contractually-specified costs, and crediting rates. This means that the monthly deductions are broken down into an array of discrete charges. The Dictionary of Insurance Terms describes unbundled universal life insurance as "coverage in which the investment features, mortality element and cost factors of a life insurance policy are separated, permitting each part to be independently analyzed." The COI charge is the policy's unbundled insurance component and is used to cover the insurer's mortality risk. It is also referred to in the industry as the "mortality charge" or the "pure cost of protection." The savings component, as discussed in more detail herein, allows policyholders to use their policies as tax-advantaged savings vehicles and earn interest on the account value.

4.     For every policy at issue, the COI is listed as a charge that is separate from charges for other expenses and a premium charge from which Security Life earns a profit. Collectively, these charges constitute the total premium that a policyholder pays. The COI charge is typically the largest part of that premium. The COI charge is deducted from the policy owner's account value on a monthly basis, so the policyholder forfeits the COI charge entirely to Security Life.

5.     The COI charge is supposed to compensate Security Life for mortality risk, *i.e.*, the expected probability that the insured for that particular policy will die in a particular year. Security Life's parent company, Voya, maintains a "Life Insurance Glossary" on its website,

2

**EXHIBIT A**

which defines "Cost of Insurance" as the deduction for "the pure death benefit protection" and is

synonymous with "Mortality Charge":

**Cost of Insurance (COI)**

Cost of Insurance (COI) is the automatic deduction made from the Accumulation Value on universal and variable universal life policies, for the pure death benefit protection. This cost is based on the net amount at risk under the policy, the insured's risk classification at the time of policy purchase and the insured's current age. The deduction occurs on a monthly basis. This is also known as Cost of Risk or Mortality Charge. Refer to your policy for the specific terms and conditions.

6.      The Subject Policies do not provide any alternative definition to "mortality

charge" or "pure death benefit protection" for what the cost of insurance is supposed to pay. The

Subject Policies state that this cost of insurance rate "will be determined by us from time to

time" and will be multiplied against the net amount at risk in order to determine monthly

charges:

The cost of insurance for the policy is the sum of the cost of insurance for all segments. A segment's cost of insurance is the cost of insurance rate for the premium class for the segment multiplied by the net amount at risk allocated to the segment. It is determined on a monthly basis.
***
The cost of insurance rate for each segment will be determined by us from time to time.[1]

7.      After issuance, an insurer is typically required to periodically review—as the

contract requires here, "determined by us from time to time"—the COI rates to confirm that they

correctly capture the insurer's projected mortality costs.   If the insurer's review reveals that

---

[1] The policies define "segment" to mean "a block of death benefit coverage." The "premium class" of the insured is provided for on a schedule for every policy and it is the insured's underwriting classification and smoker status (e.g., Preferred Non-Smoker; Standard Non-Smoker), which are groups used to assess mortality risks.

3

**EXHIBIT A**

projected mortality costs are lower than the corresponding COI rates, the insurer is required to reduce COI rates.

8.    Policyholders' comfort with this arrangement is based on trust that the insurer will dutifully adjust COI rates to reflect only the pure costs of mortality coverage. Security Life, however, has not only failed to live up to its end of the bargain in terms of decreasing rates as its mortality expectations improved—it has attempted to dramatically increase COI rates at the same time as it was projecting that mortality rates would continue to decline.

9.    In September 2015, Security Life sent letters to policyholders notifying them of significant COI increases for the Subject Policies.    The increase imposed on Strategic Accumulator UL policies was a massive 42%, which is costing Plaintiff hundreds of thousands of dollars each year. For Life Design Guarantee UL, the increase was 9.25%, which also materially impacts the value of such policies. Security Life's letters to policyholders were deliberately cryptic as to the reasons for the increases, making no mention of mortality experience and stating only that "[t]he increase in the cost of insurance rates was made in response to the increase in the anticipated cost of providing future coverage."

10.    There was no sudden change for the worse in Security Life's mortality expectations for the policies, as would be required to raise COI rates. Nationwide mortality rates have declined significantly over the past several decades and this trend is widely projected to continue. That trend of improving mortality expectations should have resulted in the lowering of COI rates, not a massive raise. Indeed, Security Life has itself stated that mortality experience has been more favorable than it originally expected and that it expects historic mortality improvement trends to continue. For example, in its 2015 Annual Statement Exhibit 5, which was filed with each state and signed by Voya's Chief Actuary, Security Life stated that

4

**EXHIBIT A**

"[r]egarding future experience, we expect historical mortality improvement trends…to continue." As a result, insureds are living longer than Security Life originally anticipated when the policies at issue were first priced and Security Life expects to pay out fewer death benefits on an annual basis. And if Security Life pays out fewer death benefits over time, then Security Life's "anticipated cost of providing future coverage" goes down, and the COI rate should correspondingly decrease.

11.     Despite this improved mortality experience, however, Security Life has not only failed to lower the COI rates it charges its customers—it has increased them. Security Life's apparent motivation is profit and increasing the dividends paid to its parent company, Voya. When life insurers issue policies, they record deferred acquisition costs ("DAC"), which are designed to defer accounting charges for the up-front costs of commissions, marketing expenses, and product development. DAC is an intangible asset on the books of the insurer and amortized over the time the policy is in-force. The amortization of those costs, rather than the costs themselves, is recorded as an expense. The amount of amortization in a year is based upon the expectations of future cash flows compared with past and current cash flows, including COI charges. When COI rates are adjusted upwards in a way that increases expected future cash flows, it triggers an accounting process called "dynamical unlocking" whereby past amortizations are retroactively changed and released into the current year's earnings. The accounting benefit is immediate (as opposed to waiting until COI charges are actually collected), and the profit recognized in the year of increase greatly exceeds the amount of excess COI charges that are actually collected in that year.

12.     In recent years, insurers have improperly used COI increases to trigger large, one-time dividends to their parent companies. In Security Life's case, the 2015 COI increase allowed

5

EXHIBIT A

Security Life to pay an "extraordinary dividend" of $111 million to Voya in 2015, on top of a $111 million "ordinary dividend." This $241 million total dividend in 2015 constituted a 750% increase over the $32 million dividend that Security Life paid to Voya in 2014. This confirms that the 2015 increase was not based on any increase in the *cost* of providing pure death benefit protection to Security Life's policyholders, but rather Security Life's and Voya's *profit* objectives and their desire to provide increased returns to Voya's shareholders. This is, of course, improper: Security Life is not allowed to bake profit margins into its COI rates, let alone increase COI rates to boost profits and trigger extraordinary dividends to its parent company.

13.     Security Life's manipulation of COI rates to load and increase profits is particularly egregious given that the policies at issue have various other unbundled and transparent mechanisms through which profits are already realized and other expenses are funded:

- A premium charge of 4% of each premium, which means that Security Life collects as profit 4% of all premiums paid by policyholders;
- A sales charge of 11% of each premium in the first 10 years;
- Monthly administrative charges;
- Per policy administrative charges;
- Loan charges; and
- Interest earned on account values in excess of the credited rate (known as the "interest spread").

14.     A reasonable policyholder would expect Security Life's profits to come from these other express provisions, not from COI charges. Indeed, there is no plausible interpretation of "cost of insurance" that would include profits—the two terms (cost & profit) are antonyms.

15.     In sum, Security Life has violated the terms of the Subject Policies by failing to base cost of insurance rates on the projected cost of insurance. In the face of the substantially

6

**EXHIBIT A**

improved mortality experience that has benefited Security Life enormously, Security Life has not only failed to reduce COI rates—it has increased them. Security Life apparently believes that it has the right to load COI rates with profit margins and other impermissible considerations unrelated to the actual costs of insurance, despite imposing separate charges for profits and expenses. This position has no merit and is contrary to the well-established definition of "cost of insurance" and the reasonable expectations of insureds. As a result of this misconduct, plaintiff seeks, among other things, monetary relief for the COI overcharges that Security Life has wrongly imposed and continues to impose on its customers.

## THE PARTIES

16.     Plaintiff Advance Trust & Life Escrow Services, LTA is organized under the laws of Texas and is located at 1401 New Road, Suite 200, Waco, Texas 76711. Plaintiff is suing in its capacity as security intermediary of Life Partners Position Holder Trust and is the owner of the following Security Life policies that are subject to the 2015 COI Increase:

- Policy #1603978 (Policy Date: 5/17/2005; Initial Stated Death Benefit: $1,500,000)
- Policy #1605330 (Policy Date: 9/7/2005; Initial Stated Death Benefit: $3,215,799)
- Policy #1602412 (Policy Date: 12/28/2004; Initial Stated Death Benefit: $10,000,000)
- Policy #1617003 (Policy Date: 10/26/2007; Initial Stated Death Benefit: $1,000,000)
- Policy #1629065 (Policy Date: 3/17/2008; Initial Stated Death Benefit: $7,000,000)

17.     Defendant Security Life is a corporation organized and existing under the laws of Colorado and has its corporate headquarters at 8055 East Tufts Avenue, Suite 710, Denver, Colorado 80237.

7

**EXHIBIT A**

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over Plaintiff's claims because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. Security Life is incorporated and has its principal place of business in Colorado. Plaintiff is a citizen of Texas and unnamed class members are citizens of states across the United States. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

19.     This Court has personal jurisdiction over Security Life because it is incorporated in Colorado and its principal place of business is in Colorado.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because Security Life is headquartered in this District and the events giving rise to Plaintiff's causes of action occurred in this District.

## FACTUAL BACKGROUND

### A.     The Policies at Issue

21.     The policies at issue are all flexible-premium, UL policies issued by Security Life in the mid-2000s. They were all issued on the same standardized policy forms and insureds are not permitted to negotiate different terms. Exhibit A to this Complaint is a representative policy (Policy #1603978), redacted for personal information.

22.     UL policies combine death benefits with a savings or investment component, often known as the "account value." One benefit of UL policies is that they permit policyholders flexibility in the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other

8

**EXHIBIT A**

specified expenses. The COI charge is deducted from the Policy Account (i.e., the savings component) of the policy on a monthly basis, so the policyholder forfeits the COI charge entirely to Security Life. Any premiums paid in excess of COI charges and other charges are applied to a policy's "Policy Account," sometimes known as "policy account value" or "cash value." These excess premiums earn interest at the credited rate. This structure is beneficial because it allows policyholders the choice to either (i) minimize their capital investment and generate greater rates of return through other investments or (ii) to use the UL policy as a savings vehicle and earn interest on the account value.

23.    The size of the COI charge is highly significant to universal life policyholders. First, it dictates the minimum amount of money that must be paid to keep a policy in force. Second, high COI rates can quickly diminish a policy's account value and reduces the amount of money on which interest can be earned. Absent a secondary guarantee, if the policy account value diminishes such that COI charges can no longer be deducted, then the policy will go into grace and, if no additional premiums are paid after adequate time provided by an accurate grace notice, the policy may lapse. Third, higher current and illustrated future COI rates reduce the value of a policy in the secondary and tertiary markets.

24.    Although many UL policies contain a table of guaranteed maximum COI rates, policies are marketed, illustrated, and sold based almost exclusively on the basis of current rates. The guaranteed rates are set far in excess of current rates—often as much as three times higher— and generally bear no connection to either current or projected rates. If policies were marketed and sold based on guaranteed COI rates, virtually no one would ever buy a UL policy because the economics would not make any sense. For example, Exhibit B to this Complaint is an August 19, 2015 illustration for Policy #1603978. While Security Life was required, by statute,

9

**EXHIBIT A**

to illustrate values under both guaranteed maximum rates and current rates, the "Guaranteed" columns are all populated with "0" even with a premium outlay of $227,463 per year. *See* Exhibit B at p. 4. These zeros are explained in a footnote that states: "In the event that the guaranteed costs were deducted and the guaranteed interest rate was paid from 8/19/2015 forward, the policy would lapse and cannot be illustrated beyond the year shown. Additional premiums [above the $227,463 per year] would be required to continue the coverage." In other words, the policy would lapse even if the $227,463 projected premium outlay were paid, and Security Life refused to even illustrate the premiums that would be required under the guaranteed rates. In contrast, under the then-current rates, the policy would remain in force through age 100 and have an account value of $765,561 by the nineteenth policy year. On page 7 of Exhibit B, Security Life provided another illustration that further breaks down the separate policy charges, including COI charges. This illustration is based solely on current rates—no similar illustration is provided under guaranteed rates, and there is no projection of what annual COI charges would be under guaranteed maximum rates. This is consistent with the way UL policies are always illustrated and marketed: the focus is on current rates, and no consumer expects to pay the guaranteed maximum rates (which the insurer will not even properly illustrate).

25.    The COI charge is part of the insurance component of a UL policy. It is supposed to be the insurer's cost of providing mortality coverage. Security Life's parent defines "Cost of Insurance" on its website as the charge for the "pure death benefit protection," and states that "Cost of Insurance" is synonymous with "Mortality Charge." The Society of Actuaries conducts actuarial exams for "Individual Life & Annuities United States – Design & Pricing," in which it instructs that "mortality charge" is an "equivalent or similar term" to "cost of insurance." And popular online dictionary sources, like BusinessDictionary, define "cost of insurance charge" as

10

**EXHIBIT A**

follows: "Synonym for the mortality charge. The charge associated with the pure insurance protection element of a life insurance policy."[2]

    26.    The Subject Policies do not provide any alternative definition of this well-known term, stating instead that the cost of insurance rate "will be determined by us from time to time" and will be multiplied against the net amount at risk in order to determine monthly charges. The entirety of the COI language in the Subject Policies is set forth below:

> The cost of insurance for the policy is the sum of the cost of insurance for all segments.[3] A segment's cost of insurance is the cost of insurance rate for the premium class for the segment multiplied by the net amount at risk allocated to the segment. It is determined on a monthly basis.
>
> The net amount at risk is (a) minus (b) where:
>
>     a) is the sum of (i) the base death benefit for each segment as of the monthly processing date after the monthly deductions (other than cost of insurance charges for the base death benefit and any riders), divided by (ii) the result of 1 plus the monthly equivalent of the guaranteed minimum interest rate as shown in the Schedule; and
>     b) is your account value as of the monthly processing date after the monthly deductions (other than the cost of insurance charges for the base death benefit and any riders).
>
> The net amount at risk will be allocated to a segment in the same proportion as that segment's stated death benefit bears to the sum of the Stated death benefits for all segments.
>
> The cost of insurance rate for each segment will be determined by us from time to time. Different rates will apply to each segment. The Company will refer to the gender and age of the insured as of the effective date of segment coverage, the duration since the coverage began, the amount of target death benefit and the segment premium class in applying its current rates for each insured. Any change in rates will apply to all individuals of the same premium class and whose policies have been in effect for the same length of time. The rates will never exceed those

---

[2] http://www.businessdictionary.com/definition/cost-of-insurance-charge.html (visited July 3, 2018)
[3] A "segment" is defined in the Subject Policies as "a block of death benefit coverage." For example, if a policy has an initial death benefit of $1,000,000, and later increases the amount to $1,500,000, this would be deemed as two "segments," one in the amount of $1,000,000 and a second in the amount of $500,000. The total cost of insurance for the policy would then be the sum of the cost of insurance for both segments.

11

EXHIBIT A

rates shown in the Table of Guaranteed Rates for the segment. These tables are in the Schedule.

