EXHIBIT B

FILED UNDER SEAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

3     ADVANCE TRUST & LIFE ESCROW      )
      SERVICES, LTA, as securities     )
4     intermediary for LIFE PARTNERS   )
      POSITION HOLDER TRUST, on        )
5     behalf of itself and all         )
      others similarly situated,       )
6                                      )
                        Plaintiffs,    )
7                                      )
               vs.                     )  Civil Action No.
8                                      )  1:18-CV-01897
      SECURITY LIFE OF DENVER          )  WJM-NYW
9     INSURANCE COMPANY,               )
                                       )
10                      Defendant.     )

11

12                 *REVISED*

13   VIDEOCONFERENCE DEPOSITION OF TIMOTHY PFEIFER

14                Chicago, Illinois

15            Wednesday, June 17, 2020

16

17

18

19

20

21

22

23   Reported by:

24   RACHEL F. GARD, CSR, RPR, CLR, CRR

25   JOB NO. 180238

Page 2

```
 1                    T. PFEIFER
 2
 3
 4               June 17, 2020
 5                9:02 a.m.
 6
 7        Videoconference deposition of TIMOTHY
 8   PFEIFER, in Chicago, Illinois, pursuant to
 9   notice before Rachel F. Gard, Illinois
10   Certified Shorthand Reporter, Registered
11   Professional Reporter, Certified LiveNote
12   Reporter, Certified Realtime Reporter.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    T. PFEIFER
 2   A P P E A R A N C E S:
 3        SUSMAN GODFREY
 4        Attorneys for Plaintiffs
 5            1000 Louisiana Avenue
 6            Houston, TX 77002
 7        BY:   SCOTT FULFORD, ESQ.
 8            (Via videoconference)
 9
10
11
12
13        KAPLAN JOHNSON ABATE & BIRD
14        Attorneys for Defendants
15            710 West Main Street
16            Louisville, KY 40202
17        BY:   CASEY HINKLE, ESQ.
18            (Via videoconference)
19
20
21
22   ALSO PRESENT:
23   HOWARD ZAIL, Expert (Via videoconference)
24   ROBERT RINKEWICH, Videographer (Via videoconference)
25
```

Page 4

```
 1                    T. PFEIFER
 2                 I N D E X
 3   WITNESS                              PAGE
 4   TIMOTHY PFEIFER
 5        Examination by Mr. Fulford       8
 6
 7           E X H I B I T S
 8   DEPOSITION EXHIBIT                   PAGE
 9   Exhibit 177  Amended notice of       10
                deposition
10
     Exhibit 178  Expert Rebuttal Report of  12
11                Timothy C. Pfeifer
12   Exhibit 179  (Not identified)        19
13   Exhibit 180  Specimen policy         96
14   Exhibit 181  Specimen policy         96
15   Exhibit 182  In-force illustration   191
                dated July 11th, 2014
16
     Exhibit 183  Expert report of Howard  194
17                Zail
18   Exhibit 184  Advisor's Guide To Life  231
                Insurance
19
20
21
22
23
24
25
```

Page 5

```
 1                    T. PFEIFER
 2                 E X H I B I T S
 3           PREVIOUSLY MARKED/ID
 4   DEPOSITION EXHIBIT                   PAGE
 5   Exhibit 37   Spreadsheet             33
 6   Exhibit 9    Baseline assumptions for  35
                SAUL
 7
     Exhibit 40   Baseline assumptions for  36
 8                GUL
 9   Exhibit 13   Redetermination policy   89
                dated January 3rd, 2012
10
     Exhibit 11   Ability and intent memo  138
11
     Exhibit 172  COI sensitivity tab     162
12
     Exhibit 136  2011 mortality study    174
13
     Exhibit 140  ASOP 24                 183
14
     Exhibit 5    Agreement               204
15
16
17
18
19
20
21
22
23
24
25
```

Page 26

T. PFEIFER

1  less favorable for consumers?

