EXHIBIT Z

FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| IN RE: | ) Civil Action No. |
| | ) 18-cv-01897-DDD-NYW |
| ADVANCE TRUST & LIFE ESCROW SERVICES, LTA, | ) |
|   As securities intermediary for | ) |
| | ) |
| LIFE PARTNERS POSITION HOLDER TRUST, | ) |
|   On behalf of itself and all others similarly situated, | ) |
| Plaintiff, | ) |
| v. | ) |
| SECURITY LIFE OF DENVER INSURANCE COMPANY, | ) |
| Defendant | ) |

**EXPERT REBUTTAL REPORT OF TIMOTHY C. PFEIFER, FSA, MAAA**

Confidential Pursuant to Protective Order

A.  *INTRODUCTION*

   1. I am the Consulting Actuary and President of Pfeifer Advisory LLC, an actuarial consulting firm based in Libertyville, Illinois.  I am a Fellow of the Society of Actuaries ("FSA") and a Member of the American Academy of Actuaries ("MAAA").

   2. I have been engaged by Security Life of Denver Insurance Company ("SLD" or the "Company") to provide expert opinions in connection with the action entitled Advance Trust & Life Escrow Services, LTA, as securities intermediary for Life Partners Position Holder Trust, on behalf of itself and all others similarly situated, Plaintiff vs. Security Life of Denver Insurance Company, Defendant, Civil Action No. 18-cv-01897-DDD-NYW.   In particular, I have been asked to address opinions offered by Mr. Howard Zail regarding the increase to cost of insurance ("COI") rates for certain Strategic Accumulator Universal Life ("SAUL") policies and Life Design Guaranteed Universal Life ("LDGUL") policies effective beginning October 1, 2015 (the "COI Adjustments").

   3. I am being compensated for my time spent on this engagement at my standard hourly rate of $650.  My compensation is not related to the outcome of the action, nor is my compensation a function of or dependent in any way on the opinions rendered herein.

B.  *QUALIFICATIONS*

   4. I have been an actuary for over 38 years.  Over the last 32 years, I have worked as an independent consultant on behalf of life insurance companies, distribution organizations, asset management firms, state regulators, and others.  Throughout my entire career, I have specialized in the design, pricing, and marketing of individual life insurance and annuity products.  I have extensive experience in the development of pricing assumptions and models for all types of life insurance products.  I led the U.S. life insurance industry's largest independent actuarial product development consultancy from 1998 to 2006.  I also led an

independent actuarial consultancy to the life settlement industry during many of those same years that included, among other things, services related to mortality analyses used by the life settlement industry.

      5.    In addition, I am very familiar with the requirements imposed upon life insurers and actuaries with respect to illustration formats, content, and compliance testing, and have served as Illustration Actuary for multiple insurers. In all of these areas, I have substantial knowledge of and experience with Actuarial Standards of Practice and their guidance to professional actuaries. I have served on the Board of Governors of the Society of Actuaries ("SOA") and as the Chairman of the SOA's Product Development Section. I currently serve on the American Academy of Actuaries Task Force on the Revisions to Actuarial Standards of Practice (ASOP) No. 2. I have been involved with or otherwise analyzed life insurer changes in COI rates on at least ten prior occasions. My full current Curriculum Vitae is attached as Exhibit 1, and a list of the cases for which I testified as an expert in a deposition or at trial in the last four years is attached as Exhibit 2.

## C. *EXECUTIVE SUMMARY*

      6.    The following paragraphs summarize the primary opinions that I am offering in this rebuttal report. The list of materials I considered in forming these opinions is attached as Exhibit 3.

        a)   SLD's SAUL and LDGUL universal life products featured typical designs for such products during the period of sale. The COI charges compensated SLD for mortality, expenses, and provided a profit element, which is typical. The policy language in each of these contracts allows for

COI rates to be changed based upon changes in future expectations of any experience factor.

b) SLD's COI rate increases of 42.3% for SAUL and 9.25% for LDGUL were applied to all policyholders of fully-underwritten SAUL and LDGUL and were applied equitably to all members of the policy classes.

c) SLD's redetermination approach, based on comparing the present value of future profit under current assumptions to the present value of profits assuming baseline assumptions, is a reasonable approach widely used in the industry and was consistent with SLD's January 3, 2012 Redetermination Policy.

d) The recognition of reinsurance impacts in the SLD redetermination analysis was appropriate because the SAUL and LDGUL original pricing reflected the use of reinsurance and it was a material factor in pricing. Further, YRT reinsurance was a component of the "cost of mortality" for SLD.

e) ███████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████

f)  The fact that SLD's implementation date of the COI changes (October 1,
    2015) was after the "As of Date" of the redetermination analysis (June 30,
    2014) is typical in the industry and does not represent SLD recouping past
    losses, particularly since no SAUL or LDGUL policyholder was charged
    higher COIs during that interim period.

g)  SLD's 2015 COI increases were based on adverse changes in future
    expectations of mortality costs.  These expectations were based, in part, on
    experience reflected in a 2011 Milliman Mortality Study.  There is no
    actuarial requirement that changes in future mortality expectations must be
    translated into changes in nonguaranteed elements within any particular
    time period following generation of experience studies that contribute to
    the future expectations, especially as in this matter when the underlying
    policies were heavily reinsured at the time of the mortality study.

h)  Guaranteed Issue (GI) SAUL business was not subject to the COI rate
    increase applied to fully-underwritten SAUL business. This is not
    improper, as the SAUL GI product was separately designed, marketed,
    and financially evaluated, thus representing a different policy class.

i)  Plaintiff's expert's contention that differences in lapse rate and discount
    rate assumptions were Disallowed Factors included in the COI
    redetermination analysis is incorrect.  Lapse rate differences between
    original and current scenarios were a function of level setting the premium
    funding pattern (a common assumption in redeterminations).  The discount
    rate assumption is a modeling assumption that reflects SLD's current view

of the risk-adjusted time value of money, was applied consistently to baseline and current future profits, and is not an experience factor.

j) The two relevant SLD policy forms in this matter are non-participating policy forms. This means that policyholders of these forms are not eligible for "shareholder dividends", which are distributions of SLD's overall past financial performance. Non-participating policies' nonguaranteed element redetermination is a forward-looking process and is distinct from the concept of non-participation.

### D. *UNIVERSAL LIFE INSURANCE POLICIES*

7. The two life insurance policy forms of relevance in this matter, namely the Strategic Accumulator Universal Life ("SAUL") and the Life Design Guaranteed Universal Life ("LDGUL") both represent a type of policy commonly known as universal life insurance or "UL". Such policies emerged on the U.S. life insurance scene in the early 1980's and have grown to be a major type of life insurance contract made available to policyholders.