27.    Cost of insurance, by definition, does not include a profit component.

28.    When first introduced as a product, universal life was designed to separately identify the charges levied on a policyholder, including a separate cost of insurance charge that was intended to be a pure mortality charge, covering only the cost of providing death benefits. For example, the Dictionary of Insurance Terms defines universal life insurance as: "ADJUSTABLE LIFE INSURANCE under which (1) premiums are flexible, not fixed; (2) protection is adjustable, not fixed; and (3) insurance company expenses and other charges are specifically disclosed to a purchaser. This policy is referred to as UNBUNDLED *life insurance* because its three basic elements (investment earnings, *pure cost of protection,* and company expenses) are separately identified both in the policy and in an annual report to the policyholder."[4] The pure cost of protection is the cost of providing the death benefit, without expenses or profit margins, and therefore covers only expected mortality risks. The other expense and profit charges are then separately charged and, together with the COI charge, constitute the total premiums paid each month. *See* The Dictionary of Insurance Terms at 430 (explaining in the definition of "Rate Making" that insurance companies use experience studies to determine the "*pure cost of protection,* or *pure premium,* to which the insurance company adds on loads for agent commissions, premium taxes, administrative expenses, contingency reserves, other acquisition costs, and profit margin," and that "[t]he result is the GROSS PREMIUM to be charged to the insured.").

29.    Pure cost of protection rates are designed to be charged against the actual amount payable in the event of a claim, known as the "net amount at risk," which is defined in The

---

[4] Rubin, Dictionary of Insurance Terms (6th ed. 2013) (emphasis in original).

12

Dictionary of Insurance Terms as "difference between the face amount of a life insurance policy and its cash value (also known as "pure amount of protection")." The difference between the cash value discussed above and the account value is a "surrender charge," which decreases over time and provides a further source of profit to the issuing company.

30.   The structure and terms of the Subject Policies are consistent with this design. First, they state that "[a] segment's cost of insurance is the cost of insurance rate multiplied by the net amount at risk," with the net amount at risk calculated as death benefit minus account value. This is consistent with the "pure cost of protection" described in The Dictionary of Insurance Terms and the "pure death benefit protection" described in Voya's glossary: using net amount at risk to calculate COI charges ensures that the COI charge is directly tied to what the insurer must pay out upon a mortality event. Second, the Subject Policies have other distinct charges (or loads) to pay for agent commissions, premium taxes, administrative expenses, marketing and sales costs, and profits. For example:

- Security Life collects a premium charge of 4% of each premium payment, which reflects profit margin on the policies. Retaining three to four percent of all premiums as profits is a standard profit margin in the industry.

- Security Life imposes a sales charge of 11% of each premium in the first 10 years, which amount compensates Security Life for commissions and marketing costs (hence its title as a "sales charge").

- Security Life imposes a monthly administrative charge of $0.049 per $1000 of target death benefit in years 1-5, and $0.010 thereafter. This covers Security Life's administrative costs.

13

EXHIBIT A

- Security Life imposes a per policy administrative charge of $13 per policy month in
  years 1-3, and $3 per policy month in years 4 and thereafter. This also covers
  administrative costs.

- Security Life charges $25 for each illustration after the first year, to cover illustration
  costs.

- The surrender charge.

- Security Life earns additional profit based on the difference between the investment
  income that Security Life earns by investing policyholders' account values and the
  amounts that it credits to the account values. With the current credited rate at the
  guaranteed minimum of 3%, and most insurers projecting earned rates of around 5%,
  this means that Security Life is annually earning a spread of 2% on all policyholder
  accounts, equating to tens of millions of dollars.

31.    Including anything other than mortality charges in the COI rate would be
inconsistent with these provisions and the unbundled policy structure. For example, if Security
Life were to claim that it could recover administrative expenses through the COI charges, then it
would be violating the cap on administrative charges. The same would be true if Security Life
sought to recover taxes or commissions through the COI rates. Indeed, Security Life's
illustrations expressly state that "[t]he monthly expense charge is made up of the policy charge,
monthly policy fees, tax charges, sales charges, service fees for partial withdrawals, and
administration charges." The cost of insurance is described separately and should not contain
those charges. The Subject Policies are therefore structured as traditional universal life policies,
in which charges for mortality and charges to cover administrative and marketing costs are
separated.

14

**EXHIBIT A**

32.      Further additional evidence that the various different monthly deduction charges
each have their own specific purposes comes from the "Periodic Reports" section of the Subject
Policies, which promises to send the policy owner at least once a year a report that "will include
any other information that may be currently required by the insurance company supervisory
official of the jurisdiction in this policy is delivered." Pursuant to the Code of Colorado
Regulations, the annual report must include "[t]he total amounts that have been credited or
debited to the policy value during the current report period, identifying each *by type* (e.g.,
interest, mortality, expense and riders)." 3 C.C.R. 702-4 Series 4-1-7, Section 10 (emphasis
added).  The only entry in the Periodic Reports that Security Life sent to policyholders that
plausibly purports to identify mortality charges is the "Cost of Insurance Charges" section.
"Administrative Charges," "Policy Charges," "Rider Charges," "Interest Credited," and "Other
Charges/Adjustments"[5] are all separately listed in the Periodic Reports.

## B.      Security Life Fails to Reduce COI Rates Despite Continued Mortality Improvement

33.      A mortality table is a chart showing the rate of death at a certain age. Rate of
death can be measured as a percentage or in terms of the number of deaths per thousand.
Separate tables are produced to reflect groups with different mortality. Mortality tables will
usually have separate tables for gender. Mortality tables for use with individual life insurance
policies additionally distinguish mortality rates for tobacco-use status, underwriting status, and
duration since underwriting.  Mortality tables are used by actuaries to calculate insurance rates
and are designed to reflect mortality rate expectations.

---

[5] As explained in a footnote to the Periodic Reports, "Other Charges/Adjustments" include surrender
charges, value adjustments, partial surrenders and withdrawals, and partial surrender and withdrawal fees.

15

**EXHIBIT A**

34.    Beginning at least as early as 1941, the National Association of Insurance
Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO")
mortality tables. These are industry-standard mortality tables that are commonly used by insurers
to calculate reserves and to set maximum permitted cost of insurance rates in universal life
policies. A mortality table is a chart showing the expected rate of death at a certain age.

35.    In 2001, at the request of the NAIC, the Society of Actuaries ("SOA") and the
American Academy of Actuaries ("Academy") produced the 2001 CSO Mortality Table, which
showed strong mortality improvements, particularly at older ages, over the 1980 CSO table. An
investigative report on the update of the CSO tables by the SOA was published in March 2015
and showed significant reductions in insurance company reserves compared to CSO 2001 due to
mortality improvements since 2001.

36.    The SOA performs surveys of large life insurance companies for the death rates
actually observed in their policies and compares these to published mortality tables. These
surveys have consistently showed mortality improvements over the last three decades,
particularly for ages 70-90.

37.    Periodically the SOA will publish an updated table to reflect the evolving industry
experience. Major updates they have published over the last few decades include: (a) 1990-95
Basic Select and Ultimate Mortality Tables; (b) 2001 Valuation Basic Mortality Table, (c) 2008
Valuation Basic Table, and (d) 2015 Valuation Basic Table.

38.    The 1990-95 Basic Table was drawn from the death rates observed by 21 large
life insurance companies with policy anniversaries between 1990 and 1995. This experience
study is for data at, around, or immediately prior to the publication of the policy forms which are
the subject of this complaint. The 2001, 2008 and 2015 Valuation Basic Tables each show

16

**EXHIBIT A**

significant mortality improvements from the 1990-1995 Basic Tables and the 1975-80 Basic Tables, demonstrating that mortality experience has continued to improve substantially and consistently. That trend continues. In 2014, the SOA finalized new mortality tables and a new mortality improvement scale, reflecting improved life expectancies and an expectation that the trend of improving mortality will continue.

39.   Security Life has acknowledged that mortality has continually improved not only industry-wide, but specifically with respect to the policies it has issued. Each year, insurers are required to file a statement entitled "Annual Statement Exhibit 5, Interrogatory 3, Determination of Non-Guaranteed Elements" (the "Annual Statement"). The Annual Statement must be signed by an appointed actuary and contains various representations regarding non-guaranteed elements. Security Life's 2015 Annual Statement represented that, "[r]egarding future experience, we expect historical mortality improvement trends and maintenance expense inflation to continue," and that "changes in these trends will be reflected in the re-determination of non-guaranteed elements." COI rates are one of the "non-guaranteed elements" referenced in this statement. Security Life made the same or similar statements in its Annual Statements for the years 2012-2014. And in each of 2008 (the first year such statements are available online), 2009, 2010, and 2011, Security Life acknowledged that mortality experience had been better than originally estimated at original pricing, stating: "For older business, our mortality...experience has generally been better than the anticipated experience factors underlying the non-guaranteed elements."

17

40.     Despite this continued improvement in mortality experience and Security Life's commitment to redetermine cost of insurance rates "from time to time"[6]—and despite Security Life's sworn promise to regulators that its improving mortality trends "will be reflected in the redetermination of" its COI rates—Security Life has never decreased COI rates on the Subject Policies at any time over the past 15 years.

## C.     Security Life's Unlawful COI Increase in the Face of Continued Mortality Improvement

41.     In September 2015, Security Life started mailing letters to policyholders notifying them of a COI increase that would be taking effect on their October 2015 processing dates. The letter did not explain what costs were projected to increase, stating only that "[t]he increase in the cost of insurance rates was made in response to the increase in the anticipated cost of providing future coverage."

42.     The amount of the increase was significant: owners of Life Design Guarantee policies were subjected to 9.25% increases, while owners of Strategic Accumulator policies were hit with 42.3% increases. To illustrate the magnitude of the increases in dollar terms, Plaintiff received an illustration for Policy # 1603978 on August 20, 2015—less than a month before the increase was announced—showing that COI charges in policy year 13 (2017) would be $134,890. A post-increase illustration dated May 31, 2016 showed that the new cost of insurance charge for policy year 13 would be $214,103—a $79,103 increase for a single year.[7]   If the insured reaches age 99, the amount of overcharge due to the COI increase alone (exclusive of the

_____

[6] Industry standards, and some state regulations, require review of COI rates at least every five years. *See, e.g.,* 11 New York Code of Rules and Regulations 48.

[7] This equates to a greater than 42.3% increase because the illustrations use different assumptions as to account values.

18

**EXHIBIT A**

pre-increase base rate and all other charges) will total over $1.5 million for a single $3 million policy.

43.      There is no possible justification for the 2015 increase. Mortality had steadily improved from the time the Subject Policies had issued and less than six months after the 2015 increase, Security Life's Chief Actuary again certified that it expected mortality rates to continue to improve. As a result, Security Life was projecting at the time of the 2015 increase that insureds would live longer than Security Life originally anticipated and that Security Life would have to pay out fewer death benefits on an annual basis. This, in turn, decreased—rather than increased—Security Life's projected costs of insurance.

44.      Further, Security Life had continued to illustrate COI charges under the pre-increase COI rates as late as August 19, 2015. This also contradicts Security Life's purported justification for the COI increase. The Code of Colorado Regulations requires that illustrations provided to policyholders be not more favorable than a scale of rates that is reasonably based on actual recent experience, and requires insurers to annually certify compliance. 3 CCR 702-4 Series 4-1-8 at §§ 4(D) & 6(B)(5). The purpose of such illustration regulations, which exist in virtually every state, is to ensure that policyholders are informed of experience trends and that the insurer is not illustrating COI rates that it knows may change. This prevents insurers from engaging in bait-and-switch tactics whereby they illustrate low rates in order to convince policyholders to continue paying premiums and then suddenly increase rates at a later date after policyholders have invested tens of thousands of dollars into their policies. That Security Life was illustrating pre-increase COI rates as late as August 19, 2015 further confirms that—contrary to its letters to policyholders—Security Life had no actuarial basis for concluding that the "anticipated cost of providing future coverage" was increasing.

19

**EXHIBIT A**

45.     In light of declining mortality rates both industry-wide and within Security Life,
the only possible explanation for Security Life's conduct is that it is impermissibly using COI
rates to manage and increase its own profitability.  At the same time that Security Life was
increasing COI rates on the Subject Policies, it declared a $111 million ordinary dividend and a
$130 million extraordinary dividend to its parent company, Voya.  This aggregate dividend of
$241 million marked a *750%* increase over the single $32 million dividend that Security Life
paid to Voya in 2014. The only way that such a massive dividend could have been triggered is if
Security Life was using COI adjustments to increase profitability.

46.     In addition to merely increasing profitability, the increase also furthered Security
Life's goal of inducing policy lapses and relieving itself of potential death claims.   COI
increases—particularly those as high as 42.3%—result in a phenomenon called "shock lapse."
Shock lapse occurs when, in response to a COI increase, significant numbers of policies either
lapse or are surrendered because (a) account values are being rapidly drained by the new COI
charges and/or (b) the cost of the future premiums is not worth the benefits of coverage.  Shock
lapses are a boon for insurers because policyholders are forced to forfeit all the premium charges
they previously paid—often over the course of a decade—and the insurer is relieved from ever
paying out death benefits under the lapsed or surrendered policies. This allows the insurer to lock
in profits and to release reserves, further enabling the type of dividend that Security Life declared
in 2015.

47.     Though the number of shock lapses depends on the size of the increase, it is
commonly projected that ten percent of all policies will lapse or be surrendered within the first
year of the increase. For an increase of 42.3%—which Security Life imposed on Strategic

EXHIBIT A

Accumulator policyholders—Security Life was likely projecting an even higher rate of lapses and surrenders.

48.     Using COI rates to increase profitability and induce lapses violates the terms of the Subject Policies and the covenant of good faith and fair dealing. As discussed, cost of insurance charges are, by definition, supposed to reflect the actual costs of providing insurance— not to provide an additional profit mechanism. Including profits—or anything other than "pure death benefit protection"—in the cost of insurance is contrary to the reasonable expectations of insureds and directly conflicts with the plain and ordinary meaning set forth in Security Life's own parent company's "Life Insurance Glossary."

49.     And while, subject to the language in the contract and other applicable law, an insurer may claim to have discretion in setting rates, the covenant of good faith and fair dealing imposes additional limitations on that discretion. For example, courts have held that insurers may not use COI rates to manage profitability; may not use COI rates to induce lapses by forcing policyholders to unexpectedly pay exorbitant premiums; must use actuarially reasonable assumptions when setting COI rates; and must set COI rates in good faith. Security Life violated each of these restrictions: it dramatically increased COI rates in order to bolster profitability and induce lapses, and it did not have any actuarially reasonable basis to increase COI rates given its own projections that mortality would continue to decline. In doing so, Security Life breached its contracts with its policyholders.

## CLASS ACTION ALLEGATIONS

50.     This action is brought by Plaintiff individually and on behalf of a class pursuant to Rule 23(b)(3) and Rule 23(b)(2) of the Federal Rules of Civil Procedure. The class—referred to herein as the "COI Overcharge Class"—consists of:

21

**EXHIBIT A**

> All owners of Strategic Accumulator and Life Design Guarantee universal life
> policies issued by Security Life of Denver Insurance Company that were
> subjected to a cost of insurance rate increase announced in or after September
> 2015.

The COI Overcharge Class does not include defendant Security Life, its officers and directors,
members of their immediate families, and the heirs, successors or assigns of any of the
foregoing.

51.    The COI Overcharge Class consists of hundreds, if not thousands, of
policyholders and is thus so numerous that joinder of all members is impracticable.    The
identities and addresses of class members can be readily ascertained from business records
maintained by Security Life.