2      Q.    Correct.

3      A.    The only one that I can think of

4  which, again, I think one kind of needs to look

5  at all of this in totality, but the one area

6  would have been the treatment of the

7  TransAmerica recapture.

8      Q.    And what about SLD's treatment of

9  the TransAmerica recapture do you think is more

10 aggressive -- well, let me strike that.

11     Is it your opinion that SLD's

12 treatment of the TransAmerica recapture was not

13 permitted by the policy language?

14     A.    That is not my opinion.

15     Q.    So in your opinion, SLD's treatment

16 of the TransAmerica recapture is consistent

17 with the policy language; is that right?

18     A.    It is not inconsistent with the

19 policy language.

20     Q.    And I used the word "consistent,"

21 you used the two words, "not inconsistent."

22 Can you explain to me what difference, if any,

23 you mean by that?

24     A.    Well, I think the term "consistent"

Page 27

T. PFEIFER

1  implies to me that there is explicit language.

2  For example, if the policy form itself

3  specifically addressed the issue of recaptures,

4  then I believe you can articulate that it is

5  consistent with the contract.  If a contract

6  does not specifically address a particular

7  point but the action is not inconsistent with

8  the contract, then that's why I'm using that

9  terminology.

10     Q.    Okay.  And what about SLD's approach

11 did you consider -- approach to treatment of

12 the TransAmerica recapture did you consider to

13 be more aggressive than you would recommend?

14     MS. HINKLE:  Objection to form.

15     A.    Typically changes in non-guaranteed

16 elements are determined based on

17 forward-looking assumptions, forward-looking

18 events.  And the redetermination date for these

19 calculations was June 30th of 2014.  And the

20 recapture took place effectively prior to that

21 date.  And so from a standpoint of typical

22 practice, I would say that preceded what is

23 normally the timeline for redetermination.

24     Q.    Okay.  And do you think that SLD's

Page 28

T. PFEIFER

1  treatment of the TransAmerica recapture and the

2  redetermination is consistent with its

3  redetermination policy?

4      A.    Redetermination policies are guiding

5  principles.  There are elements of SLD's

6  calculations that were much more favorable to

7  the customer, more conservative in my language,

8  than the redetermination policy required.  And

9  those elements actually would outweigh

10 significantly the TransAmerica treatment.  But

11 if you viewed the redetermination sort of

12 holistically, I think the TransAmerica action

13 was consistent.  But if you focus on that

14 specific assumption, it probably would be

15 inconsistent with the redetermination policy.

16     Q.    So looking at the TransAmerica

17 recapture as reflected -- well, we'll get to it

18 a little later.

19     Okay.  Were there any other

20 professional differences in opinion between

21 SLD's actuary and yourself that we have not

22 discussed yet?

23     A.    I guess I would not -- I wouldn't

24 characterize these as differences.  It's

Page 29

T. PFEIFER

1  important to note that in these types of

2  calculations and these types of actuarial

3  engagements, that there's professional judgment

4  that comes into play.  And simply because you

5  disagree on the professional judgment doesn't

6  mean one side is wrong, the other one is right.

7      The other one that comes to mind

8  would be reflecting future increases in

9  reinsurance YRT rates in the redetermination

10 calculations, which the company again

11 conservatively opted not to do but which, in my

12 opinion, would have been completely

13 justifiable.

14     Q.    I just want to be -- I just want to

15 understand, when you say that there are

16 differences in opinion, is it fair to call them

17 differences in professional judgment?

18     A.    I think that's appropriate.  That's

19 the category of things we're largely talking

20 about here.

21     Q.    And you're opining based on your --

22 let me strike that.

23     Your opinions are based on your

24 professional judgment, correct?