8. UL policies are characterized by two significant attributes – transparency and flexibility. In contrast to whole life and term life contracts available prior to the appearance of UL (and following the appearance of UL), UL contracts are structured to explicitly identify the charges and fees that are deducted from the contract's account value. As defined by the contracts, the UL account value is credited with customer premium payments and interest credits, and debited by charges and fees assessed by the life insurance company to recognize the insurer's costs for initial and ongoing expenses, mortality costs, taxes, rider charges, capital costs and to allow for a profit return to the insurer. As long as the account value associated with the UL contract is greater than zero, the UL contract will remain inforce. If the account value falls

to zero or below, the policyholder must replenish the contract with additional premium deposits or else the UL contract will lapse (terminate).

       9.     The collection of charges and fees assessed on a UL contract in total compensate the insurer for its aggregate expenses, taxes, and contractual and regulatory obligations.  Typical categories of charges and fees include:

- Percent of premium loads
- Per $1,000 of face amount loads (Year 1 only, and/or all years)
- Monthly per policy fees
- Cost of Insurance charges (also known as COI charges)
- Surrender charges (assessed upon early termination of the contract)
- Charges for secondary death benefit guarantees
- Fees for optional riders/benefits added to the contract
- Charges for specific transactions such as policy loans, partial withdrawals or death benefit changes

       10.    The charges and fees assessed in a UL contract may be either fixed at a defined level (i.e., guaranteed), or allow for the insurer to establish a charge or fee at a specified level, but then change it under certain conditions subject to a contractually defined maximum level.  This latter "current/guaranteed" structure allows the insurer to assess lower current charges and fees as compared to a fully guaranteed structure, but provides the insurer with the right to increase them under certain conditions.  Thus, policyholders generally benefit from the current/guaranteed structure to charges and fees by having lower current assessments.

       11.    COI charges can be a significant deduction from a UL contract.  Typically, COI charges are assessed against the UL's account value monthly, and are expressed as a rate

per $1,000 of the contract's Net Amount at Risk (which is defined in broad terms as the total

death benefit less the Account Value).  The Net Amount at Risk can be thought of as the portion

of the death benefit paid that comes from the insurer's own funds.  COI rates typically vary

according to the insured's issue age, policy year, gender, risk or premium class, net amount at

risk, and whether the insured is a standard or substandard risk.  COI rates are normally structured

under a "current/guaranteed" framework as defined in the prior paragraph.  This means that

typically an insurer assesses a COI charge based upon a "current" COI rate, but reserves the right

to increase the COI rate in the future under specified conditions.  Commonly, these conditions

relate to changes in future expectations of experience factors such as mortality, investment

income, premium funding, lapses, and others.

      12.     In addition to the "current/guaranteed" nature of certain charges and fees,

interest credits added by the insurer to the UL Account Value are also generally structured on

such a basis.  Thus, the insurer can specify a current declared interest rate, and then raise or

lower it in the future, subject to a contractual minimum credited interest rate.  Policyholders

benefit from this structure, in that policyholders can realize higher credited interest than if the

insurer had to guarantee a fixed, unchangeable credited interest rate for the life of a UL contract.

      13.     The _transparency_ of a UL contract as described above is supplemented by

its _flexibility_.  Unlike many traditional forms of permanent life insurance, UL contracts permit

policyholders to choose the amount and timing of their premium payments (sometimes subject to

early year minimums or overall maximums that are required in order to maintain a life insurance

contract's qualification as a life insurance policy under the federal income tax code).  Further,

UL contracts usually allow a policyholder to increase or decrease their coverage amounts

without purchasing a new contract, or to add or remove a supplemental benefit or rider.

Policyholders can also change the form of death benefit option they may choose, or select policy loans and/or withdrawals to maximize tax efficiency.  Overall, the flexibility of UL is considered one of its primary advantages to the insurance-buying public.

14.　██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████

15.　██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████

16.     Contrary to assertions made in Paragraph 15 of Mr. Zail's report, it is well understood in the life insurance industry, and particularly among actuaries, that the COI charge is intended to compensate the insurers for more than the expected cost of mortality that it has assumed.  Typically, the COI rate includes a component for other elements, such as initial and ongoing expenses, taxes, cost of capital, risk margins, and a profit element.  Examples of industry sources which address this concept are as follows:

- *The Advisor's Guide to Life Insurance*, states that "unbundled" universal life components for deductions and credits "do not necessarily track the insurer's actual mortality, investment, and expense experience."  Rather, "mortality margins" are added to anticipated mortality rates: "Mortality (and other) margins are part of an insurer's overall pricing structure and are not necessarily intended to represent mortality and its risk only.  They provide a cushion against adverse developments and can be a source of insurer profits, surplus accumulations, and/or expense recovery."  Skipper & Tonning, *The Advisor's Guide to Life Insurance at 112, 117 (2011)*.

- Black & Skipper, *Life Insurance* at 63 (14th ed. 2013) ("Insurers usually build margins into the COI charges and interest credits that provide renewal year profits in order to recoup early-year losses").

- *Insuranceopedia*, https://www.insuranceopedia.com/definition/1393/cost-of-insurance (COI charges "are billed to pay for administration, mortality, and other responsibilities of the insurer").

- *Actuarial Standard of Practice No. 2, Nonguaranteed Charges or Benefits for Life Insurance Policies and Annuity Contracts, Appendix 1*, provides:

"It is also common in practice for the actuary to adjust nonguaranteed charges or benefits for items not directly related to the actual nonguaranteed charge or benefit" – there is no one-to-one correspondence between non-guaranteed elements, such as COI charges, and generally associated expenses, such as mortality.

- The textbook *Actuarial Aspects of Individual Life Insurance and Annuity Contracts* states that "The current mortality rate is derived from the company's actual or anticipated mortality experience on the contracts being sold and may also be loaded for expense and profit targets." (Harris, Easton, Abkemeier – pp. 212-213).

- A White Paper developed by M Financial Group (a prominent marketing organization which sells large amounts of life insurance) entitled "*2015 In-Force COI Increases: Background, Perspective, and Considerations*" states on Pages 4 and 5 "The COI charge, while primarily applied to support insurance carrier death claims (i.e., mortality experience), also provides recovery for carrier expenses, profit, and interest spread (e.g., the pricing interest spread may be reduced by increasing COIs and vice versa). (SLD0037322-36).

17. The language in the SAUL policy form (1165-8/03) and the LDGUL policy form (1166-3/04) with respect to the cost of insurance charge are essentially identical. *See* SLD0005763 (SAUL); SLD0005805 (LDGUL). The key provisions in the cost of insurance language are (1) that the COI rate will be determined from time to time, (2) the COI rate will vary by gender, issue age, policy duration, amount of death benefit, and the premium class, and

(3) any change in COI rates will apply to individuals of the same premium class and policy duration. *Id.* Therefore, the contracts do not limit in any respect experience factors that are permitted to be considered in redetermining COI rates, thus contractually permitting <u>any</u> reasonable experience factor to be considered by SLD in redetermining COI rates. Of course, if recommending COI changes to SLD, SLD's actuaries' recommendations are to be consistent with SLD's Redetermination Policy, as required by Actuarial Standards of Practice (ASOP), specifically ASOP 2, which guides actuaries in the redetermination of non-guaranteed elements (NGEs).