52.    The claims asserted by Plaintiff are typical of the claims of the COI Overcharge
Class.

53.    Plaintiff will fairly and adequately protect the interests of the COI Overcharge
Class and does not have any interests antagonistic to those of the other members of the class.

54.    Plaintiff has retained attorneys who are knowledgeable and experienced in life
insurance matters, as well as class and complex litigation.

55.    Plaintiff requests that the Court afford class members with notice and the right to
opt-out of any class certified in this action.

56.    This action is appropriate as a class action pursuant to Rule 23(b)(2) of the
Federal Rules of Civil Procedure because Security Life has acted on grounds that apply generally
to the COI Overcharge Class, such that final injunctive and/or declaratory relief is appropriate.
Appropriate declaratory and/or injunctive relief includes, but is not limited to:

(a)    prohibiting the continuing imposition of the 2015 COI increase; and

22

**EXHIBIT A**

(b)     allowing reinstatement of policies that have lapsed or been surrendered following Security Life's breach of contract.

57.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

(a)     the construction and interpretation of the form insurance policies at issue in this litigation;

(b)     whether Security Life has breached its contracts with the class members by not decreasing COI rates;

(c)     whether Security Life has breached its contracts with class members by increasing COI rates;

(c)     whether Security Life has violated the implied covenant of good faith and fair dealing;

(d)     whether Plaintiff and class members are entitled to receive damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages; and

(h)     whether Plaintiff and class members are entitled to declaratory relief, injunctive relief, and/or specific performance.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress

23

**EXHIBIT A**

individually for the wrongs that defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)      when Security Life's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)      this action will cause an orderly and expeditious administration of the class claims and foster economics of time, effort and expense, and ensure uniformity of decisions;

(d)      without a class action, many class members would continue to suffer injury, and Security Life's breaches will continue without redress while Security Life continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e)      this action does not present any undue difficulties that would impede its management by the Court as a class action.

### FIRST CLAIM FOR RELIEF

#### Breach of Contract (on Behalf of the COI Overcharge Class)

59.      Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth therein.

60.      The Subject Policies are binding and enforceable contracts.

61.      Security Life materially breached the policies because it did not base COI rates on its actual projected costs of insurance and increased COI rates based on factors other than the cost of insurance.

24

62.    In the event that any breach alleged herein is not explicitly covered by the terms of the contract, Security Life has breached the covenant of good faith and fair dealing by the conduct alleged above.

63.    Plaintiff has performed all of its obligations under the policies, except to the extent that its obligations have been excused by Security Life's conduct as set forth herein.

64.    As a direct and proximate cause of Security Life's material breaches of the policies, Plaintiff and the COI Overcharge Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding Plaintiff and the COI Overcharge Class compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity;

3.    Awarding Plaintiff and the COI Overcharge Class pre-judgment and post-judgment interest, as well as costs;

4.    Awarding Plaintiff and the COI Overcharge Class injunctive and equitable relief that may include:

(a)    prohibiting Security Life from continuing to collect the unlawfully and unfairly increased COI amounts in violation of the COI Increase Policies; and

(b)    ordering the reinstatement of any policy that was surrendered, lapsed, or otherwise terminated following Security Life's breach.

6.    Awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

25

**EXHIBIT A**

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a

trial by jury as to all issues so triable.

Dated: July 26, 2018

                              */s/ Paul H. Schwartz*
                              Paul H. Schwartz
                              Jonathan A. Helfgott
                              SHOEMAKER GHISELLI + SCHWARTZ LLC
                              1811 Pearl Street
                              Boulder, CO 80302
                              Tel: 303-530-3452
                              pschwartz@sgslitigation.com

                              Steven G. Sklaver
                              SUSMAN GODFREY LLP
                              1900 Avenue of the Stars, Suite 1400
                              Los Angeles, CA 90067-6029
                              Tel: 310-789-3100
                              Fax: 310-789-3150
                              ssklaver@susmangodfrey.com

                              Ryan Kirkpatrick
                              (D. Colo. bar application to be filed)
                              Seth Ard
                              (D. Colo. bar application to be filed)
                              SUSMAN GODFREY LLP
                              1301 Avenue of the Americas, 32nd Floor
                              New York, NY  10019-6023
                              Tel.: 212-336-8330
                              Fax: 212-336-8340
                              rkirkpatrick@susmangodfrey.com
                              sard@susmangodfrey.com

                              Stephen E. Morrissey
                              (D. Colo. bar application to be filed)
                              SUSMAN GODFREY LLP
                              1201 Third Avenue, Suite 3800
                              Seattle, WA  98101
                              Tel: 206-516-3880
                              Fax: 206-516-3883
                              smorrissey@susmangodfrey.com
                              *Attorneys for Plaintiff*

26

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-01897-WJM-NYW

ADVANCE TRUST & LIFE ESCROW SERVICES, LTA, as
securities intermediary for LIFE PARTNERS POSITION
HOLDER TRUST, on behalf of itself and all others similarly
situated,

Plaintiff,

v.

SECURITY LIFE OF DENVER INSURANCE COMPANY,

Defendant.

---

### [PROPOSED] STIPULATED PROTECTIVE ORDER

---

WHEREAS, certain information and documents may be sought, produced, or exhibited

by and among the parties to the above-captioned action (the "Action"), or by third parties in

connection with the Action, which the party making the production believes in good faith to

constitute trade secrets, proprietary business information, competitively sensitive information,

or non-public personal medical or financial information;

WHEREAS a protective order would facilitate the production, exchange, and discovery

of documents, testimony, and information in connection with the Action while preserving the

parties' respective positions as to whether or not particular documents, testimony, or information

merit confidential treatment; and

WHEREAS this matter has come before the Court, by stipulation of the parties, for the

entry of a protective order pursuant to Fed. R. Civ. P. 26(c), limiting the review, copying,

1

**EXHIBIT A**

dissemination and filing of confidential and/or proprietary documents and information to be produced by any party and their respective counsel or by any non-party in the course of discovery in this matter to the extent set forth below; and the parties, by, between and among their respective counsel, having stipulated and agreed to the terms set forth herein, and good cause having been shown;

IT IS hereby STIPULATED AND ORDERED that:

1.      This Stipulated Protective Order Governing the Production and Exchange of Confidential Information ("Protective Order") shall govern the handling of documents and all other information produced by or between the parties to the Action or by third parties in connection with the Action, including all documents and information produced pursuant to interrogatories, depositions, requests for production of documents, subpoenas, requests for admissions, or other requests for disclosures (whether formal or informal), and all information provided, submitted, or exhibited by the parties hereto or third parties in connection with any evidentiary hearings or other proceedings conducted during the course of the Action.

2.      As used herein:

(a)    "Confidential Information" shall mean all documents, testimony, and information designated as "Confidential" by any party or non-party pursuant to the terms of this Protective Order and that falls within one or more of the categories set forth in paragraph 3, including the contents and all copies, excerpts, extracts, and summaries of such documents, testimony, and information, provided that such designation has not been successfully challenged and finally revoked pursuant to paragraph 9 herein.

2

**EXHIBIT A**

(b)    "Designating Party" shall mean the parties to this action and any third parties producing "Confidential Information" in connection with depositions, document production, or otherwise, or the party asserting the confidentiality privilege, as the case may be.

(c)    "Non-Designating Party" shall mean the party to this action and/or any nonparty other than the Designating Party.

(d)    "Qualified Person" shall mean any person authorized to receive or review Confidential Information pursuant to paragraph 6 herein.

3.    The person designating any discovery material as "Confidential" may designate, after good faith review by counsel of record, as "Confidential" any document or material that contains (a) financial information previously nondisclosed to the public (including without limitation profitability reports or estimates, percentage fees, design fees, royalty rates, minimum guarantee payments, sales reports, and sale margins); (b) material previously nondisclosed to the public relating to ownership or control of any nonpublic company; (c) business plans, product development information, or marketing plans previously nondisclosed to the public; (d) any information of a personal or intimate nature regarding any individual, including any financial information; or (e) any other category of information hereinafter given confidential status by the Court.

4.    Any party, subpoenaed nonparty, or other third party whose information may be disclosed in connection with this Action may designate documents produced, testimony given, or other information exchanged in connection with this action as "Confidential" either by notation on the document, statement on the record of the deposition, designation pursuant to paragraph 8 or 10 herein, or written advice to the respective undersigned counsel for the parties

P

**EXHIBIT A**

hereto. Electronic documents and information, if any, shall be designated as

"Confidential" by any of the foregoing methods or pursuant to a procedure to be agreed upon

by the parties.

5.      All Confidential Information shall be used solely for the purpose of this Action,

and no person receiving such Confidential Information shall, directly or indirectly, use, transfer,

disclose, or communicate in any way the Confidential Information to any person other than

Qualified Persons. Any other use or disclosure is prohibited.

6.      Except with the prior written consent of the Producing Party or by order of the

Court, Confidential Information shall not be furnished, shown, or disclosed to any person or

entity except to:

      a.      the parties in this action, including employees of the parties who are
            assisting in this action;

      b.      counsel for the parties to this action and their associated attorneys,
            paralegals and other professional personnel (including support staff) who are
            directly assisting such counsel in the preparation of this action for trial or
            other proceeding herein, and are under the supervision or control of such
            counsel;

      c.      copying, imaging, computer services, and/or litigation support services
            who are bound to protect Confidential Information either by their services
            contract with counsel or the Receiving Party or by execution of the
            confidentiality agreement attached hereto as Exhibit A;

      d.      any agreed-upon or ordered mediator and that mediator's personnel;

      e.      persons whom counsel of record for a party believes (i) are likely to be
            called to give testimony, through deposition, affidavit, or at trial, on
            matters relating to Confidential Information or (ii) possess information
            reasonably necessary and relevant for the prosecution or defense of the
            Action; provided, however, that such information is furnished, shown, or
            disclosed in accordance with paragraph 7 herein;

      f.      expert witnesses or consultants retained by the parties or their counsel to
            furnish technical or expert opinions, services, or assistance in connection
            with this action or to give testimony with respect to the subject matter of
            this action at the trial of this action or other proceeding herein; provided,

P

**EXHIBIT A**

however, that such Confidential Information is furnished, shown, or
disclosed in accordance with paragraph 7 herein;

g.    the Court and court personnel, provided that the Confidential Information is
filed in accordance with paragraph 11 herein or otherwise disclosed in
accordance with paragraph 12 herein;

h.    an officer before whom a deposition is taken, including stenographic reporters
and videographers and any necessary secretarial, clerical or other personnel of
such officer, provided that the Confidential Information is furnished, shown,
or disclosed in accordance with paragraph 13 herein;

i.    trial and deposition witnesses, provided that the Confidential Information is
furnished, shown, or disclosed in accordance with paragraphs 12 and 13,
respectively, herein; and

j.    any other person agreed to by the parties.

7.    Subject to paragraph 13, before any disclosure of Confidential Information is
made to any person pursuant to paragraph 6(e) or 6(f) herein, such person must execute a
confidentiality agreement in the form of Exhibit A attached hereto. Counsel shall maintain the
executed confidentiality agreements required by this Protective Order and supply a copy  to
counsel for the other party upon request; provided, however, that with respect to experts  and
consultants, counsel for the party shall not be required to supply a copy to counsel for the other
party unless and until that expert is disclosed pursuant to Rule 26 of the Federal Rules  of Civil
Procedure.

8.    Any document or information that may contain Confidential Information that has
been inadvertently produced without identification as to its confidential nature may be so
designated by the party asserting the confidentiality privilege by written notice to the
undersigned counsel for the Receiving Party identifying the document or information as
"Confidential" within a reasonable time following the discovery that the document or
information has been produced without such designation. Any party producing such improperly
designated documents shall retrieve such documents from persons not entitled to receive those

P

EXHIBIT A

documents.

9.      Documents and information designated as "Confidential" shall be treated as "Confidential Information" unless and until a challenge to the propriety of the designation is made successfully pursuant to this paragraph or the Designating Party withdraws the designation. A party shall not be obligated to challenge the propriety of a designation as "Confidential" at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. In the event that any party to this Action disagrees at any stage of these proceedings with the designation by the Designating Party of any information as "Confidential," or the designation of any person as a Qualified Person, that party may serve upon counsel for the designating party a written notice stating with particularity the grounds for the objection. The parties and any affected protected person shall then discuss this contention and attempt to resolve the disagreement over the classification of the material. If the parties and the affected protected person cannot resolve the matter within ten (10) days, the Designating Party, if it wishes to seek relief from the Court, must follow the procedure set forth in the Court's practice standards for resolution of discovery disputes. A party or nonparty may challenge the designation of confidentiality at any time that is consistent with the Court's scheduling order in this action. Pending the resolution of such motion by the Court and any subsequent appeal therefrom, the parties agree to treat the information that is the subject of the motion in accordance with the Designating Party's designation. The Designating Party shall at all times carry the initial burden of establishing that the contested information merits a "Confidential" designation.

10.     All depositions, the information disclosed therein, and the transcripts thereof shall presumptively be treated as Confidential Information and subject to this Protective Order during the deposition and for a period of thirty (30) days after a transcript of said deposition

P

EXHIBIT A

is received by counsel for each of the parties. At or before the end of such thirty- day period, any party who claims some part of the deposition shall be classified as "Confidential" shall notify all of the parties in writing of the specific pages and lines of the transcript which should be treated as Confidential Information thereafter.

      11.    A Non-Designating Party who seeks to file with the Court any deposition transcripts, exhibits, answers to interrogatories, and other documents which have previously been designated as comprising or containing Confidential Information, and any pleading, brief, or memorandum which reproduces, paraphrases, or discloses Confidential Information, shall follow the procedures of this Court for seeking leave to file documents under seal so as to prevent the disclosure of Confidential Information to persons other than Qualified Persons. The filing party will take all reasonable steps to file the documents or information in a way that preserves confidentiality, including fully utilizing all procedures for filing the document on a restricted basis under D.C.COLO.LCivR 7.2. The party who designated the documents "Confidential" will have the obligation to justify any sealing request under D.C.COLO.LCivR 7.2 or any other applicable Local Rule or Practice Standard. The parties acknowledge that this Stipulated Protective Order does not entitle them to file confidential information under seal except as set forth in D.C.COLO.LCivR 7.2, which describes the procedures that must be followed and the standards that will be applied when a party seeks permission from the Court to file material under seal.

      12.    Should the need arise for any of the parties to disclose Confidential Information during any hearing or trial before the Court, including through argument or the presentation of evidence, such party may do so only after taking such steps as the Court, upon

P

EXHIBIT A

motion of the disclosing party, shall deem necessary to preserve the confidentiality of such
Confidential Information.

13.     Any deposition witness who will be given access to Confidential Information
shall, prior thereto, be provided with a copy of this Protective Order and counsel shall make
reasonable efforts to have such person execute a confidentiality agreement in the form of Exhibit
A attached hereto. If unable to obtain an executed confidentiality agreement from such person,
counsel shall immediately and prior to the deposition provide notice to counsel for the other
party and such party may seek relief from the Court regarding the terms and conditions under
which Confidential Information may be disclosed to the witness in the deposition. Alternatively,
counsel for the parties may agree that Confidential Information is adequately protected by such
person's existing obligations to maintain the confidentiality of such information. Nothing herein,
however, shall prevent any counsel of record from utilizing Confidential Information in the
examination or cross-examination of any person who is indicated on the document as being an
author, source, or recipient of the Confidential Information, irrespective of which party produced
such information. Further, no executed confidential agreement shall be required to show a
current officer or employee of a party any Confidential Information that was disclosed by that
party, provided that such Confidential Information is reasonably necessary and relevant to
eliciting the testimony of such officer or employee.