Page 74

```
1            T. PFEIFER
2 obviously.  How do you define "significant"?
3          I believe it was significant in the
4 sense that ███████████████████████
  ████████████████████████████████████████
  ████████████████████████████████  So just kind of the
8 mere shifting of understanding of slopes of old
9 rates of mortality, in my opinion, would
10 represent a meaningful change in mortality
11 assumptions.
12     Q.    And when you said "meaningful," is
13 "significant" also a fair descriptor?
14     A.    Yes.
15     Q.    Okay.  TransAmerica, SLD recaptured
16 reinsurance policies covering SAUL and GUL from
17 TransAmerica, right?
18     A.    Correct.
19     Q.    And when did that recapture occur?
20     A.    I don't have exactly the dates, but
21 I believe it was in the year 2011.
22     Q.    Do you know what -- the month that
23 it occurred?
24     A.    I recall -- I recall seeing what
25 month it was, but although it's something I
```

Page 75

```
1            T. PFEIFER
2 could probably find frequently, I don't recall
3 which month exactly.
4     Q.    And is the month in which it
5 occurred material to your analysis?
6     A.    In this context, probably not.
7     Q.    ████████████████████████████████
  ████████████████████████████████████
  ██████████
  ████████████████████████████████████████
  █████████████████████
  ████████████████████████████████████████████
  ███████████████████████████
  ████████████████████████████████████████
  ██████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████
20     Q.    Okay.  Are there any accounting
21 methodologies that you're aware of in which the
22 recapture would not have been reflected in
23 2011?
24     A.    Off the top of head, I can't think
25 of any standard financial reporting regimes
```

Page 76

```
1            T. PFEIFER
2 that would have had it reported in subsequent
3 years.
4     Q.    And suppose that SLD had
5 redetermined its nonguaranteed elements in
6 2011.  ████████████████████████████████████
  ████████████████████████████████████████████
  ███████████████████████████████
9     A.    ████████████████████████████████
  ████████████████████████████████████████████ I
12 can say they would be different.  But whether
13 they're higher or lower, I don't know.
14     Q.    How could they be higher if the
15 TransAmerica recapture -- sorry, strike that.
16          How could it be higher?
17     A.    Well, you were asking me about the
18 margin, I believe.  ████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████  I don't know whether the
24 margin would go up or down.  But those two
25 components would certainly go down.
```

Page 77

```
1            T. PFEIFER
2     Q.    Isn't it true that the -- SLD's
3 payment of premiums to TransAmerica was less
4 than the reinsurance death benefits that they
5 would receive from TransAmerica?
6     A.    ████████████████████████████████
  ████████████████████████████████████████████
  ██████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ███████████████████████
  ████████████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  █████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████
  ████████████████████████████████████████████
  █████████████████████████████████
  ████████████████████████████████████████████
  ██████████████████████
```



Page 90

```
                    T. PFEIFER
1
2    but articulating here that the company should
3    not attempt to recoup past losses.
4         Q.    Okay.  And did SLD -- did SLD's COI
5    increase recoup past losses based on the
6    TransAmerica recapture run in SLD940?
7         A.    No, it's a question that honest
8    actuaries could have differences of opinion on.
9    In my opinion, I would not have included the
10   TransAmerica transaction for that reason.
11        Q.    Suppose that the term
12   "redetermination date" refers to October 1st --
13   let me strike that.
14        Suppose that the term
15   "redetermination date" refers to the date that
16   the COI increase took effect.  Would the
17   ████████████████ constitute a past
18   loss as that term is used in the
19   redetermination policy?
20        A.    I would have to -- it's a
21   hypothetical that I don't -- in my opinion is
22   not true.  So I haven't given it a lot of
23   thought because I believe the operative date is
24   the 6/30/14 date.  If, in fact, the
25   redetermination calculations would have been
```

Page 91

```
                    T. PFEIFER
1
2    done as of 10/1 from the get-go, then probably
3    a certain number of the ████████████████
4    ████████████ would have been prior to that
5    operative date.  Some would not have been.
6         Q.    And as to the policies that were
7    recaptured prior to the operative date, you
8    would agree in that scenario that SLD would
9    have attempted to recoup that past loss in
10   increasing COI rates, correct?
11             MS. HINKLE:  Objection to form.
12        This is still an assumption you're asking
13        Mr. Pfeifer to make, right?
14             MR. FULFORD:  Correct.
15        A.    Yeah, I think that there would be
16   more room to argue that because the actual
17   effective date in your hypothetical for any
18   given policy, you know, you're talking about a
19   cohort of policies, some of which will have the
20   recapture executed after the operative date and
21   others before the operative date.  You know,
22   kind of the modeling limitations on that could
23   be large.  So I think you could have a much
24   more consistent view that that entire cohort
25   could be treated as not having predated the
```