18.     Because the primary promise made by the insurer is to honor valid contractual obligations, including death claims, many years into the future, the long-term financial stability and strength of a life insurer is paramount. Accordingly, life insurers are heavily regulated by both state and federal regulators. An important component of this regulation is the requirement that life insurers hold aside conservative financial reserves and earmarked surplus on each policy to ensure that funds will be available as needed to pay death claims to beneficiaries and other obligations to policyholders. These conservative financial requirements are reviewed and revised by regulators and are subject to regular audits. Insurers falling short of regulatory standards in these areas are required to strengthen their financials or risk being taken over by regulators.

19.     State insurance regulators not only expect life insurers to establish adequate financial reserves and earmarked surplus for the policies they sell, but such regulators anticipate and endorse the fact that insurers will earn profits in managing their life insurance business. It is these profits that enable insurers to build the necessary surplus funds to meet future obligations. State regulators do not restrict how insurers earn such profit, but they do

build frameworks that ensure that products are self-supporting in order to be illustrated or sold to the public.  Examples are the Self Support/Lapse Support Tests built into the NAIC's Illustration Model Regulation and the state of New York's Self Support demonstration requirement. Managing interest spreads, changes to policy charges such as expense loads and COIs, and use of reinsurance are all considered valid and acceptable ways for insurers to generate profitable portfolios of life insurance policies.

**E.   _SLD'S PROCESS FOR IMPLEMENTING THE COI INCREASES_**

20. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

██   ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

22. ███████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████

███ ██████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████

███ ██████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████

███ ██████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

██    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

**F.** ***REBUTTAL OPINIONS TO INITIAL EXPERT OPINIONS OFFERED BY MR. HOWARD ZAIL***

i. **Mr. Zail renders a number of opinions concerning the treatment of third party YRT reinsurance in SLD's COI Redetermination Analysis that are incorrect.**

27. ████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

■      ███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

Confidential Pursuant to Protective Order

29. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██ ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

ii. ████████████████████████████

████████████████████████████

███████████████████████████████

██████████████

██████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████

☐ ████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

[REDACTED]

42.     Even if Mr. Zail's reading of the Redetermination Policy language is accurate (which it is not), there is no industry requirement, standard, or custom and practice which can be identified that mandates any particular timetable for the redetermination of non-guaranteed elements after an experience study is completed.

43.     Mr. Zail's assertion that since SLD chose not to adjust COIs for the period 2011-2015 following the 2011 Mortality Study, SLD had essentially established a new profit baseline that should have been used in 2015 is absurd. The implications of this opinion are non-sensical. This opinion suggests that every time an insurer develops new assumptions about the future, no matter how insignificant or significant, it establishes a new profit baseline if it chooses not to adjust non-guaranteed elements. This is contrary to industry practice and common sense.

In practice, new baselines are established only when insurers have previously redetermined nonguaranteed elements in the past, or have specifically documented a new baseline with Board approval (even New York Regulation 210 confirms this.)  Taken to its logical conclusion, Mr. Zail's view suggests that an insurer's profit baseline should increase if experience studies are favorable to the insurer and it improves its anticipated experience assumption.  Such a view cannot and should not operate in only one direction.  In any event, this opinion is impractical and is not in the mainstream of insurer or regulatory positions.  Further, Mr. Zail opines that "actuarial requirements are designed to prevent such events from sudden and dramatic changes in COIs".  He does not cite which specific actuarial <u>requirements</u> he is alluding to, because there are none to my knowledge.

44. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

██████████████████

██   ████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

Confidential Pursuant to Protective Order

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

### iii. Mr. Zail contends that SLD improperly excluded Guaranteed Issue SAUL policies from the COI increase, in violation of contractual language.

46.     Mr. Zail further cites contractual language in the SAUL contract which states that "any change in rates will apply to all individuals of the same premium class and whose policies have been in effect for the same length of time."  Zail Report at ¶ 140.  He then concludes that SLD violated this provision because Guaranteed Issue (GI) SAUL policies were not included as part of the COI increase, but were issued on the same policy form which showed GI policyholders' premium class as either Standard Tobacco or Standard Non-Tobacco.  *Id.*  I disagree with Mr. Zail's opinion for the reasons cited below.

47.     ████████████████████████████████████████

█████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████



iv.  **Mr. Zail opines that SLD's COI increases were in violation of the contracts' provisions related to permissible factors that can substantiate a COI increase, with respect to the lapse rates and discount rate reflected.**

48.     Mr. Zail also contends that SLD's COI Adjustment improperly was based upon certain Disallowed Factors. *See* Paragraph 91. Two of these "Disallowed Factors" were, according to Mr. Zail, lapse rates used in the redetermination analysis and the discount rate used to calculate the comparative present values of future profits under the current and baseline scenarios. I address each of these contentions below.

49.     I disagree with Mr. Zail's assessment that the treatment of lapses was a Disallowed Factor. Non-death terminations of a universal life contract are of two types. The first is a voluntary termination of a contract that carries positive cash value and represents a policyholder's right to walk away from the life insurance with their built-up "equity". The second are voluntary or involuntary terminations of a contract due to inadequate premium funding such that the policy's Account Value reaches zero without any secondary death benefit guarantee. The frequency of this second type of termination is completely a function of the premium pattern actions chosen by the policyholder and cannot be predicted by simple a priori assumption as to rates of termination. Mr. Zail asserts that this second type of termination is referred to as a "dynamic lapse". In my experience, I have not heard the term "dynamic lapse" used in this way – rather, "dynamic lapses" are more typically used to convey surrender behavior that reflects policyholder choices influenced by interest rate and competitive crediting rate movements.

50.     █████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

Confidential Pursuant to Protective Order

████████████████████████████████████████████████

████████████████████████████████████

*       *       *

Mr. Zail offers other opinions in his report that I disagree with. Specifically:

54. In regards to policy illustrations, Mr. Zail asserts in his Paragraph 17 that "if mortality experience materially worsens, that must be reflected in the illustration." This is not accurate. If a policy is being sold for new business, the ability of a Disciplined Current Scale (DCS) to pass the Self Support/Lapse Support Tests at the policy form level determines whether the DCS can be certified, and if the Illustrated Scale is not more favorable than the lesser of a certified DCS and the Currently Payable Scale (CPS), this is in compliance with the Illustration Rules. For closed block inforce business, the Lapse Support/Self Support Tests needn't be performed, but the DCS can be certified by various means using Section 3.7 of ASOP 24. Even if mortality experience worsens, it is still possible for an existing DCS to be certified, and therefore, Mr. Zail's assertion is incorrect. Similarly, in Paragraph 18, Mr. Zail states that "The purpose of the Disciplined Current Scale is to ensure that a company is not illustrating COI rates more favorable to the policyholder than what is "reasonably based on actual recent historical experience." The ASOP 24 standard is different – it is that the Illustrated Scale is not more favorable than the least favorable of the Disciplined Current Scale and the Currently Payable Scale (Section 2.6 of ASOP 24).