14.     A party may designate as Confidential Information subject to this Protective
Order any document, information, or deposition testimony produced or given by any nonparty
to this case, or any portion thereof, where such information has not already been designated   as
"Confidential" by the nonparty.

P

EXHIBIT A

15.     The production or disclosure of Confidential Information shall in no way constitute a waiver of each party's right to object to the production or disclosure of other information in this action or in any other action.

16.     In the event that the Non-Designating Party is requested or required (by oral questions, interrogatories, requests for information or documents in a legal proceeding, subpoena, civil investigative demand, other similar process, or rule of law) to disclose any Confidential Information in another action or proceeding, the Non-Designating Party shall provide the Non-Designating Party with prompt written notice of any such request or requirement so that the Producing Party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Protective Order, provided, however, that nothing in this Protective Order shall be interpreted to obligate the Non- Designating Party to seek such a protective order or other remedy. Unless the Designating Party waives the protections of this Protective Order, the Non-Designating Party will not disclose any Confidential Information except pursuant to the order of a court of competent jurisdiction directing the disclosure of such Confidential Information.

17.     In the event any "Confidential Information" is disclosed to or acquired by an entity, person, or persons not authorized under this Protective Order to view such material, the party to this action (or that party's agent) responsible for having made or allowed such improper disclosure or acquisition (even if inadvertent or due to authorized access) ("Responsible Disclosing Party"), and each party (or party agent) with knowledge thereof, shall immediately inform counsel for the Designating Party of the Confidential Information at issue, as well as the party or third party who designated the Confidential Information at issue "Confidential" (if different), all known relevant information concerning the nature and

P

EXHIBIT A

circumstances of the disclosure or acquisition. The Responsible Disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed or acquired Confidential Information and to mitigate the risk that further or greater unauthorized disclosure, acquisition, and/or use thereof is made, and shall inform counsel for the Designating Party of the Confidential Information at issue, as well as the party or third party who designated the Confidential Information at issue "Confidential" (if different) of actions taken in that regard. Further, the Responsible Disclosing Party shall take all appropriate actions to address the circumstances that led to the inadvertent disclosure or acquisition, and prevent additional inadvertent disclosures or acquisitions from occurring thereafter.

18. Consistent with Federal Rule of Civil Procedure 26(b)(5)(B) and Federal Rule of Evidence 502, in the event a producing party inadvertently discloses information subject to the attorney-client privilege, attorney work-product doctrine, or other applicable privilege or immunity, the disclosure of the inadvertently disclosed information shall not constitute or be deemed a waiver or forfeiture of any claim of privilege or work product protection that the producing party would otherwise be entitled to assert with respect to the inadvertently disclosed information and its subject matter. Where it appears on its face that the information was inadvertently disclosed, or the producing party informs the receiving party that privileged information has been disclosed, the receiving party (i) must promptly return or destroy the specified information except for one copy for the purpose of contesting the claim of privilege, (ii) must not use or disclose the information until the claim is resolved, (iii) must take reasonable steps to retrieve any such information that was disclosed or distributed before the receiving party was notified and prevent any further dissemination of the information, and

10

EXHIBIT A

(iv) may promptly present the information to the Court for a determination of the claim. The producing party must preserve the information until the claim is resolved.

19.    In the event anyone shall violate or threaten to violate any terms of this Protective Order, the aggrieved party may immediately apply to the Court to obtain relief, including, without limitation, injunctive relief against such person. The existence, if any, of an adequate remedy at law shall not preclude the applying party from obtaining such relief.

20.    This Protective Order shall continue to be binding after the conclusion of this litigation except that (a) there shall be no restriction on documents that are used as exhibits in Court (unless such exhibits were filed under seal); and (b) that a party may seek the written permission of the Designating Party or further order of the Court with respect to dissolution or modification of any provision of the Protective Order. The provisions of this Protective Order shall, absent prior written consent of both parties, continue to be binding after the conclusion of this action. The Court expressly retains jurisdiction over this Action for enforcement of the provisions of this Protective Order following the final resolution of the Action.

21.    Nothing herein shall be deemed to waive any privilege recognized by law, or shall be deemed an admission as to the admissibility in evidence of any facts or documents revealed in the course of disclosure.

22.    Within sixty (60) days after entry of an order, judgment, or decree finally disposing of this Action, all Confidential Information produced or designated and all reproductions thereof, shall be returned to the Designating Party or shall be destroyed, at the option of the Designating Party, except that one copy of each document may be retained. In the event that any party chooses to destroy physical objects and documents, such party shall

11

**EXHIBIT A**

certify in writing within sixty (60) days of the final termination of this litigation that it has undertaken its best efforts to destroy such physical objects and documents, and that such physical objects and documents have been destroyed to the best of its knowledge. Notwithstanding anything to the contrary, counsel of record for the parties may retain all pleadings, motion papers, discovery responses, deposition transcripts, deposition and trial exhibits, legal memoranda, correspondence, work-product, and attorney-client communications that include or are derived from Confidential Information. This Protective Order shall not be interpreted in a manner that would violate any applicable canons of ethics  or codes of professional responsibility. Nothing in this Protective Order shall prohibit or interfere with the ability of counsel for any party, or of experts specially retained for this case, to represent any individual, corporation, or other entity adverse to any party or its affiliate(s)  in connection with any other matters.

23.     This Protective Order is entered into without prejudice to the right of either party to seek relief from, or modification of, this Protective Order or any provisions thereof  by properly noticed motion to the Court or to challenge any designation of confidentiality as inappropriate under applicable law.

24.     This Protective Order may be changed by further order of this Court, and is without prejudice to the rights of a party to move for relief from any of its provisions, or to seek or agree to different or additional protection for any particular material or information.

25.     When serving any subpoena in this Action on a nonparty to the Action, a copy of this Protective Order shall be included with the subpoena.

26.     This Protective Order shall be binding upon any future party to the Action.

12

**EXHIBIT A**

27.   This Protective Order may be executed in counterparts, each of which shall be

deemed an original, but all of which taken together shall constitute one and the same document.

DATED:  October 10, 2018

BY THE COURT:

Nina Y. Wang
United States Magistrate Judge

Dated: October 10, 2018

__/s/ Michael T. Leigh__
Kathryn A. Reilly
Cedric D. Logan
Chuan "CiCi" Cheng
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone: 303.244.1800
Facsimile: 303.244.1879
Email: reilly@wtotrial.com
logan@wtotrial.com
cheng@wtotrial.com

Clark C. Johnson
Michael T. Leigh
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street
Louisville, KY 40202
Telephone: 502-416-1630
cjohnson@kaplanjohnsonlaw.com
mleigh@kaplanjohnsonlaw.com

*Attorneys for Defendant*

__/s/ Jonathan A. Helfgott__
Paul H. Schwartz
Jonathan A. Helfgott
SHOEMAKER GHISELLI + SCHWARTZ LLC
1811 Pearl Street
Boulder, CO 80302
Telephone: 303-530-3452
pschwartz@sgslitigation.com
jhelfgott@sgslitigation.com

Seth Ard
Ryan C. Kirkpatrick
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel.: 212-336-8330
Fax: 212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

Steven G. Sklaver
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
ssklaver@susmangodfrey.com

*Attorneys for Plaintiff*

13

**EXHIBIT A**

14

**EXHIBIT A**

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of Colorado

| | | |
|---|---|---|
| Advance Trust & Life Escrow Services, LTA | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   18-cv-01897-WJM-NYW |
| Security Life of Denver Insurance Company | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   SCOR Global Life Americas Reinsurance Company, c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: First Legal Records, c/o Metro Legal Services, Inc., 330 Second Ave. South, Ste. 150, Minneapolis, MN 55401 | Date and Time: 03/29/2019 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   03/12/2019

*CLERK OF COURT*

OR

_____                    /s/ Scott. J. Fulford
*Signature of Clerk or Deputy Clerk*                   *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Advance Trust & Life Escrow Services, LTA                                          , who issues or requests this subpoena, are:

Scott Fulford; 1000 Louisiana St., Suite 5100, Houston, TX 77005; SFulford@SusmanGodfrey.com; 713.653.7860

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT A**

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  18-cv-01897-WJM-NYW

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**EXHIBIT A**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

---

**EXHIBIT A**

# EXHIBIT A

**EXHIBIT A**

## INSTRUCTIONS

This is an exhibit to a subpoena pursuant to the authority of the United States District Court for the District of Colorado requiring you to produce certain documents, electronic files, and/or tangible things for inspection, copying, etc. This exhibit provides instructions, definitions, and specific document requests. Documents, electronic files, or tangible things that are responsive to those requests must be produced no later than 5:00 p.m. on March 29, 2019, at the offices of First Legal Records, c/o Metro Legal Services, Inc., 330 Second Ave. South, Ste. 150, Minneapolis, MN 55401.

Do not destroy or alter any document, electronic file, or other evidence that is related in any way to any of the document requests below.

The document requests below include all documents within your possession, custody, or control, whether or not you are their author or owner.

Responsive documents shall be produced as they have been kept in the usual course of business and shall not be shuffled or otherwise rearranged. Alternatively, you may produce responsive documents organized and labeled to correspond to the enumerated requests of this demand. Documents you find stapled, clipped, or otherwise fastened together shall be produced in such form.

If no document within your possession, custody, or control is responsive to any particular document request below, so state in writing.

Electronic documents such as spreadsheets should be produced in their native format, which is the format in which the documents are maintained electronically.

If information stored in, or accessible through, a computer or other data retrieval system is produced, it must be accompanied with instructions and all other materials necessary to use or interpret such data.

1

**EXHIBIT A**

Documents that cannot be copied legibly must be produced in their original form.

If any portion of a document is responsive to an individual document request below, then the entire document shall be produced.

Where specific documents are listed as part of a general category of documents, then you must produce all documents falling within that general category.

If a responsive document contains legally privileged material, produce the entire document with the privileged material redacted, noting the redactions on the face of the document.

Do not redact any document such that any of its content is altered or destroyed permanently.

If any responsive document is withheld under a claim of privilege, you shall produce a list specifying each such document and setting forth the following information:

    (i)    the date the document was created;

    (ii)    the number of pages of the document;

    (iii)    the name and last known address of each person who prepared or participated in the preparation of the document;

    (iv)    the name and last known address of each addressee or other person to whom the document, or any part thereof, was sent or to whom the document or its contents, or any part thereof, was disclosed;

    (v)    a summary of the general subject matter of the document (and such other information as is necessary to identify the document, such as whether the document is a letter or memorandum);

    (vi)    a statement of the legal basis upon which the asserted privilege is claimed; and

    (vii)    the individual document request herein to which the document is responsive.

Any responsive document or part of a document withheld under a claim of privilege must be preserved and must not be altered or destroyed.

If you do not withhold any documents under a claim of privilege, so state in writing.

2

**EXHIBIT A**

If any document responsive to this request once existed but has been destroyed or discarded, or is otherwise not capable of being produced, you shall furnish a list specifying each such document and setting forth the following information:

(i)     the date document was created;

(ii)    a description of the subject matter of the document;

(iii)   the name and last known address of each person who prepared or participated in the preparation of the document;

(iv)    the name and last known address of each addressee or other person to whom the document, or any part thereof, was sent or to whom the document or its contents, or any part thereof, was disclosed;

(v)     the name and last known address of any person not covered by items (iii) and (iv) who had possession, custody or control of the document or a copy thereof;

(vi)    the date on which the document was destroyed or discarded and a statement of the reasons why the document was destroyed or discarded or why such document is not capable of being produced; and

(vii)   the individual document request herein to which the document is responsive.

Each individual document request set forth below shall be construed independently and not with reference to any other request for purposes of limitation unless a particular request so specifies.

Unless otherwise specified, the documents requested herein are documents prepared, written, sent, dated, received, or in effect at any time commencing from the date on which You first reinsured the Subject Policies (defined below) through and including the date of this document request.

A Protective Order has been entered in this case and is attached as Exhibit 2.

This request for documents shall be deemed continuing in nature and requires prompt supplemental responses in accordance with Rule 26(e) of the Federal Rules of Civil Procedure in

**EXHIBIT A**

the event you become aware of, or acquire within your possession, custody or control, additional

responsive documents at any time hereafter.

## DEFINITIONS

1.     The term "Communication" means the transmittal of information (in the form of

facts, ideas, inquiries or otherwise).

2.     The term "Document" is defined to be synonymous in meaning and equal in scope

to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P.

34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

3.     The term and abbreviation "ESI" shall mean and refer to all electronically stored

information, including all writings, drawings, graphs, charts, photographs, sound recordings,

images, email, source code, software, databases, phone messages and records, operating systems

and software applications, backup tapes, metadata, voicemail messages, text messages, instant

messages, and other data or data compilations stored in any medium from which information can

be obtained. Any request herein for any Document or all Documents includes and requires

production of all ESI.

4.     The term "Person" is defined as any natural person or any legal entity, including,

without limitation, any business or governmental entity or association.

5.     The term "Concerning" means relating to, referring to, describing, evidencing or

constituting.

6.     The terms "all," "any," and "each" shall each be construed as encompassing any

and all.

**EXHIBIT A**

7.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

8.      The term "SLD" means and refers to Security Life of Denver Insurance Company, its parents, agents and/or employees, persons acting on their behalf; and, the predecessors and successors in interest of each of the foregoing described entities and persons.

9.      The term "Complaint" means the Class Action Complaint and Jury Demand filed in *Advance Trust & Life Escrow Services, LTA v. Security Life of Denver Insurance Company*, Case No. 18-cv-01897-WJM (D. Colo.), attached hereto as Exhibit 1.

10.    The term "COI Increase" refers to the cost of insurance rate increase on certain SLD policies described in paragraph 41 of the Complaint.

11.    The term "Subject Policies" refers to all standardized form policies issued on Security Life policy forms 1165-8/03 and 1166-3/04 and marketed under the product names Strategic Accumulator Universal Life (or Strategic Accumulator UL) and Life Design Guarantee Universal Life (or Life Design Guarantee UL).

12.    The use of the singular form of any word includes the plural and vice versa.

13.    The terms "You" and "Your" mean and refer to the entity named in the subpoena, its parents and subsidiaries including their agents and/or employees and persons acting on their behalf; and, the predecessors and successors in interest of each of the foregoing described entities and persons.

14.    "Custodial file" means all documents, including ESI, in each person's file(s), including all documents created, sent, received or otherwise in his or her possession, custody, or

5

control. A custodial file includes but is not limited to all documents in a person's possession, custody, or control contained in email inboxes, hard drives, shared drives, and hard copy files.

15. Electronically Stored Information ("ESI") – as referenced in paragraph 3 above and which is included within the definition of Document – must be provided in a form that includes all data in native format (the format in which it was originally created) and metadata (and all fields of metadata) and states the computer hardware and software programs needed to translate the information into readable and searchable form. All ESI should have a unique file name and should be named with the Bates number assigned to it. In addition, all ESI produced in response to this request must also be provided as single-page TIFFs, in Group IV format, and each TIFF should be named with a Bates number assigned to it, and provided standard Concordance load files "Dat and OPT". Document level OCR shall be provided as a separate text file named per the Corresponding Bates number. The load files must include the following metadata fields in the load file: MD5hash value; conversation index; subject; to; from; cc; bcc; date sent; date received; time received; time sent; attachment or file name; beginning attachment; end attachment. The production time zone for all ESI must be in the time zone in which the Subpoena was served.