Page 92

```
                    T. PFEIFER
1
2    operative date, whereas on the TransAmerica
3    side, it's a little different situation.
4         Q.    And do you know whether SLD
5    accounted for the losses associated with the
6    ████████████████████████ fully in 2014?
7             MS. HINKLE:  Objection to form.
8         A.    Just to be clear, what losses are
9    you referring to?
10        Q.    ██████████████████████████████
     ████████████████
12        A.
     ████████████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████████████████████
19        Q.    Now would probably be a good time
20   for a break.  We've been going for another hour
21   and a half or so since our last break.  Does
22   that work for you, Mr. Pfeifer?  Does anybody
23   need 10 minutes or so?
24        A.    I would be more up for a lunch
25   break, if that's okay, or whatever works for
```

Page 93

```
                    T. PFEIFER
1
2    everybody.
3         Q.    That's certainly fine here.  Does
4    that work for everybody else, lunch break?
5             MS. HINKLE:  No objection here.
6         Q.    How long would you take a break for,
7    Mr. Pfeifer?
8         A.    You're on Central time, right,
9    Scott?
10        Q.    That's right.
11        A.    So maybe 12:20 be back?
12        Q.    Sounds great.  I'll see everyone
13   then.
14        THE VIDEOGRAPHER:  The time is
15   11:39 a.m.  This is the end of Media No. 2.
16   We're off the record.
17             (A short break was taken.)
18        THE VIDEOGRAPHER:  The time is
19   12:20 p.m.  This is the start of Media
20   No. 3.  We're on the record.
21        Q.    Great.  Welcome back.  I'll share my
22   screen again.  Okay.  So I've displayed SLD940.
23   I had another question for you on it.  ████████
     ████████████████████████████████████████████
```

Page 194

T. PFEIFER

1
2     Q.    Okay.  And do you agree that
3  mortality, SLD's expectations of future
4  mortality experience improved from 2011 to
5  2015?
6     A.    I think there were -- there were
7  certain cells -- and when I say "cells," I mean
8  certain policy groupings or cohorts that showed
9  improvement and others that did not.  That's my
10 recollection.
11          (Deposition Exhibit Number 183
12          marked for identification.)
13    Q.    Sure.  I'm going to display the
14 expert report of Howard Zail.  And it's been
15 previously marked as an exhibit, but this is a
16 much more legible copy, so I'm going to mark it
17 as Exhibit 183.
18          Do you dispute -- do you see the
19 table on page 24?
20    A.    I do see the table.
21    Q.    Do you dispute any of the
22 calculations or figures in this table?
23    A.    I have no reason to dispute them.
24    Q.    And does that apply to each of the
25 tables that Mr. Zail included in his report?

Page 195

T. PFEIFER

1
2     A.    I'm only talking about the page 24
3  table.
4     Q.    Okay.  Well, let's check them.  What
5  about Table 2?  Do you have any basis to
6  dispute figures in Table 2?
7     A.    Well, conceptually, I mean, I don't
8  necessarily have an issue with the actual
9  numbers given his opinion.  You know, the issue
10 of prior adjustments and what constitutes prior
11 adjustments, I think my report talks about the
12 areas I disagree with him conceptually.  But in
13 terms of whether these numbers were calculated
14 correctly, I don't have any reason to believe
15 they're not calculated correctly.
16    Q.    Okay.  And do you have any reason to
17 believe that any of the calculations he
18 performed were calculated incorrectly?
19    A.    If you're talking in terms of the
20 mathematics, the pure math of it, I do not.
21    Q.    Okay.  Yes, and that is the context
22 in which I'm asking the question.
23          What is a policy class?
24    A.    The definition of policy class that
25 I believe applies to redeterminations is