55. Further, Mr. Zail in Paragraph 18 states that since SLD's Illustration Actuary certified to the DCS in 2011-2015, which reflected pre-COI Increase rates, that confirmed that those COI rates were "reasonably based on actual recent historical experience." This is not necessarily true. For these years cited by Mr. Zail (2011-2015), neither SAUL nor

LDGUL was being sold for new business. Therefore, only inforce illustrations were applicable for these products in these years. Inforce illustrations are not subject to Lapse Support/Self Support testing, and the DCS can be certified using the provisions of Section 3.7 of ASOP 24, including the pledging of surplus. Such use of a Section 3.7 certification of a DCS scale (which SLD explicitly documented for LDGUL in 2009) allows for inforce illustrations of an existing DCS even if experience has deteriorated. Thus, it is not accurate to say (as Mr. Zail does) that if a DCS used pre-COI increase rates, those rates were always "reasonably based on actual recent historical experience". Mr. Zail repeats this inaccuracy in Paragraph 19 of his report ("…it means that experience has deteriorated and the illustrated scale must change to reflect the deteriorated experience.").

56.      Mr. Zail also opines that if anticipated experience factors deviate materially from pricing assumptions, these revised assumptions must be incorporated into the insurer's financial models, resulting in potential gains or losses. I disagree. There are potentially many different financial reporting regimes for U.S. life insurers. These include statutory accounting, GAAP accounting, IFRS accounting, tax accounting, internal financial reporting metrics, and compensation-based financial reporting. All of these various regimes have their own guideline rules and thresholds regarding the incorporation of emerging experience. Further, different insurers interpret and apply such rules differently from other insureds. To imply that all insurers immediately reflect differences in expected assumptions from pricing into all of their financial reporting regimes is inaccurate. Finally, treatment of experience assumption differences in financial reporting are normally related to changes from previous financial reporting to current financial reporting assumptions, not pricing assumptions, since it is often the case that financial reporting assumptions are not the same as pricing assumptions.

57.     Mr. Zail contends that the mortality rates contained in the 1980 CSO Table, rates which represent a maximum ceiling for SLD's current COI rates, contain margins that make them more conservative than realistic mortality tables that might be used in pricing. He further states that these maximum COI rates "do not constitute actuarially justified rates" and "represent an extreme scenario to protect against a worse-case event". In my opinion, Mr. Zail exaggerates the irrelevance of the 1980 CSO maximum COI rates. Although it is accurate that the 1980 CSO rates contain risk margins, those risk margins are relatively small at the younger ages. Further, as stated earlier, COI rates are expected to cover more than pure mortality costs, so that a direct comparison of pricing mortality rates to COI rates (especially maximum COI rates) is an apples-to-oranges comparison. Mr. Zail admits, as he must, that insurers sometimes establish current COI rates equal to these contractual maximum rates. The presence of these maximum contractual rates enables insurers to feel comfortable in setting current COI rates at the competitive levels that they do. Finally, the industry has experienced substantial anti-selection at the older issue/attained ages since the early 2000's, the ages with the greatest mortality margins under the 1980 CSO Table. Thus, from an actuarial perspective, the margins built into the 1980 CSO Table can be justifiable.

58.     ████████████████████████████
████████████████████████████████
████████████████████████████
█████████████████████████████████
███████████████████████████████
██████████████████████
██████████████████████████

59. In Paragraph 27 of Mr. Zail's report, he attempts to support his opinion that non-participating UL contracts are prohibited from recouping past losses by citing one sentence from my expert report in another litigated matter ("It is axiomatic that future COI changes should be based on future anticipated experience, not past experience or events such as receipt of recapture fees.")  Mr. Zail's use of this sentence is inaccurate.  First, this sentence made no reference to the non-participation or the non-participating provision of life insurance policies.  My opinion is that non-participation refers to the fact that policyholders of the given policy form cannot receive "shareholder dividends" based upon the rights of an owner to an insurer's <u>overall</u> past financial performance.  This is an entirely distinct concept from prospective changes to nonguaranteed elements of a specific policy form or subset of policyholders.  Second, my sentence in the previous report is correct – future COI changes <u>should</u> be based upon future anticipated experience.  This, however, does not preclude the expected recovery of future profits based on current assumptions and a COI increase from exceeding the expectations of future profits based upon original assumptions.  These are entirely different concepts.

60. The paragraphs above summarize my opinions as of this date.  I reserve the right to offer additional opinions in the event other data is made available to me or if I am asked to rebut additional opinions from opposing experts.

Signed:

Timothy C. Pfeifer, FSA, MAAA

March 4, 2020

**Exhibit 1**

# Curriculum Vitae

**Timothy C. Pfeifer, F.S.A., M.A.A.A.**
5220 West Meagan Court
Libertyville, Illinois 60048
www.pfeiferadvisory.com

Timothy C. Pfeifer is an independent consultant, and President of Pfeifer Advisory LLC.

Mr. Pfeifer specializes in the areas of product and market development and strategy for life insurance and annuity companies' products. He has focused much of his time in working with clients such as life insurance companies, financial institutions, marketing organizations, and state insurance departments in both traditional and non-traditional product and marketing efforts. In addition, he has a substantial background in product design, pricing, and marketing of whole life, term life, universal life, variable products, and deferred and immediate annuities (group and individual) through all forms of distribution.

## EMPLOYMENT HISTORY

- **Pfeifer Advisory LLC**                                                                **2008 - Current**
  - ✓ Founder and President of consulting firm specializing in life insurance and annuity product and market strategies and innovation

- **Milliman USA**                                                                        **1991 – 2006**
  - ✓ Consulting Actuary specializing in life insurance and annuity and market development
  - ✓ Lead product development actuary within Milliman

- **Tillinghast, a Towers Perrin Company**                                              **1986 – 1991**
  - ✓ Consulting Actuary focusing on life and annuity product and market development
  - ✓ Firm's designated annuity expert

- **Allstate Life Insurance Company**                                                   **1981 – 1986**
  - ✓ Associate Actuary in charge of individual life pricing and product division