16. Non-Convertible Files: Certain types of files such as system, program, video and sound files may not be amenable to conversion into anything meaningful in TIFF format. Responsive, non-convertible files will be produced in the form of a placeholder TIFF image. Some examples of file types that may not convert include file types with the following extensions: *.exp *.ilk *.res *.trg *.tlh *.idb *.pdb *.pch *.opt *.lib *.cab *.mov *.mp3 *.swf *.psp *.chi *.chm *.com *.dll *.exe *.hlp *.ivi *.ivt *.ix *.msi *.nls *.obj *.ocx *.rmi *.sys *.tmp *.ttf *.vbx *.wav *.wpg *.iso *.pdb *.eps *.mpeg *.mpg *.ram *.rm *.psd *.ai *.aif *.bin *.hqx *.snd *.mpe

6

*.wmv *.wma *.xfd * Other files may not be able to be converted to TIFF due to password
protection or corruption (for example). If reasonable efforts to obtain useful TIFF images of these
files are unsuccessful, these non-convertible files will also be accounted for with a TIFF
placeholder. Non-convertible files will be produced in the form of a placeholder TIFF image.
Each TIFF placeholder will contain the endorsed bates number, endorsed confidentiality
designation and the name of the non-convertible file, including the file extension.

     17.    Productions should contain sequential bates numbers with no gaps. There should
be no gaps in bates numbers between productions. A unique production volume number will be
used for each production. If any unavoidable gaps occur, the parties agree to provide advance
notice of those gaps within productions and/or between productions.

## DOCUMENTS REQUESTED

**Request for Production No. 1**: All reinsurance agreements, excess retention reinsurance
agreements, financial reinsurance agreements, or other similar agreements, including any
amendments to those agreements, between You and SLD Concerning the Subject Policies.

**Request for Production No. 2**: All Documents Concerning mortality data You considered in
connection with any actual or proposed reinsurance rate increases affecting the Subject Policies,
including, without limitation,

    (a) Internal communications regarding such mortality data;

    (b) Communications with SLD regarding such mortality data; and

    (c) Memoranda, analyses, white papers, charts, presentations, calculations, actuarial work,
        Communications, or other Documents Concerning whether and how mortality experience
        or expectations of future mortality experience would affect the reinsurance rate applicable
        to the Subject Policies.

**Request for Production No. 3**: All Documents Concerning any actual or proposed reinsurance
rate increases affecting the Subject Policies, including, without limitation:

    (a) Communications with SLD regarding such increases;

    (b) Internal Communications Concerning such increases;

    (c) Documents Concerning the bases for your decision to increase reinsurance rates affecting
        the Subject Policies; and

<div align="center">7</div>

**EXHIBIT A**

**Request for Production No. 4**: All Communications with SLD Concerning reinsurance that you issued or considered issuing for the Subject Policies.

**Request for Production No. 5**: All Documents Concerning the COI Increase, including, without limitation, (a) Communications between You and SLD concerning the COI Increase and (b) Internal Communications Concerning the COI Increase.

Dated:  March 12, 2019

/s/ Scott Fulford
Seth Ard
Ryan C. Kirkpatrick
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019-6023
Tel.: 212-336-8330
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com

Paul H. Schwartz
Jonathan A. Helfgott
SHOEMAKER GHISELLI + SCHWARTZ LLC
1811 Pearl Street
Boulder, CO 80302
Tel: 303-530-3452
pschwartz@sgslitigation.com

Steven G. Sklaver
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: 310-789-3100
ssklaver@susmangodfrey.com

Edgar Sargent
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: 206-516-3880
esargent@susmangodfrey.com

Scott J. Fulford
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Tel: 713.653.7860
sfulford@susmangodfrey.com

*Attorneys for Plaintiff*

8

**EXHIBIT A**

# EXHIBIT 1

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
pg 69 of 109
Case 1:18-cv-01897-WJM-NYW    Document 1    Filed 07/26/18    USDC Colorado    Page 1 of 26

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

ADVANCE TRUST & LIFE ESCROW SERVICES, LTA,
as securities intermediary for
LIFE PARTNERS POSITION HOLDER TRUST,
on behalf of itself and all others similarly situated,

      Plaintiff,

v.

SECURITY LIFE OF DENVER INSURANCE COMPANY,

      Defendant.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

Plaintiff Advance Trust & Life Escrow Services, LTA, as securities intermediary of Life Partners Position Holder Trust ("Plaintiff"), on behalf of itself and all others similarly situated, for its Complaint against defendant Security Life of Denver Insurance Company ("Security Life"), states as follows:

### NATURE OF THE ACTION

1.    This is a class action brought on behalf of Plaintiff and similarly situated owners of universal life insurance policies issued by Security Life. Plaintiff seeks to represent a class of Security Life policyholders who have paid and are being forced to pay unlawful and excessive cost of insurance ("COI") charges by Security Life. These policies are all standardized form policies issued on Security Life policy forms 1165-8/03 and 1166-3/04 and marketed under the product names Strategic Accumulator Universal Life (or Strategic Accumulator UL) and Life Design Guarantee Universal Life (or Life Design Guarantee UL) (the "Subject Policies").

1

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
pg 70 of 109
Case 1:18-cv-01897-WJM-NYW   Document 1   Filed 07/26/18   USDC Colorado   Page 2 of 26

2.      Security Life is one of several life insurer subsidiaries of Voya Financial, Inc. ("Voya"). Beginning in September 2015, Voya subsidiaries began announcing COI increases on certain legacy blocks of universal life insurance policies. Universal life ("UL") policies combine death benefits with a savings or investment component, often known as the "account value."

3.      A key feature of such policies was the "unbundling" or "transparency" of the COI charges, other contractually-specified costs, and crediting rates. This means that the monthly deductions are broken down into an array of discrete charges. The Dictionary of Insurance Terms describes unbundled universal life insurance as "coverage in which the investment features, mortality element and cost factors of a life insurance policy are separated, permitting each part to be independently analyzed." The COI charge is the policy's unbundled insurance component and is used to cover the insurer's mortality risk. It is also referred to in the industry as the "mortality charge" or the "pure cost of protection." The savings component, as discussed in more detail herein, allows policyholders to use their policies as tax-advantaged savings vehicles and earn interest on the account value.

4.      For every policy at issue, the COI is listed as a charge that is separate from charges for other expenses and a premium charge from which Security Life earns a profit. Collectively, these charges constitute the total premium that a policyholder pays. The COI charge is typically the largest part of that premium. The COI charge is deducted from the policy owner's account value on a monthly basis, so the policyholder forfeits the COI charge entirely to Security Life.

5.      The COI charge is supposed to compensate Security Life for mortality risk, *i.e.*, the expected probability that the insured for that particular policy will die in a particular year. Security Life's parent company, Voya, maintains a "Life Insurance Glossary" on its website,

2

which defines "Cost of Insurance" as the deduction for "the pure death benefit protection" and is synonymous with "Mortality Charge":

> **Cost of Insurance (COI)**
>
> Cost of Insurance (COI) is the automatic deduction made from the Accumulation Value on universal and variable universal life policies, for the pure death benefit protection. This cost is based on the net amount at risk under the policy, the insured's risk classification at the time of policy purchase and the insured's current age. The deduction occurs on a monthly basis. This is also known as Cost of Risk or Mortality Charge. Refer to your policy for the specific terms and conditions.

6.      The Subject Policies do not provide any alternative definition to "mortality charge" or "pure death benefit protection" for what the cost of insurance is supposed to pay.  The Subject Policies state that this cost of insurance rate "will be determined by us from time to time" and will be multiplied against the net amount at risk in order to determine monthly charges:

> The cost of insurance for the policy is the sum of the cost of insurance for all segments. A segment's cost of insurance is the cost of insurance rate for the premium class for the segment multiplied by the net amount at risk allocated to the segment.  It is determined on a monthly basis.
> ***
> The cost of insurance rate for each segment will be determined by us from time to time.[1]

7.      After issuance, an insurer is typically required to periodically review—as the contract requires here, "determined by us from time to time"—the COI rates to confirm that they correctly capture the insurer's projected mortality costs.   If the insurer's review reveals that

---

[1] The policies define "segment" to mean "a block of death benefit coverage."  The "premium class" of the insured is provided for on a schedule for every policy and it is the insured's underwriting classification and smoker status (e.g., Preferred Non-Smoker; Standard Non-Smoker), which are groups used to assess mortality risks.

3

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
pg 72 of 109
Case 1:18-cv-01897-WJM-NYW    Document 1    Filed 07/26/18    USDC Colorado    Page 4 of 26

projected mortality costs are lower than the corresponding COI rates, the insurer is required to reduce COI rates.

8.      Policyholders' comfort with this arrangement is based on trust that the insurer will dutifully adjust COI rates to reflect only the pure costs of mortality coverage. Security Life, however, has not only failed to live up to its end of the bargain in terms of decreasing rates as its mortality expectations improved—it has attempted to dramatically increase COI rates at the same time as it was projecting that mortality rates would continue to decline.

9.      In September 2015, Security Life sent letters to policyholders notifying them of significant COI increases for the Subject Policies.   The increase imposed on Strategic Accumulator UL policies was a massive 42%, which is costing Plaintiff hundreds of thousands of dollars each year.   For Life Design Guarantee UL, the increase was 9.25%, which also materially impacts the value of such policies.   Security Life's letters to policyholders were deliberately cryptic as to the reasons for the increases, making no mention of mortality experience and stating only that "[t]he increase in the cost of insurance rates was made in response to the increase in the anticipated cost of providing future coverage."

10.     There was no sudden change for the worse in Security Life's mortality expectations for the policies, as would be required to raise COI rates.   Nationwide mortality rates have declined significantly over the past several decades and this trend is widely projected to continue. That trend of improving mortality expectations should have resulted in the lowering of COI rates, not a massive raise.   Indeed, Security Life has itself stated that mortality experience has been more favorable than it originally expected and that it expects historic mortality improvement trends to continue.   For example, in its 2015 Annual Statement Exhibit 5, which was filed with each state and signed by Voya's Chief Actuary, Security Life stated that

4

**EXHIBIT A**

"[r]egarding future experience, we expect historical mortality improvement trends...to continue." As a result, insureds are living longer than Security Life originally anticipated when the policies at issue were first priced and Security Life expects to pay out fewer death benefits on an annual basis. And if Security Life pays out fewer death benefits over time, then Security Life's "anticipated cost of providing future coverage" goes down, and the COI rate should correspondingly decrease.

11.    Despite this improved mortality experience, however, Security Life has not only failed to lower the COI rates it charges its customers—it has increased them. Security Life's apparent motivation is profit and increasing the dividends paid to its parent company, Voya. When life insurers issue policies, they record deferred acquisition costs ("DAC"), which are designed to defer accounting charges for the up-front costs of commissions, marketing expenses, and product development. DAC is an intangible asset on the books of the insurer and amortized over the time the policy is in-force. The amortization of those costs, rather than the costs themselves, is recorded as an expense. The amount of amortization in a year is based upon the expectations of future cash flows compared with past and current cash flows, including COI charges. When COI rates are adjusted upwards in a way that increases expected future cash flows, it triggers an accounting process called "dynamical unlocking" whereby past amortizations are retroactively changed and released into the current year's earnings. The accounting benefit is immediate (as opposed to waiting until COI charges are actually collected), and the profit recognized in the year of increase greatly exceeds the amount of excess COI charges that are actually collected in that year.

12.    In recent years, insurers have improperly used COI increases to trigger large, one-time dividends to their parent companies. In Security Life's case, the 2015 COI increase allowed

5

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
pg 74 of 109
Case 1:18-cv-01897-WJM-NYW    Document 1    Filed 07/26/18    USDC Colorado    Page 6 of 26

Security Life to pay an "extraordinary dividend" of $111 million to Voya in 2015, on top of a $111 million "ordinary dividend." This $241 million total dividend in 2015 constituted a 750% increase over the $32 million dividend that Security Life paid to Voya in 2014. This confirms that the 2015 increase was not based on any increase in the *cost* of providing pure death benefit protection to Security Life's policyholders, but rather Security Life's and Voya's *profit* objectives and their desire to provide increased returns to Voya's shareholders. This is, of course, improper: Security Life is not allowed to bake profit margins into its COI rates, let alone increase COI rates to boost profits and trigger extraordinary dividends to its parent company.

13.    Security Life's manipulation of COI rates to load and increase profits is particularly egregious given that the policies at issue have various other unbundled and transparent mechanisms through which profits are already realized and other expenses are funded:

- A premium charge of 4% of each premium, which means that Security Life collects as profit 4% of all premiums paid by policyholders;
- A sales charge of 11% of each premium in the first 10 years;
- Monthly administrative charges;
- Per policy administrative charges;
- Loan charges; and
- Interest earned on account values in excess of the credited rate (known as the "interest spread").

14.    A reasonable policyholder would expect Security Life's profits to come from these other express provisions, not from COI charges. Indeed, there is no plausible interpretation of "cost of insurance" that would include profits—the two terms (cost & profit) are antonyms.

15.    In sum, Security Life has violated the terms of the Subject Policies by failing to base cost of insurance rates on the projected cost of insurance. In the face of the substantially

**EXHIBIT A**

improved mortality experience that has benefited Security Life enormously, Security Life has not only failed to reduce COI rates—it has increased them. Security Life apparently believes that it has the right to load COI rates with profit margins and other impermissible considerations unrelated to the actual costs of insurance, despite imposing separate charges for profits and expenses. This position has no merit and is contrary to the well-established definition of "cost of insurance" and the reasonable expectations of insureds. As a result of this misconduct, plaintiff seeks, among other things, monetary relief for the COI overcharges that Security Life has wrongly imposed and continues to impose on its customers.

## THE PARTIES

16.    Plaintiff Advance Trust & Life Escrow Services, LTA is organized under the laws of Texas and is located at 1401 New Road, Suite 200, Waco, Texas 76711. Plaintiff is suing in its capacity as security intermediary of Life Partners Position Holder Trust and is the owner of the following Security Life policies that are subject to the 2015 COI Increase:

- Policy #1603978 (Policy Date: 5/17/2005; Initial Stated Death Benefit: $1,500,000)
- Policy #1605330 (Policy Date: 9/7/2005; Initial Stated Death Benefit: $3,215,799)
- Policy #1602412 (Policy Date: 12/28/2004; Initial Stated Death Benefit: $10,000,000)
- Policy #1617003 (Policy Date: 10/26/2007; Initial Stated Death Benefit: $1,000,000)
- Policy #1629065 (Policy Date: 3/17/2008; Initial Stated Death Benefit: $7,000,000)

17.    Defendant Security Life is a corporation organized and existing under the laws of Colorado and has its corporate headquarters at 8055 East Tufts Avenue, Suite 710, Denver, Colorado 80237.

7

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
pg 76 of 109
Case 1:18-cv-01897-WJM-NYW    Document 1    Filed 07/26/18    USDC Colorado    Page 8 of 26

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over Plaintiff's claims because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. Security Life is incorporated and has its principal place of business in Colorado. Plaintiff is a citizen of Texas and unnamed class members are citizens of states across the United States. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

19.    This Court has personal jurisdiction over Security Life because it is incorporated in Colorado and its principal place of business is in Colorado.