Page 196

T. PFEIFER

1
2  defined in ASOP 2, a group of policies
3  considered together for purposes of defining
4  nonguaranteed elements.
5     Q.    Okay.  And when SLD originally
6  priced the policies, what policy classes were
7  used?
8     A.    There were certainly the two policy
9  forms itself.  SAUL and GUL were separate
10 policy classes.  Within that, there were
11 separate classes by gender, by age, by premium
12 class.  Substandard versus standard.  There was
13 separate pricing done for simplified issue and
14 guaranteed issue.  So the uniqueness of the
15 pricing is what, in my opinion, defines what a
16 policy class is.
17    Q.    And when SLD redetermined COI rates
18 in 2015, what policy classes were used?
19    A.    The policy classes were -- there was
20 a defined COI increase that applied to the
21 fully underwritten SAUL policies and fully
22 underwritten GUL policies.
23    Q.    So did SLD analyze a COI increase on
24 a policy-class basis?
25    A.    Yes.  I mean, ASOP 2 permits you to

Page 197

T. PFEIFER

1
2  combine policy classes.  It says that in
3  probably three different parts of ASOP 2.  So
4  the ability to combine policy classes for
5  purposes of defining a COI or any nonguaranteed
6  element change is permissible.  So I guess to
7  answer your question, at redetermination,
8  policy classes can be combined to form, you
9  know, a combined policy class.  So yes.
10    Q.    And have you seen any documentation
11 from SLD describing the policy classes being
12 used in a redetermination?
13    A.    I don't recall seeing the term
14 policy classes explicitly referenced in the way
15 I'm talking about it.  But sometimes companies
16 don't specifically delineate it in that
17 fashion.
18    Q.    So you haven't seen any
19 documentation of why those policy classes were
20 used?
21    A.    Well, I think the company chose
22 those, the entire policy form to reflect its
23 overall experience with those policies since
24 mortality and reinsurance affected all of those
25 policies.  So I think that's why they chose to

<table>
<tr><td>

Page 250

```
1                    T. PFEIFER
2               C E R T I F I C A T E
3   STATE OF ILLINOIS  )
                       ) ss.:
4   COUNTY OF COOK     )
5       I, RACHEL F. GARD, CSR, RPR, CLR, CRR,
6   within and for the State of Illinois do hereby
7   certify:
8       That TIMOTHY PFEIFER, the witness whose
9   deposition is hereinbefore set forth, was
10  duly sworn by me and that such deposition
11  is a true record of the testimony given by
12  such witness.
13      I further certify that I am not
14  related to any of the parties to this
15  action by blood or marriage; and that I am
16  in no way interested in the outcome of this
17  matter.
18      IN WITNESS WHEREOF, I have hereunto
19  set my hand this 26th day of June, 2020.
20     Rachel F Gard
21  ---------------------------------
22  RACHEL F. GARD, CSR, RPR, CLR, CRR
23
24
25
```

</td><td>

Page 251

```
1                    T. PFEIFER
2   NAME OF CASE: Advance vs. Security
3   DATE OF DEPOSITION: 06/17/20
4   NAME OF WITNESS: Timothy Pfeifer
5   Reason codes:
6   1. To clarify the record.
7   2. To conform to the facts.
8   3. To correct transcription errors.
9
10  Page _____ Line _____ Reason _____
11  From _____to_____
12  Page _____ Line _____ Reason _____
13  From _____to_____
14  Page _____ Line _____ Reason _____
15  From _____to_____
16  Page _____ Line _____ Reason _____
17  From _____to_____
18  Page _____ Line _____ Reason _____
19  From _____to_____
20  Page _____ Line _____ Reason _____
21  From _____to_____
22  Page _____ Line _____ Reason _____
23  From _____to_____
24  Page _____ Line _____ Reason _____
25  From _____to _____
```

</td></tr>
</table>