# EDUCATION

- University of Pittsburgh, B.S. (Mathematics)  **1981**

# PROFESSIONAL ACTIVITIES AND MEMBERSHIPS

| | |
|---|---|
| Fellow of the Society of Actuaries | **Became Fellow in 1987** |
| Member of the American Academy of Actuaries | **Member Since 1986** |
| Editor of Society of Actuaries' Product Development Section Newsletter | **1988 – 1992** |
| Chairman, Professional Actuarial Specialty Guide Committee on Annuities | **1991** |
| Chairman, Society of Actuaries' Product Development Section | **1995** |
| Member of Editorial Committee for Journal of Actuarial Practice | **Member Since 1995** |
| Member of American Academy of Actuaries Subcommittee on Equity Indexed Annuities | **1997 – 2004** |
| Member of American Academy of Actuaries Subgroup on Variable Annuities with Guaranteed Living Benefits | **1998 - 1999** |
| Elected Member of Society of Actuaries Board of Governors | **1998 - 2001** |
| Elected Member of Board for National Association for Variable Annuities | **2000 - 2002** |
| Member of Editorial Committee for NAVA Outlook | **2002 – 2003** |
| Review Team for ACTEX Book – "The Influential Actuary" | **2008 – 2010** |
| Member of American Academy of Actuaries Working Groups on Contingent Annuities and Annuity Illustrations | **2011 - Present** |
| Member of American Academy of Actuaries Life Practice Committee | **2014 - Present** |
| Member of American Academy of Actuaries Task Force on the Revisions to Actuarial Standard of Practice Number 2 | **2019 - Present** |

Mr. Pfeifer has been a frequent contributor to industry publications such as <u>Best's Review</u>, <u>Product Development News</u>, the <u>National Underwriter</u>, and <u>The Actuary</u>.  He is also a frequent speaker at professional meetings, and has been quoted on life insurance issues by the <u>Wall Street Journal</u>, <u>Bloomberg Markets</u>, the <u>New York Times</u> and CNN Television.  The tables below summarize some of Mr. Pfeifer's history of articles and industry presentations over the past twenty-eight years.

| DATE | PUBLICATIONS | TITLE OF ARTICLE |
|---|---|---|
| 02/88 | The Actuary | Variable Products – Today's Design Trends |
| 02/89 | Best's Review | SSAs:  A Calculated Risk |
| 10/90 | Best's Review | No-Load Products:  The New Breed |
| 12/92 | Product Development News – SOA | Editor's Notes |
| 04/93 | Product Development Bulletin | An Update from Milliman & Robertson, Inc. |
| 06/93 | Society of Actuaries – PDS | Products Under the New Administration |
| 07/93 | Product Development Bulletin | Internal Replacements |
| 11/93 | Product Development Bulletin | Term Insurance and Actuarial Guideline XXX |
| 02/94 | Product Development Bulletin | The SPWL – Phoenix from the Ashes? |
| 05/94 | Product Development Bulletin | Playing the Index Card |
| 12/94 | Product Development Section Newsletter – SOA | Chairman's Corner |
| 02/95 | Product Development Bulletin | Guaranteed Minimum Death Benefits |
| 05/95 | Product Development Section Newsletter – SOA | Chairperson's Corner |
| 10/95 | Product Development Bulletin | Thoughts about Profitability |
| 07/96 | Product Development Bulletin | Putting Some Life into Indexing |
| 01/97 | Product Development News – SOA | Putting Some Life into Indexing |
| 03/98 | National Underwriter | Equity Indexed Payout Annuities Can Do an Excellent Job |
| 05/98 | National Underwriter | MVA Feature Could Boost Sales |
| 07/98 | National Underwriter | The Next Wave for Variable Annuities:  Guaranteed Living Benefits |
| 01/99 | National Underwriter | Fixed Annuities for Lower Interest Rate Environments |
| 03/99 | National Underwriter | Enhanced Dollar Cost Averaging |
| 09/99 | National Underwriter | New Annuity Rider Targets Tax Issues at Owner's Death |
| 11/99 | National Underwriter | Universal Life with Secondary Guarantees in the Wake of XXX |
| 04/00 | National Underwriter | Ways to Manage Variables in Down Markets |
| 07/00 | National Underwriter | A 2000 CSO Could be Friend, or Foe |
| 10/00 | National Underwriter | FA Reinsurance Could Help in Several Areas |
| 04/01 | National Underwriter | VLs Just Might Nudge Out VAs as Variable Design Leader |
| 07/01 | National Underwriter | Competition is Fierce, so Life Policy Pricing is Reaching Rembrandt Levels |
| 08/01 | National Underwriter | Complexity of Riders |
| 12/01 | National Underwriter | What Does it Take to be on the Cutting Edge In Life Insurance? |

## PUBLICATIONS (CONT.)

| DATE | PUBLICATIONS | TITLE OF ARTICLE |
|------|-------------|------------------|
| 01/02 | National Underwriter | A Fertile Environment for MGAs |
| 03/02 | National Underwriter | Enhanced Rate DCA |
| 07/02 | National Underwriter | Silver Linings for the Variable Product Community |
| 09/02 | National Underwriter | Are we Ready for Some New Approaches to Indexing? |
| 09/02 | National Underwriter | Keeping Our Eye on the Ball – The Separate Account Reality |
| 03/03 | National Underwriter | Taking Another Look at A-Shares |
| 07/03 | National Underwriter | Secondary Guarantees in the UL Spotlight |
| 09/03 | National Underwriter | An Update on Our Interesting Annuity Times |
| 02/04 | National Underwriter | Everything Old is New Again |
| 03/04 | National Underwriter | Opening Up Variable Product Design Through Hedging |
| 05/04 | Product Development Bulletin | Recent Developments in the Annuity World |
| 05/04 | National Underwriter | An Update on Riders |
| 09/04 | National Underwriter | The Four Horsemen of the Annuity World |
| 04/05 | National Underwriter | New Required Minimum Distribution Rules Challenge VA Carriers |
| 06/05 | National Underwriter | Term Life – Still at the Party |
| 01/09 | National Underwriter | Variable Annuities – Outlook for 2009 |
| 02/09 | National Underwriter | Life Product Ideas for Difficult Times |
| 04/09 | National Underwriter | Underwritten Lifetime Income Benefits Are Worth Exploring |
| 04/09 | National Underwriter | Finding the Sweet Spot For Guarantees:  100 Basis Points |
| 06/09 | National Underwriter | Spreading Commissions And Bonuses:  A Fixed Annuity Solution? |
| 10/09 | National Underwriter | SPIAs Ready For Kickoff |
| 12/09 | National Underwriter | Term Life Deserves a Makeover |
| 02/10 | National Underwriter | Eight Predictions for Life Insurance |
| 04/10 | National Underwriter | Annuity Products That Will Sell |
| 03/12 | LIMRA Market Facts | The Impact of Low Interest Rates on Products |
| 06/13 | Broker World | Facing the Challenge of Low Interest Rates |
| 04/16 | LIMRA Market Facts | Actuarial Guideline 49 |