20.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because Security Life is headquartered in this District and the events giving rise to Plaintiff's causes of action occurred in this District.

## FACTUAL BACKGROUND

### A.    The Policies at Issue

21.    The policies at issue are all flexible-premium, UL policies issued by Security Life in the mid-2000s. They were all issued on the same standardized policy forms and insureds are not permitted to negotiate different terms. Exhibit A to this Complaint is a representative policy (Policy #1603978), redacted for personal information.

22.    UL policies combine death benefits with a savings or investment component, often known as the "account value." One benefit of UL policies is that they permit policyholders flexibility in the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other

8

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC   Document 39-1   filed 04/02/19   USDC Colorado
Case 1:18-cv-01897-WJM-NYW   Document 1   Filed 07/26/18   USDC Colorado   Page 9 of 26
pg. 77 of 109

specified expenses. The COI charge is deducted from the Policy Account (i.e., the savings component) of the policy on a monthly basis, so the policyholder forfeits the COI charge entirely to Security Life. Any premiums paid in excess of COI charges and other charges are applied to a policy's "Policy Account," sometimes known as "policy account value" or "cash value." These excess premiums earn interest at the credited rate. This structure is beneficial because it allows policyholders the choice to either (i) minimize their capital investment and generate greater rates of return through other investments or (ii) to use the UL policy as a savings vehicle and earn interest on the account value.

23.   The size of the COI charge is highly significant to universal life policyholders. First, it dictates the minimum amount of money that must be paid to keep a policy in force. Second, high COI rates can quickly diminish a policy's account value and reduces the amount of money on which interest can be earned. Absent a secondary guarantee, if the policy account value diminishes such that COI charges can no longer be deducted, then the policy will go into grace and, if no additional premiums are paid after adequate time provided by an accurate grace notice, the policy may lapse. Third, higher current and illustrated future COI rates reduce the value of a policy in the secondary and tertiary markets.

24.   Although many UL policies contain a table of guaranteed maximum COI rates, policies are marketed, illustrated, and sold based almost exclusively on the basis of current rates. The guaranteed rates are set far in excess of current rates—often as much as three times higher— and generally bear no connection to either current or projected rates. If policies were marketed and sold based on guaranteed COI rates, virtually no one would ever buy a UL policy because the economics would not make any sense. For example, Exhibit B to this Complaint is an August 19, 2015 illustration for Policy #1603978. While Security Life was required, by statute,

9

**EXHIBIT A**

to illustrate values under both guaranteed maximum rates and current rates, the "Guaranteed" columns are all populated with "0" even with a premium outlay of $227,463 per year. *See* Exhibit B at p. 4. These zeros are explained in a footnote that states: "In the event that the guaranteed costs were deducted and the guaranteed interest rate was paid from 8/19/2015 forward, the policy would lapse and cannot be illustrated beyond the year shown. Additional premiums [above the $227,463 per year] would be required to continue the coverage." In other words, the policy would lapse even if the $227,463 projected premium outlay were paid, and Security Life refused to even illustrate the premiums that would be required under the guaranteed rates. In contrast, under the then-current rates, the policy would remain in force through age 100 and have an account value of $765,561 by the nineteenth policy year. On page 7 of Exhibit B, Security Life provided another illustration that further breaks down the separate policy charges, including COI charges. This illustration is based solely on current rates—no similar illustration is provided under guaranteed rates, and there is no projection of what annual COI charges would be under guaranteed maximum rates. This is consistent with the way UL policies are always illustrated and marketed: the focus is on current rates, and no consumer expects to pay the guaranteed maximum rates (which the insurer will not even properly illustrate).

25.    The COI charge is part of the insurance component of a UL policy. It is supposed to be the insurer's cost of providing mortality coverage. Security Life's parent defines "Cost of Insurance" on its website as the charge for the "pure death benefit protection," and states that "Cost of Insurance" is synonymous with "Mortality Charge." The Society of Actuaries conducts actuarial exams for "Individual Life & Annuities United States – Design & Pricing," in which it instructs that "mortality charge" is an "equivalent or similar term" to "cost of insurance." And popular online dictionary sources, like BusinessDictionary, define "cost of insurance charge" as

10

Case No. 1:18-cv-01897-DDD-SKC   Document 39-1   filed 04/02/19   USDC Colorado
Case 1:18-cv-01897-WJM-NYW   Document 1   Filed 07/26/18   USDC Colorado   Page 11 of 26
pg. 79 of 109

follows: "Synonym for the mortality charge. The charge associated with the pure insurance

protection element of a life insurance policy."[2]

26.    The Subject Policies do not provide any alternative definition of this well-known

term, stating instead that the cost of insurance rate "will be determined by us from time to time"

and will be multiplied against the net amount at risk in order to determine monthly charges. The

entirety of the COI language in the Subject Policies is set forth below:

> The cost of insurance for the policy is the sum of the cost of insurance for all
> segments.[3] A segment's cost of insurance is the cost of insurance rate for the
> premium class for the segment multiplied by the net amount at risk allocated to
> the segment. It is determined on a monthly basis.
>
> The net amount at risk is (a) minus (b) where:
>
>> a) is the sum of (i) the base death benefit for each segment as of the
>>    monthly processing date after the monthly deductions (other than cost
>>    of insurance charges for the base death benefit and any riders), divided
>>    by (ii) the result of 1 plus the monthly equivalent of the guaranteed
>>    minimum interest rate as shown in the Schedule; and
>> b) is your account value as of the monthly processing date after the
>>    monthly deductions (other than the cost of insurance charges for the
>>    base death benefit and any riders).
>
> The net amount at risk will be allocated to a segment in the same proportion as
> that segment's stated death benefit bears to the sum of the Stated death benefits
> for all segments.
>
> The cost of insurance rate for each segment will be determined by us from time to
> time. Different rates will apply to each segment. The Company will refer to the
> gender and age of the insured as of the effective date of segment coverage, the
> duration since the coverage began, the amount of target death benefit and the
> segment premium class in applying its current rates for each insured. Any change
> in rates will apply to all individuals of the same premium class and whose policies
> have been in effect for the same length of time. The rates will never exceed those

---

[2] http://www.businessdictionary.com/definition/cost-of-insurance-charge.html (visited July 3, 2018)
[3] A "segment" is defined in the Subject Policies as "a block of death benefit coverage." For example, if a
policy has an initial death benefit of $1,000,000, and later increases the amount to $1,500,000, this would
be deemed as two "segments," one in the amount of $1,000,000 and a second in the amount of $500,000.
The total cost of insurance for the policy would then be the sum of the cost of insurance for both
segments.

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW    Document 1    Filed 07/26/18    USDC Colorado    Page 12 of 26
pg 80 of 109

rates shown in the Table of Guaranteed Rates for the segment. These tables are in the Schedule.

27.     Cost of insurance, by definition, does not include a profit component.

28.     When first introduced as a product, universal life was designed to separately identify the charges levied on a policyholder, including a separate cost of insurance charge that was intended to be a pure mortality charge, covering only the cost of providing death benefits. For example, the Dictionary of Insurance Terms defines universal life insurance as: "ADJUSTABLE LIFE INSURANCE under which (1) premiums are flexible, not fixed; (2) protection is adjustable, not fixed; and (3) insurance company expenses and other charges are specifically disclosed to a purchaser. This policy is referred to as UNBUNDLED *life insurance* because its three basic elements (investment earnings, *pure cost of protection,* and company expenses) are separately identified both in the policy and in an annual report to the policyholder."[4] The pure cost of protection is the cost of providing the death benefit, without expenses or profit margins, and therefore covers only expected mortality risks. The other expense and profit charges are then separately charged and, together with the COI charge, constitute the total premiums paid each month. *See* The Dictionary of Insurance Terms at 430 (explaining in the definition of "Rate Making" that insurance companies use experience studies to determine the *"pure cost of protection*, or *pure premium,* to which the insurance company adds on loads for agent commissions, premium taxes, administrative expenses, contingency reserves, other acquisition costs, and profit margin," and that "[t]he result is the GROSS PREMIUM to be charged to the insured.").

29.     Pure cost of protection rates are designed to be charged against the actual amount payable in the event of a claim, known as the "net amount at risk," which is defined in The

---

[4] Rubin, Dictionary of Insurance Terms (6th ed. 2013) (emphasis in original).

EXHIBIT A

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
pg 81 of 109
Case 1:18-cv-01897-WJM-NYW    Document 1    Filed 07/26/18    USDC Colorado    Page 13 of 26

Dictionary of Insurance Terms as "difference between the face amount of a life insurance policy and its cash value (also known as "pure amount of protection")." The difference between the cash value discussed above and the account value is a "surrender charge," which decreases over time and provides a further source of profit to the issuing company.

30.    The structure and terms of the Subject Policies are consistent with this design. First, they state that "[a] segment's cost of insurance is the cost of insurance rate multiplied by the net amount at risk," with the net amount at risk calculated as death benefit minus account value.  This is consistent with the "pure cost of protection" described in The Dictionary of Insurance Terms and the "pure death benefit protection" described in Voya's glossary: using net amount at risk to calculate COI charges ensures that the COI charge is directly tied to what the insurer must pay out upon a mortality event.  Second, the Subject Policies have other distinct charges (or loads) to pay for agent commissions, premium taxes, administrative expenses, marketing and sales costs, and profits.  For example:

- Security Life collects a premium charge of 4% of each premium payment, which reflects profit margin on the policies.  Retaining three to four percent of all premiums as profits is a standard profit margin in the industry.

- Security Life imposes a sales charge of 11% of each premium in the first 10 years, which amount compensates Security Life for commissions and marketing costs (hence its title as a "sales charge").

- Security Life imposes a monthly administrative charge of $0.049 per $1000 of target death benefit in years 1-5, and $0.010 thereafter. This covers Security Life's administrative costs.

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW    Document 1-2    Filed 07/26/18    USDC Colorado    Page 14 of 26
pg 82 of 109

- Security Life imposes a per policy administrative charge of $13 per policy month in years 1-3, and $3 per policy month in years 4 and thereafter. This also covers administrative costs.

- Security Life charges $25 for each illustration after the first year, to cover illustration costs.

- The surrender charge.

- Security Life earns additional profit based on the difference between the investment income that Security Life earns by investing policyholders' account values and the amounts that it credits to the account values. With the current credited rate at the guaranteed minimum of 3%, and most insurers projecting earned rates of around 5%, this means that Security Life is annually earning a spread of 2% on all policyholder accounts, equating to tens of millions of dollars.

31.    Including anything other than mortality charges in the COI rate would be inconsistent with these provisions and the unbundled policy structure. For example, if Security Life were to claim that it could recover administrative expenses through the COI charges, then it would be violating the cap on administrative charges. The same would be true if Security Life sought to recover taxes or commissions through the COI rates. Indeed, Security Life's illustrations expressly state that "[t]he monthly expense charge is made up of the policy charge, monthly policy fees, tax charges, sales charges, service fees for partial withdrawals, and administration charges." The cost of insurance is described separately and should not contain those charges. The Subject Policies are therefore structured as traditional universal life policies, in which charges for mortality and charges to cover administrative and marketing costs are separated.

14

**EXHIBIT A**

32.    Further additional evidence that the various different monthly deduction charges each have their own specific purposes comes from the "Periodic Reports" section of the Subject Policies, which promises to send the policy owner at least once a year a report that "will include any other information that may be currently required by the insurance company supervisory official of the jurisdiction in this policy is delivered." Pursuant to the Code of Colorado Regulations, the annual report must include "[t]he total amounts that have been credited or debited to the policy value during the current report period, identifying each *by type* (e.g., interest, mortality, expense and riders)." 3 C.C.R. 702-4 Series 4-1-7, Section 10 (emphasis added).    The only entry in the Periodic Reports that Security Life sent to policyholders that plausibly purports to identify mortality charges is the "Cost of Insurance Charges" section. "Administrative Charges," "Policy Charges," "Rider Charges," "Interest Credited," and "Other Charges/Adjustments"[5] are all separately listed in the Periodic Reports.

## B.    Security Life Fails to Reduce COI Rates Despite Continued Mortality Improvement

33.    A mortality table is a chart showing the rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status, and duration since underwriting.    Mortality tables are used by actuaries to calculate insurance rates and are designed to reflect mortality rate expectations.

---

[5] As explained in a footnote to the Periodic Reports, "Other Charges/Adjustments" include surrender charges, value adjustments, partial surrenders and withdrawals, and partial surrender and withdrawal fees.

EXHIBIT A

34.    Beginning at least as early as 1941, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry-standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. A mortality table is a chart showing the expected rate of death at a certain age.

35.    In 2001, at the request of the NAIC, the Society of Actuaries ("SOA") and the American Academy of Actuaries ("Academy") produced the 2001 CSO Mortality Table, which showed strong mortality improvements, particularly at older ages, over the 1980 CSO table. An investigative report on the update of the CSO tables by the SOA was published in March 2015 and showed significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

36.    The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. These surveys have consistently showed mortality improvements over the last three decades, particularly for ages 70-90.

37.    Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include: (a) 1990-95 Basic Select and Ultimate Mortality Tables; (b) 2001 Valuation Basic Mortality Table, (c) 2008 Valuation Basic Table, and (d) 2015 Valuation Basic Table.

38.    The 1990-95 Basic Table was drawn from the death rates observed by 21 large life insurance companies with policy anniversaries between 1990 and 1995. This experience study is for data at, around, or immediately prior to the publication of the policy forms which are the subject of this complaint. The 2001, 2008 and 2015 Valuation Basic Tables each show

16

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW   Document 1   Filed 07/26/18   USDC Colorado   Page 17 of 26
pg 85 of 109

significant mortality improvements from the 1990-1995 Basic Tables and the 1975-80 Basic Tables, demonstrating that mortality experience has continued to improve substantially and consistently. That trend continues. In 2014, the SOA finalized new mortality tables and a new mortality improvement scale, reflecting improved life expectancies and an expectation that the trend of improving mortality will continue.

39.    Security Life has acknowledged that mortality has continually improved not only industry-wide, but specifically with respect to the policies it has issued. Each year, insurers are required to file a statement entitled "Annual Statement Exhibit 5, Interrogatory 3, Determination of Non-Guaranteed Elements" (the "Annual Statement"). The Annual Statement must be signed by an appointed actuary and contains various representations regarding non-guaranteed elements. Security Life's 2015 Annual Statement represented that, "[r]egarding future experience, we expect historical mortality improvement trends and maintenance expense inflation to continue," and that "changes in these trends will be reflected in the re-determination of non-guaranteed elements." COI rates are one of the "non-guaranteed elements" referenced in this statement. Security Life made the same or similar statements in its Annual Statements for the years 2012-2014. And in each of 2008 (the first year such statements are available online), 2009, 2010, and 2011, Security Life acknowledged that mortality experience had been better than originally estimated at original pricing, stating: "For older business, our mortality...experience has generally been better than the anticipated experience factors underlying the non-guaranteed elements."

17

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC   Document 39-1   filed 04/02/19   USDC Colorado
pg 86 of 109
Case 1:18-cv-01897-WJM-NYW   Document 1   Filed 07/26/18   USDC Colorado   Page 18 of 26

40.     Despite this continued improvement in mortality experience and Security Life's commitment to redetermine cost of insurance rates "from time to time"[6]—and despite Security Life's sworn promise to regulators that its improving mortality trends "will be reflected in the redetermination of" its COI rates—Security Life has never decreased COI rates on the Subject Policies at any time over the past 15 years.