| DATE | PRESENTATIONS |
|------|---------------|
| 1990 | Life Product Development Update – Society of Actuaries – 1991 Infoline Seminar |
| 04/91 | Individual Insurance Products:  Bank/Stockbrokers – The Bankers Perspective  Society of Actuaries |
| 04/91 | 1991 Annuity Symposium – Product Development & Pricing of Financial Issues |
| 08/91 | Sales of Interest Sensitive Life and Annuity Products Through Banks & Thrifts |
| 09/91 | 1991 CAPP Annual Meeting – Life Issues - Update on Recent Developments |
| 11/91 | Measuring the Cost of Distribution |
| 1991 | 1991 NALC General Conference – Life Insurance Profitability |
| 1991 | SOA 1991 Annual Meeting – Annuity Product Trends |
| 03/92 | Chicago Actuarial Association – Accelerated Death Benefits Update |
| 04/92 | 1992 – Annuity Symposium – Market Value – Adjusted Annuities |
| 06/92 | Summary of Survey of Market Value Adjusted Annuities |
| 06/92 | Strategic Product Development – Practical Issues in Product Development –  Society of Actuaries |
| 09/92 | 1992 Annuity Symposium – Market Value Adjusted Annuities |
| 10/93 | NAVA Annual Meeting:  Companion Products – Pseudo Variables |
| 10/93 | Life Affiliates Conference – Dynamics of the Annuity Market |
| 10/93 | Variable Annuities Product Trends & Enhancements – Institute for International  Research |
| 01/94 | Banks and Annuities |
| 04/94 | 1994 Annuity Symposium – Variable Annuitization Hurdles & Opportunities |
| 05/94 | Society of Actuaries May San Francisco Meeting – Individual Annuity News  Conference |
| 09/94 | Leveraging Variable Annuity Experience for VUL Product Design – IBC  Presentation |
| 10/94 | Product Development Section Breakfast – Niche Products – Society of  Actuaries |
| 10/94 | SOA Annual Meeting – Summary of Proposed SNFL/Deferred Annuities |
| 11/94 | Variable Products – Design & Pricing – NAILBA XIII Workshop |
| 12/94 | Indexed Annuity Products |
| 04/95 | 1995 Annuity Symposium:  Fixed Annuity Profitability |
| 06/95 | NAVA Conference – Course on the Basics |
| 06/95 | 1995 NFCA Actuarial Spring Meeting – A Profile of the Annuity Market |
| 09/95 | The Proposed Changes to Annuity Non-Forfeiture Laws – Provisions &  Implications for Products – Institute for International Research |
| 09/95 | Financial Reporting for Product Development Actuaries – Society of Actuaries |
| 09/95 | Bank & Insurance General Session – 1995 Life/Pension Tech Session |
| 10/95 | Society of Actuaries Annual Meeting – Model Regulation XXX Annuities –  What's New? |
| 11/95 | Equity Indexed Annuities – A Product Discussion – Global Business Research |
| 02/96 | Financial Incentives, Measures & Goals – Splitting the Pot |
| 03/96 | Columbus Actuarial Club – Equity Index Annuities |
| 05/96 | Equity Index Annuities – Hedging  Investment Strategies |
| 05/96 | 1996 Annuity Symposium – Equity Indexed Annuities & Product Profile |
| 06/96 | NAIC Model Illustration Seminar – Product Development Implications |
| 06/96 | Society of Actuaries Meeting – Equity Indexed Annuities |
| 07/96 | Variable Annuity Conference, International Quality & Productivity Center –  Fresh Ideas in Designing & Developing Variable Annuities |

## PRESENTATIONS (CONT.)

| DATE | PRESENTATIONS |
|---|---|
| 07/96 | Interactive Workshop - Cashing Out:  Income Options from Variable Annuities – Variable Annuitization:  Hurdles & Opportunities – Institute for International Research |
| 09/96 | A Consulting Actuary's Perspective on Competitive Variable Annuity Pricing – MFS Insurance Client Services Meeting |
| 09/96 | Market Value – Adjusted Annuities - Examining Another Hybrid Annuity |
| 10/96 | Annuities in the Crystal Ball – Society of Actuaries Conference |
| 11/96 | Expanding Your Annuity Product Line with Immediate Annuities – Variable Annuitization – Hurdles & Opportunities |
| 12/96 | Product Design Choice and Challenges for Equity Indexed Life Insurance Products |
| 12/96 | Impact of New SEC Reasonableness Standard on Product Development – Focus on Variable Annuities – SAB Seminar |
| 12/96 | Society of Actuaries Seminar – Advanced GAAP – Equity Indexed Products and MVAA's |
| 03/97 | Equity Indexed Products – Annuity & Life Product Overview – Denver, Colorado Presentation |
| 04/97 | 1997 Annuity Symposium:  Investment Consideration for Fixed Annuity Products |
| 04/97 | State of Affairs in the Equity Indexed Product Market – Market Makers VII |
| 05/97 | Equity Indexed Annuities – Hot New Product for the Pension Market |
| 07/97 | Equity Index Product Workshop – Institute for International Research |
| 08/97 | Individual Life Insurance & Annuity Distribution Discussion |
| 09/97 | Equity Index Products – An Update |
| 10/97 | Society of Actuaries Conference - An Immediate Annuity w/Cash-Out Rights? |
| 11/97 | A New World of Pricing Dynamics – Profitability of IVAs |
| 11/97 | Tales from the Front:  Illustration Issues (Part I & II) – New Product Design Development |
| 12/97 | The Term Insurance Market – An Overview |
| 12/97 | Term Life Insurance – Market Profitability and Pricing Strategies |
| 01/98 | Understanding the Impact of New Tax Initiatives on Variable Products |
| 01/98 | Equity Index Annuities:  An Update |
| 03/98 | Allmerica Financial Partners Meeting – Variable Product Market Trends |
| 03/98 | Products – Today's & Tomorrow's Annuities and EIUL |
| 04/98 | LOMA Product Development Management Committee – Immediate Variable Annuities |
| 04/98 | New Generation Variable Annuities – Future Directions |
| 04/98 | The LOMA/LIMRA/SOA Annuity Conference – Annuities as Annuities |
| 04/98 | AAL Capital Management Corp. – Training Session – What Makes VUL Tick? |
| 06/98 | Life/Annuity Tax Updates:  CAA/WAC Joint Meeting |
| 06/98 | Trends in Variable Annuity Product Development – NAVA 1998 Regulatory Affairs Conference |
| 06/98 | 1998 Annuity Symposium – Overview of the Annuity Marketplace |
| 09/98 | 1990 NAVA Annual Meeting – Variable Product Strategic Alliances and Joint Ventures |
| 10/98 | The Variable Product Marketplace – Current Product Activities and Trends |