C.     **Security Life's Unlawful COI Increase in the Face of Continued Mortality Improvement**

41.     In September 2015, Security Life started mailing letters to policyholders notifying them of a COI increase that would be taking effect on their October 2015 processing dates. The letter did not explain what costs were projected to increase, stating only that "[t]he increase in the cost of insurance rates was made in response to the increase in the anticipated cost of providing future coverage."

42.     The amount of the increase was significant: owners of Life Design Guarantee policies were subjected to 9.25% increases, while owners of Strategic Accumulator policies were hit with 42.3% increases. To illustrate the magnitude of the increases in dollar terms, Plaintiff received an illustration for Policy # 1603978 on August 20, 2015—less than a month before the increase was announced—showing that COI charges in policy year 13 (2017) would be $134,890. A post-increase illustration dated May 31, 2016 showed that the new cost of insurance charge for policy year 13 would be $214,103—a $79,103 increase for a single year.[7] If the insured reaches age 99, the amount of overcharge due to the COI increase alone (exclusive of the

---

[6] Industry standards, and some state regulations, require review of COI rates at least every five years. *See, e.g.,* 11 New York Code of Rules and Regulations 48.
[7] This equates to a greater than 42.3% increase because the illustrations use different assumptions as to account values.

**EXHIBIT A**

pre-increase base rate and all other charges) will total over $1.5 million for a single $3 million policy.

43.    There is no possible justification for the 2015 increase.  Mortality had steadily improved from the time the Subject Policies had issued and less than six months after the 2015 increase, Security Life's Chief Actuary again certified that it expected mortality rates to continue to improve.  As a result, Security Life was projecting at the time of the 2015 increase that insureds would live longer than Security Life originally anticipated and that Security Life would have to pay out fewer death benefits on an annual basis.  This, in turn, decreased—rather than increased—Security Life's projected costs of insurance.

44.    Further, Security Life had continued to illustrate COI charges under the pre-increase COI rates as late as August 19, 2015.  This also contradicts Security Life's purported justification for the COI increase.  The Code of Colorado Regulations requires that illustrations provided to policyholders be not more favorable than a scale of rates that is reasonably based on actual recent experience, and requires insurers to annually certify compliance. 3 CCR 702-4 Series 4-1-8 at §§ 4(D) & 6(B)(5).  The purpose of such illustration regulations, which exist in virtually every state, is to ensure that policyholders are informed of experience trends and that the insurer is not illustrating COI rates that it knows may change.  This prevents insurers from engaging in bait-and-switch tactics whereby they illustrate low rates in order to convince policyholders to continue paying premiums and then suddenly increase rates at a later date after policyholders have invested tens of thousands of dollars into their policies.  That Security Life was illustrating pre-increase COI rates as late as August 19, 2015 further confirms that—contrary to its letters to policyholders—Security Life had no actuarial basis for concluding that the "anticipated cost of providing future coverage" was increasing.

**EXHIBIT A**

45.     In light of declining mortality rates both industry-wide and within Security Life, the only possible explanation for Security Life's conduct is that it is impermissibly using COI rates to manage and increase its own profitability.  At the same time that Security Life was increasing COI rates on the Subject Policies, it declared a $111 million ordinary dividend and a $130 million extraordinary dividend to its parent company, Voya.  This aggregate dividend of $241 million marked a *750%* increase over the single $32 million dividend that Security Life paid to Voya in 2014. The only way that such a massive dividend could have been triggered is if Security Life was using COI adjustments to increase profitability.

46.     In addition to merely increasing profitability, the increase also furthered Security Life's goal of inducing policy lapses and relieving itself of potential death claims.   COI increases—particularly those as high as 42.3%—result in a phenomenon called "shock lapse." Shock lapse occurs when, in response to a COI increase, significant numbers of policies either lapse or are surrendered because (a) account values are being rapidly drained by the new COI charges and/or (b) the cost of the future premiums is not worth the benefits of coverage.  Shock lapses are a boon for insurers because policyholders are forced to forfeit all the premium charges they previously paid—often over the course of a decade—and the insurer is relieved from ever paying out death benefits under the lapsed or surrendered policies. This allows the insurer to lock in profits and to release reserves, further enabling the type of dividend that Security Life declared in 2015.

47.     Though the number of shock lapses depends on the size of the increase, it is commonly projected that ten percent of all policies will lapse or be surrendered within the first year of the increase. For an increase of 42.3%—which Security Life imposed on Strategic

**EXHIBIT A**

Accumulator policyholders—Security Life was likely projecting an even higher rate of lapses and surrenders.

48.    Using COI rates to increase profitability and induce lapses violates the terms of the Subject Policies and the covenant of good faith and fair dealing.  As discussed, cost of insurance charges are, by definition, supposed to reflect the actual costs of providing insurance— not to provide an additional profit mechanism. Including profits—or anything other than "pure death benefit protection"—in the cost of insurance is contrary to the reasonable expectations of insureds and directly conflicts with the plain and ordinary meaning set forth in Security Life's own parent company's "Life Insurance Glossary."

49.    And while, subject to the language in the contract and other applicable law, an insurer may claim to have discretion in setting rates, the covenant of good faith and fair dealing imposes additional limitations on that discretion.  For example, courts have held that insurers may not use COI rates to manage profitability; may not use COI rates to induce lapses by forcing policyholders to unexpectedly pay exorbitant premiums; must use actuarially reasonable assumptions when setting COI rates; and must set COI rates in good faith.  Security Life violated each of these restrictions: it dramatically increased COI rates in order to bolster profitability and induce lapses, and it did not have any actuarially reasonable basis to increase COI rates given its own projections that mortality would continue to decline.  In doing so, Security Life breached its contracts with its policyholders.

## CLASS ACTION ALLEGATIONS

50.    This action is brought by Plaintiff individually and on behalf of a class pursuant to Rule 23(b)(3) and Rule 23(b)(2) of the Federal Rules of Civil Procedure. The class—referred to herein as the "COI Overcharge Class"—consists of:

21

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
pg 90 of 109
Case 1:18-cv-01897-WJM-NYW    Document 1    Filed 07/26/18    USDC Colorado    Page 22 of 26

> All owners of Strategic Accumulator and Life Design Guarantee universal life policies issued by Security Life of Denver Insurance Company that were subjected to a cost of insurance rate increase announced in or after September 2015.

The COI Overcharge Class does not include defendant Security Life, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

51.    The COI Overcharge Class consists of hundreds, if not thousands, of policyholders and is thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by Security Life.

52.    The claims asserted by Plaintiff are typical of the claims of the COI Overcharge Class.

53.    Plaintiff will fairly and adequately protect the interests of the COI Overcharge Class and does not have any interests antagonistic to those of the other members of the class.

54.    Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters, as well as class and complex litigation.

55.    Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

56.    This action is appropriate as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because Security Life has acted on grounds that apply generally to the COI Overcharge Class, such that final injunctive and/or declaratory relief is appropriate. Appropriate declaratory and/or injunctive relief includes, but is not limited to:

    (a)    prohibiting the continuing imposition of the 2015 COI increase; and

22

**EXHIBIT A**

(b)     allowing reinstatement of policies that have lapsed or been surrendered following Security Life's breach of contract.

57.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

(a)     the construction and interpretation of the form insurance policies at issue in this litigation;

(b)     whether Security Life has breached its contracts with the class members by not decreasing COI rates;

(c)     whether Security Life has breached its contracts with class members by increasing COI rates;

(c)     whether Security Life has violated the implied covenant of good faith and fair dealing;

(d)     whether Plaintiff and class members are entitled to receive damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages; and

(h)     whether Plaintiff and class members are entitled to declaratory relief, injunctive relief, and/or specific performance.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress

EXHIBIT A

individually for the wrongs that defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

        (b)     when Security Life's liability has been adjudicated, claims of all class members can be determined by the Court;

        (c)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

        (d)     without a class action, many class members would continue to suffer injury, and Security Life's breaches will continue without redress while Security Life continues to reap and retain the substantial proceeds of their wrongful conduct; and

        (e)     this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract (on Behalf of the COI Overcharge Class)

59.    Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth therein.

60.    The Subject Policies are binding and enforceable contracts.

61.    Security Life materially breached the policies because it did not base COI rates on its actual projected costs of insurance and increased COI rates based on factors other than the cost of insurance.

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW    Document 1    filed 07/26/18    USDC Colorado    Page 25 of 26
pg 93 of 109

62.    In the event that any breach alleged herein is not explicitly covered by the terms of the contract, Security Life has breached the covenant of good faith and fair dealing by the conduct alleged above.

63.    Plaintiff has performed all of its obligations under the policies, except to the extent that its obligations have been excused by Security Life's conduct as set forth herein.

64.    As a direct and proximate cause of Security Life's material breaches of the policies, Plaintiff and the COI Overcharge Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding Plaintiff and the COI Overcharge Class compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity;

3.    Awarding Plaintiff and the COI Overcharge Class pre-judgment and post-judgment interest, as well as costs;

4.    Awarding Plaintiff and the COI Overcharge Class injunctive and equitable relief that may include:

(a)    prohibiting Security Life from continuing to collect the unlawfully and unfairly increased COI amounts in violation of the COI Increase Policies; and

(b)    ordering the reinstatement of any policy that was surrendered, lapsed, or otherwise terminated following Security Life's breach.

6.    Awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

25

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW    Document 1    filed 07/26/18    USDC Colorado    Page 26 of 26
pg 94 of 109

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a

trial by jury as to all issues so triable.

Dated: July 26, 2018

<div style="margin-left: 50%;">

*/s/ Paul H. Schwartz*
Paul H. Schwartz
Jonathan A. Helfgott
SHOEMAKER GHISELLI + SCHWARTZ LLC
1811 Pearl Street
Boulder, CO 80302
Tel: 303-530-3452
pschwartz@sgslitigation.com

Steven G. Sklaver
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel: 310-789-3100
Fax: 310-789-3150
ssklaver@susmangodfrey.com

Ryan Kirkpatrick
(D. Colo. bar application to be filed)
Seth Ard
(D. Colo. bar application to be filed)
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel.: 212-336-8330
Fax: 212-336-8340
rkirkpatrick@susmangodfrey.com
sard@susmangodfrey.com

Stephen E. Morrissey
(D. Colo. bar application to be filed)
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: 206-516-3880
Fax: 206-516-3883
smorrissey@susmangodfrey.com
*Attorneys for Plaintiff*

</div>

**EXHIBIT A**

# EXHIBIT 2

11

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW    Document 25    Filed 10/10/18    USDC Colorado    Page 1 of 14
pg 96 of 109

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-01897-WJM-NYW

ADVANCE TRUST & LIFE ESCROW SERVICES, LTA, as
securities intermediary for LIFE PARTNERS POSITION
HOLDER TRUST, on behalf of itself and all others similarly
situated,

Plaintiff,

v.

SECURITY LIFE OF DENVER INSURANCE COMPANY,

Defendant.

---

### ~~[PROPOSED]~~ STIPULATED PROTECTIVE ORDER

---

WHEREAS, certain information and documents may be sought, produced, or exhibited

by and among the parties to the above-captioned action (the "Action"), or by third parties in

connection with the Action, which the party making the production believes in good faith to

constitute trade secrets, proprietary business information, competitively sensitive information,

or non-public personal medical or financial information;

WHEREAS a protective order would facilitate the production, exchange, and discovery

of documents, testimony, and information in connection with the Action while preserving the

parties' respective positions as to whether or not particular documents, testimony, or information

merit confidential treatment; and

WHEREAS this matter has come before the Court, by stipulation of the parties, for the

entry of a protective order pursuant to Fed. R. Civ. P. 26(c), limiting the review, copying,

1

**EXHIBIT A**

dissemination and filing of confidential and/or proprietary documents and information to be produced by any party and their respective counsel or by any non-party in the course of discovery in this matter to the extent set forth below; and the parties, by, between and among their respective counsel, having stipulated and agreed to the terms set forth herein, and good cause having been shown;

IT IS hereby STIPULATED AND ORDERED that:

1.      This Stipulated Protective Order Governing the Production and Exchange of Confidential Information ("Protective Order") shall govern the handling of documents and all other information produced by or between the parties to the Action or by third parties in connection with the Action, including all documents and information produced pursuant to interrogatories, depositions, requests for production of documents, subpoenas, requests for admissions, or other requests for disclosures (whether formal or informal), and all information provided, submitted, or exhibited by the parties hereto or third parties in connection with any evidentiary hearings or other proceedings conducted during the course of the Action.

2.      As used herein:

(a)      "Confidential Information" shall mean all documents, testimony, and information designated as "Confidential" by any party or non-party pursuant to the terms of this Protective Order and that falls within one or more of the categories set forth in paragraph 3, including the contents and all copies, excerpts, extracts, and summaries of such documents, testimony, and information, provided that such designation has not been successfully challenged and finally revoked pursuant to paragraph 9 herein.

2

**EXHIBIT A**

(b)    "Designating Party" shall mean the parties to this action and any third parties producing "Confidential Information" in connection with depositions, document production, or otherwise, or the party asserting the confidentiality privilege, as the case may be.

(c)    "Non-Designating Party" shall mean the party to this action and/or any nonparty other than the Designating Party.

(d)    "Qualified Person" shall mean any person authorized to receive or review Confidential Information pursuant to paragraph 6 herein.

3.    The person designating any discovery material as "Confidential" may designate, after good faith review by counsel of record, as "Confidential" any document or material that contains (a) financial information previously nondisclosed to the public (including without limitation profitability reports or estimates, percentage fees, design fees, royalty rates, minimum guarantee payments, sales reports, and sale margins); (b) material previously nondisclosed to the public relating to ownership or control of any nonpublic company; (c) business plans, product development information, or marketing plans previously nondisclosed to the public; (d) any information of a personal or intimate nature regarding any individual, including any financial information; or (e) any other category of information hereinafter given confidential status by the Court.

4.    Any party, subpoenaed nonparty, or other third party whose information may be disclosed in connection with this Action may designate documents produced, testimony given, or other information exchanged in connection with this action as "Confidential" either by notation on the document, statement on the record of the deposition, designation pursuant to paragraph 8 or 10 herein, or written advice to the respective undersigned counsel for the parties

P

**EXHIBIT A**

hereto. Electronic documents and information, if any, shall be designated as "Confidential" by any of the foregoing methods or pursuant to a procedure to be agreed upon by the parties.

     5.       All Confidential Information shall be used solely for the purpose of this Action, and no person receiving such Confidential Information shall, directly or indirectly, use, transfer, disclose, or communicate in any way the Confidential Information to any person other than Qualified Persons. Any other use or disclosure is prohibited.