## PRESENTATIONS (CONT.)

| DATE | PRESENTATIONS |
|------|---------------|
| 12/98 | Implementing Innovative Methods to Lower Term Rates Amidst Increasing Competition |
| 01/99 | Variable Annuities with Guaranteed Living Benefits – Overview/Market Landscape/Marketing |
| 02/99 | Product Portfolio for the Year 2000 and Beyond |
| 03/99 | The Annuity Conference – Guaranteed Minimum Accumulation Benefits |
| 03/99 | The Annuity Conference – Compensation to Promote Conservation:  Financial Perspective |
| 04/99 | Valuation of Life Insurance Policies Model Regulation (XXX) – Initial Sections Of Regulation, Calculation of Minimum Valuation Standard for Policies with Guaranteed Non-level Benefits |
| 04/99 | LIMRA 1999 AORT – Direction of Life and Annuity Product Designs – The Good, the Bad, and the Ugly |
| 09/99 | Annuity Product Development Update |
| 09/99 | Strategies to Conserve and Win New Fixed Annuity Market Share in a Down Market |
| 09/99 | Life Insurance Product Development Update |
| 10/99 | Modern Woodmen of America – General Discussion of Variable Products Mrkt. |
| 11/99 | Products for the New Millennium – The Longer Term Vantage Point |
| 11/99 | ALI-ABA Conference on Life Insurance Policies – Variable Product Marketplace Current Product Activities and Trends |
| 12/99 | Current and Future Issues in Managing a Term Life Portfolio |
| 02/00 | LIMRA Brokerage Conference - Workshop: How Regulation is Impacting Product Development |
| 02/00 | Recent Trends in Life Insurance and Annuity Products and Markets |
| 03/00 | The Annuity Conference – Domestic and International Fixed Annuity Product Innovation |
| 04/00 | Discussion of Insurance Product Trends |
| 04/00 | Conseco Annuity Assurance Company – Profitability Review and Rate Setting Practices for Fixed Deferred Annuities |
| 07/00 | Stone Street Capital/Fitch Rating Agency – Discussion of Mortality Assumptions |
| 09/00 | NAIC Valuation of Life Insurance Policies Model Regulation (XXX) – Impact on Product Development and Design |
| 10/00 | Current Developments in the Individual Annuity Market |
| 11/00 | NAVA Conference on Variable Life – Product Development Landscape and Future Trends |
| 02/01 | Industry Trends in Payout Annuities - Product Design and Pricing |
| 04/01 | U.S. Insurance Market Overview – OSFI Presentation |
| 04/01 | VA Product Design, Innovation and Pricing |
| 05/01 | Current Directions of the VA Industry – Variable Annuities Seminar – NAVA |
| 06/01 | Product Distinctions – United States and Canada – Permanent Life Insurance Products |
| 09/01 | NAVA Annual Meeting – Asset Retention Financial Issues |
| 02/02 | NASD Wharton School Certificate Program – Basic Structure of Variable Annuities – NAVA |

## PRESENTATIONS (CONT.)

| DATE | PRESENTATIONS |
|------|---------------|
| 02/02 | NASD Wharton School Certificate Program – Recent Design Features on VA's NAVA |
| 04/02 | LIMRA/LOMA/SOA Annuity Conference – Update on Variable Annuity Death Benefits |
| 04/02 | Variable Immediate Annuities:  Design Update 2002 |
| 05/02 | Variable and Fixed Immediate (Payout) Annuities:  Design Update 2002 |
| 06/02 | Emerging Mortality – SOA Product Development Actuary Symposium |
| 06/02 | Actuaries' Club of the Southwest – Impact of Regulation on the Product Development of Life Insurance and Annuities |
| 10/02 | VARDS & Milliman at NAVA Conference – Product Proliferation – When is Enough Too Much? |
| 12/02 | Milliman Variable Annuity Seminar – Variable Annuity Product Trends |
| 03/03 | 2003 Milliman USA Life Insurance Conference – Discussion of 2001 CSO Mortality Table |
| 03/03 | 2003 Milliman USA Life Insurance Conference – The Life Market in General |
| 03/03 | NAVA Retirement Income Conference – Discussion of Payout Annuity Financial Elements |
| 03/03 | LIMRA Strategic Marketing Issues Committee Meeting – Update on Life Insurance and Annuity Topics |
| 03/03 | Discussion of Variable Annuity Universal Life and Equity-Indexed Universal Life |
| 04/03 | Innovation and Trends in Variable Annuity Product Development |
| 04/03 | Overview of VLI |
| 06/03 | NAVA Variable Annuity Seminar – New Product Development Trends and Risk Management Initiatives |
| 06/03 | Update on Annuities – Product Development Actuary Symposium (06/13/03) |
| 07/03 | Individual Underwritten Immediate Annuities (IUIA) |
| 09/03 | GE Financial Retirement Income Summit – Recent Innovations Retirement Income Product Design |
| 10/03 | Managing Risk – Part 1 Product Design Strategies – NAVA Annual Meeting |
| 02/04 | VA Product Guarantees – Beyond VAGLB's – NAVA Marketing Conference |
| 02/04 | Fixed Annuity Financial Issues – NAVA Marketing Conference |
| 03/04 | LOMA/LIMRA Life Insurance Conference |
| 05/04 | VARDS/Greenwald Annual Meeting – Current Topics in Deferred and Payout Annuities |
| 06/04 | NAVA Variable Annuities Press Seminar – New Product Development Trends And Risk Management Initiatives |
| 10/04 | ACLI Annual Conference – Annuitization:  The Key to Retirement Security |
| 10/04 | The Future of Annuity Products |
| 11/04 | Update on Annuity Products – Southeastern Actuaries Conference |
| 04/05 | Annuity Conference – Update on Variable Annuity Guaranteed Living Benefits (VAGLB's) |
| 04/05 | LIMRA/LOMA/SOA/ACLI – Life Insurance Update |
| 04/05 | NAFA  - Focus on the Future – The Changing Landscape for SPIA's:  Payout Annuities Take on More Roles |