     6.       Except with the prior written consent of the Producing Party or by order of the Court, Confidential Information shall not be furnished, shown, or disclosed to any person or entity except to:

        a.      the parties in this action, including employees of the parties who are assisting in this action;

        b.      counsel for the parties to this action and their associated attorneys, paralegals and other professional personnel (including support staff) who are directly assisting such counsel in the preparation of this action for trial or other proceeding herein, and are under the supervision or control of such counsel;

        c.      copying, imaging, computer services, and/or litigation support services who are bound to protect Confidential Information either by their services contract with counsel or the Receiving Party or by execution of the confidentiality agreement attached hereto as Exhibit A;

        d.      any agreed-upon or ordered mediator and that mediator's personnel;

        e.      persons whom counsel of record for a party believes (i) are likely to be called to give testimony, through deposition, affidavit, or at trial, on matters relating to Confidential Information or (ii) possess information reasonably necessary and relevant for the prosecution or defense of the Action; provided, however, that such information is furnished, shown, or disclosed in accordance with paragraph 7 herein;

        f.      expert witnesses or consultants retained by the parties or their counsel to furnish technical or expert opinions, services, or assistance in connection with this action or to give testimony with respect to the subject matter of this action at the trial of this action or other proceeding herein; provided,

<div align="center">P</div>

<div align="right">**EXHIBIT A**</div>

Case No. 1:18-cv-01897-DDD-SKC   Document 39-1   filed 04/02/19   USDC Colorado
pg 100 of 109
Case 1:18-cv-01897-WJM-NYW   Document 23   Filed 10/10/18   USDC Colorado   Page 5 of 14

however, that such Confidential Information is furnished, shown, or disclosed in accordance with paragraph 7 herein;

g.    the Court and court personnel, provided that the Confidential Information is filed in accordance with paragraph 11 herein or otherwise disclosed in accordance with paragraph 12 herein;

h.    an officer before whom a deposition is taken, including stenographic reporters and videographers and any necessary secretarial, clerical or other personnel of such officer, provided that the Confidential Information is furnished, shown, or disclosed in accordance with paragraph 13 herein;

i.    trial and deposition witnesses, provided that the Confidential Information is furnished, shown, or disclosed in accordance with paragraphs 12 and 13, respectively, herein; and

j.    any other person agreed to by the parties.

7.    Subject to paragraph 13, before any disclosure of Confidential Information is made to any person pursuant to paragraph 6(e) or 6(f) herein, such person must execute a confidentiality agreement in the form of Exhibit A attached hereto. Counsel shall maintain the executed confidentiality agreements required by this Protective Order and supply a copy to counsel for the other party upon request; provided, however, that with respect to experts and consultants, counsel for the party shall not be required to supply a copy to counsel for the other party unless and until that expert is disclosed pursuant to Rule 26 of the Federal Rules of Civil Procedure.

8.    Any document or information that may contain Confidential Information that has been inadvertently produced without identification as to its confidential nature may be so designated by the party asserting the confidentiality privilege by written notice to the undersigned counsel for the Receiving Party identifying the document or information as "Confidential" within a reasonable time following the discovery that the document or information has been produced without such designation. Any party producing such improperly designated documents shall retrieve such documents from persons not entitled to receive those

P

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW   Document 25   Filed 10/10/18   USDC Colorado   Page 6 of 14
pg. 101 of 109

documents.

9.      Documents and information designated as "Confidential" shall be treated as "Confidential Information" unless and until a challenge to the propriety of the designation is made successfully pursuant to this paragraph or the Designating Party withdraws the designation. A party shall not be obligated to challenge the propriety of a designation as "Confidential" at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. In the event that any party to this Action disagrees at any stage of these proceedings with the designation by the Designating Party of any information as "Confidential," or the designation of any person as a Qualified Person, that party may serve upon counsel for the designating party a written notice stating with particularity the grounds for the objection. The parties and any affected protected person shall then discuss this contention and attempt to resolve the disagreement over the classification of the material. If the parties and the affected protected person cannot resolve the matter within ten (10) days, the Designating Party, if it wishes to seek relief from the Court, must follow the procedure set forth in the Court's practice standards for resolution of discovery disputes. A party or nonparty may challenge the designation of confidentiality at any time that is consistent with the Court's scheduling order in this action. Pending the resolution of such motion by the Court and any subsequent appeal therefrom, the parties agree to treat the information that is the subject of the motion in accordance with the Designating Party's designation. The Designating Party shall at all times carry the initial burden of establishing that the contested information merits a "Confidential" designation.

10.      All depositions, the information disclosed therein, and the transcripts thereof shall presumptively be treated as Confidential Information and subject to this Protective Order during the deposition and for a period of thirty (30) days after a transcript of said deposition

P

EXHIBIT A

is received by counsel for each of the parties. At or before the end of such thirty- day period, any party who claims some part of the deposition shall be classified as "Confidential" shall notify all of the parties in writing of the specific pages and lines of the transcript which should be treated as Confidential Information thereafter.

11.     A Non-Designating Party who seeks to file with the Court any deposition transcripts, exhibits, answers to interrogatories, and other documents which have previously been designated as comprising or containing Confidential Information, and any pleading, brief, or memorandum which reproduces, paraphrases, or discloses Confidential Information, shall follow the procedures of this Court for seeking leave to file documents under seal so as to prevent the disclosure of Confidential Information to persons other than Qualified Persons. The filing party will take all reasonable steps to file the documents or information in a way that preserves confidentiality, including fully utilizing all procedures for filing the document on a restricted basis under D.C.COLO.LCivR 7.2. The party who designated the documents "Confidential" will have the obligation to justify any sealing request under D.C.COLO.LCivR 7.2 or any other applicable Local Rule or Practice Standard. The parties acknowledge that this Stipulated Protective Order does not entitle them to file confidential information under seal except as set forth in D.C.COLO.LCivR 7.2, which describes the procedures that must be followed and the standards that will be applied when a party seeks permission from the Court to file material under seal.

12.     Should the need arise for any of the parties to disclose Confidential Information during any hearing or trial before the Court, including through argument or the presentation of evidence, such party may do so only after taking such steps as the Court, upon

P

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW    Document 23    Filed 10/10/18    USDC Colorado    Page 8 of 14
pg 103 of 109

motion of the disclosing party, shall deem necessary to preserve the confidentiality of such Confidential Information.

13.    Any deposition witness who will be given access to Confidential Information shall, prior thereto, be provided with a copy of this Protective Order and counsel shall make reasonable efforts to have such person execute a confidentiality agreement in the form of Exhibit A attached hereto. If unable to obtain an executed confidentiality agreement from such person, counsel shall immediately and prior to the deposition provide notice to counsel for the other party and such party may seek relief from the Court regarding the terms and conditions under which Confidential Information may be disclosed to the witness in the deposition. Alternatively, counsel for the parties may agree that Confidential Information is adequately protected by such person's existing obligations to maintain the confidentiality of such information. Nothing herein, however, shall prevent any counsel of record from utilizing Confidential Information in the examination or cross-examination of any person who is indicated on the document as being an author, source, or recipient of the Confidential Information, irrespective of which party produced such information. Further, no executed confidential agreement shall be required to show a current officer or employee of a party any Confidential Information that was disclosed by that party, provided that such Confidential Information is reasonably necessary and relevant to eliciting the testimony of such officer or employee.

14.    A party may designate as Confidential Information subject to this Protective Order any document, information, or deposition testimony produced or given by any nonparty to this case, or any portion thereof, where such information has not already been designated as "Confidential" by the nonparty.

P

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW    Document 25    Filed 10/10/18    USDC Colorado    Page 9 of 14
pg 104 of 109
1

15.    The production or disclosure of Confidential Information shall in no way
constitute a waiver of each party's right to object to the production or disclosure of other
information in this action or in any other action.

16.    In the event that the Non-Designating Party is requested or required (by oral
questions, interrogatories, requests for information or documents in a legal proceeding,
subpoena, civil investigative demand, other similar process, or rule of law) to disclose any
Confidential Information in another action or proceeding, the Non-Designating Party shall
provide the Non-Designating Party with prompt written notice of any such request or
requirement so that the Producing Party may seek a protective order or other appropriate remedy
and/or waive compliance with the provisions of this Protective Order, provided, however, that
nothing in this Protective Order shall be interpreted to obligate the Non- Designating Party to
seek such a protective order or other remedy. Unless the Designating Party waives the
protections of this Protective Order, the Non-Designating Party will not disclose any
Confidential Information except pursuant to the order of a court of competent jurisdiction
directing the disclosure of such Confidential Information.

17.    In the event any "Confidential Information" is disclosed to or acquired by an
entity, person, or persons not authorized under this Protective Order to view such material, the
party to this action (or that party's agent) responsible for having made or allowed such improper
disclosure or acquisition (even if inadvertent or due to authorized access) ("Responsible
Disclosing Party"), and each party (or party agent) with knowledge thereof, shall immediately
inform counsel for the Designating Party of the Confidential Information at issue, as well as the
party or third party who designated the Confidential Information at issue "Confidential" (if
different), all known relevant information concerning the nature and

P

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW    Document 25    Filed 10/10/18    USDC Colorado    Page 10 of 14
pg 105 of 109
1

circumstances of the disclosure or acquisition. The Responsible Disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed or acquired Confidential Information and to mitigate the risk that further or greater unauthorized disclosure, acquisition, and/or use thereof is made, and shall inform counsel for the Designating Party of the Confidential Information at issue, as well as the party or third party who designated the Confidential Information at issue "Confidential" (if different) of actions taken in that regard. Further, the Responsible Disclosing Party shall take all appropriate actions to address the circumstances that led to the inadvertent disclosure or acquisition, and prevent additional inadvertent disclosures or acquisitions from occurring thereafter.

18.    Consistent with Federal Rule of Civil Procedure 26(b)(5)(B) and Federal Rule of Evidence 502, in the event a producing party inadvertently discloses information subject to the attorney-client privilege, attorney work-product doctrine, or other applicable privilege or immunity, the disclosure of the inadvertently disclosed information shall not constitute or be deemed a waiver or forfeiture of any claim of privilege or work product protection that the producing party would otherwise be entitled to assert with respect to the inadvertently disclosed information and its subject matter. Where it appears on its face that the information was inadvertently disclosed, or the producing party informs the receiving party that privileged information has been disclosed, the receiving party (i) must promptly return or destroy the specified information except for one copy for the purpose of contesting the claim of privilege, (ii) must not use or disclose the information until the claim is resolved, (iii) must take reasonable steps to retrieve any such information that was disclosed or distributed before the receiving party was notified and prevent any further dissemination of the information, and

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
Case 1:18-cv-01897-WJM-NYW    Document 23    Filed 10/10/18    USDC Colorado    Page 11 of 14
pg 106 of 109

(iv) may promptly present the information to the Court for a determination of the claim. The producing party must preserve the information until the claim is resolved.

19.    In the event anyone shall violate or threaten to violate any terms of this Protective Order, the aggrieved party may immediately apply to the Court to obtain relief, including, without limitation, injunctive relief against such person. The existence, if any, of an adequate remedy at law shall not preclude the applying party from obtaining such relief.

20.    This Protective Order shall continue to be binding after the conclusion of this litigation except that (a) there shall be no restriction on documents that are used as exhibits in Court (unless such exhibits were filed under seal); and (b) that a party may seek the written permission of the Designating Party or further order of the Court with respect to dissolution or modification of any provision of the Protective Order. The provisions of this Protective Order shall, absent prior written consent of both parties, continue to be binding after the conclusion of this action. The Court expressly retains jurisdiction over this Action for enforcement of the provisions of this Protective Order following the final resolution of the Action.

21.    Nothing herein shall be deemed to waive any privilege recognized by law, or shall be deemed an admission as to the admissibility in evidence of any facts or documents revealed in the course of disclosure.

22.    Within sixty (60) days after entry of an order, judgment, or decree finally disposing of this Action, all Confidential Information produced or designated and all reproductions thereof, shall be returned to the Designating Party or shall be destroyed, at the option of the Designating Party, except that one copy of each document may be retained. In the event that any party chooses to destroy physical objects and documents, such party shall

11

**EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC    Document 39-1    filed 04/02/19    USDC Colorado
pg 107 of 109
Case 1:18-cv-01897-WJM-NYW    Document 25    Filed 10/10/18    USDC Colorado    Page 12 of 14

certify in writing within sixty (60) days of the final termination of this litigation that it has undertaken its best efforts to destroy such physical objects and documents, and that such physical objects and documents have been destroyed to the best of its knowledge. Notwithstanding anything to the contrary, counsel of record for the parties may retain all pleadings, motion papers, discovery responses, deposition transcripts, deposition and trial exhibits, legal memoranda, correspondence, work-product, and attorney-client communications that include or are derived from Confidential Information. This Protective Order shall not be interpreted in a manner that would violate any applicable canons of ethics  or codes of professional responsibility. Nothing in this Protective Order shall prohibit or interfere with the ability of counsel for any party, or of experts specially retained for this case, to represent any individual, corporation, or other entity adverse to any party or its affiliate(s) in connection with any other matters.

23.    This Protective Order is entered into without prejudice to the right of either party to seek relief from, or modification of, this Protective Order or any provisions thereof   by properly noticed motion to the Court or to challenge any designation of confidentiality as inappropriate under applicable law.

24.    This Protective Order may be changed by further order of this Court, and is without prejudice to the rights of a party to move for relief from any of its provisions, or to seek or agree to different or additional protection for any particular material or information.

25.    When serving any subpoena in this Action on a nonparty to the Action, a copy of this Protective Order shall be included with the subpoena.

26.    This Protective Order shall be binding upon any future party to the Action.

12

**EXHIBIT A**

27.     This Protective Order may be executed in counterparts, each of which shall be

deemed an original, but all of which taken together shall constitute one and the same document.


DATED:  October 10, 2018                    BY THE COURT:

                                            Nina Y. Wang
                                            United States Magistrate Judge



Dated: October 10, 2018



  /s/ Michael T. Leigh                       /s/ Jonathan A. Helfgott
Kathryn A. Reilly                           Paul H. Schwartz
Cedric D. Logan                             Jonathan A. Helfgott
Chuan "CiCi" Cheng                          SHOEMAKER GHISELLI + SCHWARTZ LLC
WHEELER TRIGG O'DONNELL LLP                 1811 Pearl Street
370 Seventeenth Street, Suite 4500          Boulder, CO 80302
Denver, CO 80202-5647                       Telephone: 303-530-3452
Telephone: 303.244.1800                     pschwartz@sgslitigation.com
Facsimile: 303.244.1879                     jhelfgott@sgslitigation.com
Email: reilly@wtotrial.com
logan@wtotrial.com                          Seth Ard
cheng@wtotrial.com                          Ryan C. Kirkpatrick
                                            SUSMAN GODFREY LLP
Clark C. Johnson                            1301 Avenue of the Americas, 32nd Floor
Michael T. Leigh                            New York, NY  10019-6023
KAPLAN JOHNSON ABATE & BIRD LLP             Tel.: 212-336-8330
710 West Main Street                        Fax: 212-336-8340
Louisville, KY 40202                        sard@susmangodfrey.com
Telephone: 502-416-1630                     rkirkpatrick@susmangodfrey.com
cjohnson@kaplanjohnsonlaw.com
mleigh@kaplanjohnsonlaw.com                 Steven G. Sklaver
                                            SUSMAN GODFREY LLP
*Attorneys for Defendant*                   1900 Avenue of the Stars, Suite 1400
                                            Los Angeles, CA 90067-6029
                                            ssklaver@susmangodfrey.com

                                            *Attorneys for Plaintiff*


                               13


                                                   **EXHIBIT A**

Case No. 1:18-cv-01897-DDD-SKC   Document 39-1   filed 04/02/19   USDC Colorado
Case 1:18-cv-01897-WJM-NYW   Document 25   Filed 10/10/18   USDC Colorado   Page 14 of 14
pg 109 of 109

14

**EXHIBIT A**