## PRESENTATIONS (CONT.)

| DATE | PRESENTATIONS |
|---|---|
| 04/05 | LIMRA Distribution Leaders Round Table |
| 06/05 | NAVA Press Seminar – Product Trends in Today's Annuity Market |
| 06/05 | NAVA Compliance and Regulatory Affairs Conference – Variable Annuity Product Developments |
| 11/06 | ALI-ABA Annual Meeting – Future Annuity Perspectives |
| 02/09 | BRAMCO Annuity Boot Camp – What's New With Fixed Annuities? |
| 02/09 | NAVA Marketing Conference – Variable Annuities – A Look Back and Forward |
| 02/09 | LIMRA Distribution Conference – Perception versus Reality |
| 03/09 | LOMA/LIMRA Life Insurance Conference – Life Product Trends |
| 10/09 | SOA Annual Conference – Life Insurance Product Development Trends and Issues |
| 11/09 | Estate Planning Council Meeting – State of the Union for Life Insurers |
| 03/10 | SOA ReFocus Conference – Crafting Successful Product Portfolios for 2010 and Beyond |
| 04/10 | LIMRA Retirement Income Conference – The Ideal Annuity Suite for Today and Tomorrow |
| 04/10 | LIMRA Life Insurance Conference – The Next Five Years: Protection-Focused Life Insurance |
| 04/11 | LIMRA Life Insurance Conference – Simplified Issue Life Insurance |
| 04/11 | LIMRA Life Insurance Conference – Whole Life |
| 06/11 | LIMRA – DLRT Webcast (Internet) – Future Direction of Life Insurance, Annuities, and Investment Products |
| 06/11 | Retirement Management Executive Forum - Retirement Income Products, Services, and Solutions – Looking Ahead at What's on the Horizon |
| 10/11 | LIMRA Annual Meeting – Interest Rate Limbo: Strategies for Managing Falling Interest Rates |
| 02/12 | LIMRA DLRT – Future of Life and Annuity Product Development |
| 04/12 | LOMA/LIMRA/SOA Life Insurance Conference – Expanding Universe of Universal Life Products |
| 05/12 | SOA Life and Annuity Symposium – Life and Annuity Product Development Strategies in the Wake of Low Interest Rates |
| 05/12 | SOA Life and Annuity Symposium – Annuity Market Trends |
| 10/12 | SOA Annual Meeting – UL Deep Dive II – Accumulation Market |
| 04/13 | LIMRA Life Insurance Conference – Brave New World of Life Products |
| 04/14 | LIMRA Life Insurance Conference – Implications of Low Interest Rates on Products |
| 05/14 | SOA Life and Annuity Product Development Symposium – Life Insurance Products – Brave New World |
| 10/14 | SOA Annual Meeting – Annuity Hot Topics |
| 11/14 | ALI CLE Conference – Cutting Edge Insurance Products |
| 05/15 | SOA Life and Annuity Symposium – Annuity Hot Topics |
| 10/15 | SOA Annual Meeting – Indexed Products Deep Dive |
| 05/16 | SOA Life and Annuity Symposium – Life Product Update |
| 10/16 | SOA Annual Meeting – Life Product Update |
| 11/16 | ALI CLE Conference – Insurance Products' Trends |
| 04/17 | LIMRA Retirement Income Conference – Annuity Update |
| 11/17 | ALI CLE Conference – Life Insurance Products – High Level Reviews |
| 04/18 | LIMRA Life Insurance Conference – Life Insurance Update |
| 04/18 | LIMRA Life Insurance Conference – View from the Other Side |

## PRESENTATIONS (CONT.)

| DATE | PRESENTATIONS |
|------|---------------|
| 04/19 | LIMRA Retirement Income Conference – Mortality Drivers |
| 06/19 | Retirement Management Executive Forum – Meeting Retirees' Income Needs with Insurance Products |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Exhibit 2**

# PFEIFER PRIOR FOUR-YEAR TESTIMONY SUMMARY

| NAME OF CASE | DATE | JURISDICTION | CASE NUMBER | NATURE OF CASE |
|---|---|---|---|---|
| Hanks, et al v. Lincoln Life and Annuity Company of New York; VOYA Retirement Insurance and Annuity Company | 06/2018 | U.S. District Court, Southern District of New York | 16-CV-6399 | Cost of Insurance Increases |
| Brach Family Foundation, et al v. AXA Equitable Life Insurance Company (plus individual actions) | 12/2019 | U.S. District Court, Southern District of New York | 16-CV-740 17-CV-4767 17-CV-4803 17-CV-9355 18-CV-2111 18-CV-10730 | Cost of Insurance Increases |

**Exhibit 3**

# MATERIALS CONSIDERED

| | **BATES RANGE OR DESCRIPTION** |
|---|---|
| | SLD0000338 – SLD0000341 |
| | SLD0000338 – SLD0000341 |
| | SLD0000868 – SLD0000869 |
| | SLD0000870 – SLD0000911 |
| | SLD0000940 |
| | SLD0000943 |
| | SLD0000946 |
| | SLD0000947 |
| | SLD0005714 – SLD0005737 |
| | SLD0005744 – SLD0005778 |
| | SLD0005779 – SLD0005820 |
| | SLD0006122 – SLD0006155 |
| | SLD0008825 – SLD0000826 |
| | SLD0020400 – SLD0020407 |
| | SLD0024494 – SLD0024497 |
| | SLD0024501 – SLD0024529 |
| | SLD0024501 – SLD0024529 |
| | SLD0024659 – SLD0024663 |
| | SLD0025438 |
| | SLD0025618 – SLD0025638 |
| | SLD0033985 – SLD0034026 |
| | SLD0034029 – SLD0034031 |
| | SLD0034052 – SLD0034067 |
| | SLD0034068 – SLD0034072 |
| | SLD0034082 – SLD0034084 |
| | SLD0034085 – SLD0034089 |
| | SLD0034487 – SLD0034519 |
| | SLD0034593 – SLD0034600 |
| | SLD0034900 – SLD0034936 |

| |
|---|
| SLD0036943 |
| SLD0037322 – SLD0037336 |
| SLD0037741 – SLD0037774 |
| SLD0038326–SLD0038335 |
| SLD0038333 – SLD0038335 |
| SLD0041516 – SLD0041535 |
| SLD0044235 – SLD0044250 |
| SLD0044276 – SLD0044344 |
| SLD0044345 – SLD0044352 |
| SLD0044353 – SLD0044514 |
| SLD0046149 – SLD0046204 |
| SLD0046244 – SLD0046252 |
| SLD0046706 – SLD0046713 |
| SLD0047523 – SLD0047531 |
| SLD0047580 – SLD0047582 |
| SLD0047644 |
| SLD0047645 |
| SLD0047646 – SLD007647 |
| SLD0047710 – SLD0047723 |
| SLD0047724 |
| SLD0047731 |
| SLD0047807 – SLD0047817 |
| SLD0048027 – SLD0048028 |
| SLD0050733 – SLD0050740 |
| SLD0050854 – SLD0050865 |
| SLD0051154 – SLD0051157 |
| SLD0052416 – SLD0052417 |
| SLD0053301 – SLD0053302 |
| SLD0055225 – SLD0055237 |
| SLD0059024–SLD0059030 |
| SLD0059263 |
| SLD0059264 |
| Complaint |
| SLD Responses to Plaintiff's Requests for Admission |
| Expert Report of Howard Zail, FSA, FFA, MAAA, In Support of Plaintiff's Motion for Class Certification |

| | Expert Report of Howard Zail, FSA, FFA, MAAA |
|---|---|
| | Brantzeg 30(b)(6) Deposition Transcript |
| | Brantzeg Individual Deposition Transcript |
| | Carney Deposition Transcript |
| | Fallon Deposition Transcript |
| | King Deposition Transcript |